UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BERNARDO BETTINELLI and<br>CAROL G. BETTINELLI,<br>and all others similarly situated<br><br>    Plaintiffs<br><br>v.<br><br>WELLS FARGO<br>    HOME MORTGAGE, INC.<br><br>    Defendant. | C.A. NO. 09-11079-MLW<br><br>**FIRST AMENDED<br>CLASS ACTION<br>COMPLAINT** |

## I. INTRODUCTION

1. Plaintiffs, Bernardo and Carol G. Bettinelli ("the Bettinellis") are Massachusetts homeowners with little expertise in mortgage lending. Ms. Bettinelli has owned a home in Stoughton for more than 25 years. That home is now, due to the unfair, deceptive and unconscionable conduct of the Defendant, Wells Fargo Home Mortgage, Inc. ("Wells Fargo") and its predecessor in interest World Savings Bank, FSB ("World Savings"), at risk of default and foreclosure.

2. On July 10, 2002 and June 24, 2005, the Bettinellis refinanced their existing home mortgage with new mortgages from World Savings. The Bettinellis' loans are Payment Option Arms (POAs). Other members of the class the Bettinellis will seek to represent are Massachusetts residents who also received POAs from World Savings. Wells Fargo is the successor in interest to World Savings, by merger.

3. The POAs were intentionally designed to result in negative amortization and obligations to pay compound interest. The POAs were also designed to make fully amortizing payments unaffordable to the Bettinellis and to other consumers. The Bettinellis are therefore slaves to Wells Fargo's willingness to temporarily or permanently restructure their loans.

4. The Bettinellis seek relief from Wells Fargo including damages, restitution and reformation of contract on their own behalf and on behalf of a class of other similarly situated Massachusetts homeowners.

## II. JURISDICTION AND VENUE

5. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this matter is brought as a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which any member of the class of plaintiffs is a citizen of a State different from any defendant.

6. Venue lies in this District because the Plaintiffs reside here.

## III. PARTIES

7. The Plaintiffs are Massachusetts residents who reside at 78 Pratts Court, Stoughton, MA 02072.

8. Defendant, Wells Fargo Home Mortgage, Inc., does business in Massachusetts and is headquartered at 7000 Vista Dr., West Des Moines, IA 50266-9310. Wells Fargo Home Mortgage is a successor in interest to World Savings Bank, FSB, by merger.

IV. **FACTUAL ALLEGATIONS**

**A. Payment Option ARMs**

9. The Bettinellis loans from World Savings were Payment Option Arms (POAs).

10. POAs have been aggressively pressed on unsophisticated borrowers as a way to borrow more money with temporarily and artificially low monthly payments. Nearly $750 billion in these loans was issued between 2004 and 2007. Ruth Simon, Option Arms See Rising Defaults, Wall Street Journal, A1, January 30, 2009.

11. POAs are a substantial cause of defaults and foreclosures. *Id*; Susan E. Barnes, Patrice Jordan, Victoria Wagner & David Wyss, Standard & Poor's, Standard & Poor's Weighs in on the U.S. Subprime Mortgage Market 12 (Apr. 5, 2007) (increase in early payment defaults within four months of origination), available at www2.standardandpoors.com/spf/pdf/media/TranscriptSubprime_040507.pdf.

12. As of December 2008, 28% of option ARMs were delinquent or in foreclosure, according to LPS Applied Analytics, a data firm that analyzes mortgage performance. Nearly 61% of POAs originated in 2007 will eventually default, according to a recent analysis by Goldman Sachs. Goldman further estimates that more than half of all POAs originated in any year will default. Ruth Simon, Option Arms See Rising Defaults, Wall Street Journal, A1 January 30, 2009.

13. In a POA loan, a borrower has, in theory, a choice of three payments: a minimum non-amortizing payment; an interest only payment that covers the actual interest accruing; and a fully amortizing payment. In practice, because the loans are sold to borrowers of limited means such as the Plaintiffs, three-quarters of all borrowers pay

3

only the minimum payment, thus generating negative amortization. Indeed, these borrowers can afford to make only the minimum monthly payment – an amount that will never pay off the loan. Joint Ctr. for Hous. Studies, State of the Nation's Housing 2007, at p. 17, available at http://www.jchs.harvard.edu/publications/markets/son2007/son2007.pdf. *See also* Economist.com, Ticking time bomb (Aug. 14, 2008) (loans recast after a set period), available at http://www.economist.com/finance/displaystory.cfm?story_id=11921871; Les Christie, CNN Money.com, Pick-a-payment loans turn poisonous (Sep. 3, 2008) (more than 65% of option ARM borrowers make only minimum payments), available at http://money.cnn.com/2008/09/02/real_estate/pick_a_poison/index.htm.

      14. Once POA principal caps are reached (typically at 110% to 125% of principal), the borrower must pay an amount sufficient to pay off the loan in the remaining time of the loan term. This means that if the original loan term was thirty years, and the remaining term is now twenty-five years, the aggregate principal plus accrued (unpaid) interest will be amortized over the remaining twenty-five years of the loan. See e.g. USA Today, 'Pick-a-payment' Mortgage Risks are High, July 18, 2005 available at http://www.usatoday.com/money/perfi/columnist/block/2005-07-18-pick-a-payment_x.htm.

      15. The combination of negative amortization and forced payment restructuring including interest coming due on unpaid interest results in significant "payment shock", significantly higher payment obligations thirty to sixty months after loan consummation.

16.     POA loans are complex. They involve concepts that are unfamiliar and confusing to most, even fairly sophisticated, homeowners. See e.g. Consumer Fed'n. of America press release, Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages 3, July 26, 2004, (consumers cannot calculate the increase in the payment in an adjustable rate mortgage and minimize the interest rate risk by understating the increase in the payment) available at http://www.consumerfederation.org/releases.cfm#Consumer%20Literacy; Business Week, Nightmare Mortgages (Sep. 11, 2006) (option ARM "might be the riskiest and most complicated home loan product ever created") available at http://www.businessweek.com/magazine/content/06_37/b4000001.htm.

17.     Lenders, including World Savings, made these loans knowing that borrowers cannot afford the fully indexed rate or the anticipated fully amortizing payments. Subprime Mortgage Market Turmoil: Examining the Role of Securitization, Hearings Before the S. Comm. On Banking, Hous., & Urban Dev., 110th Cong. (2007) (statement of Sandor Samuels, Executive Managing Dir., Countrywide Fin. Corp.) (60% of borrowers from Countrywide could not qualify at the fully indexed rate). Steven Sloan & Joe Adler, How Freddie Cutbacks in Hybrids May Reverberate, Am. Banker, Feb. 28, 2007 (quoting Wright Andrews, a lobbyist for nonbank lending institutions, as saying that most subprime borrowers cannot afford the fully indexed rate and requiring underwriting to the fully indexed rate would prevent adjustable rate mortgages from being made).

18.     On information and belief, hundreds of Massachusetts homeowners have POAs originated by World Savings and now owned by Wells Fargo that will ultimately require payments that those homeowners cannot afford. Many of those borrowers have

been subjected to various loan modification agreements that require payment of interest on interest together with substantial costs and fees to avoid foreclosure.

**B. The Mortgage Transactions at Issue**

19. The Bettinellis are 49 and 59 years old respectively. Ms. Bettinelli purchased the home in Stoughton approximately 25 years ago.

20. Mr. Bettinelli is a trucker and Ms. Bettinelli runs a state-approved day-care center in the basement of their home. Neither Mr. nor Ms. Bettinelli has a college degree.

21. They initially obtained a home mortgage from World Savings on July 10, 2002 and refinanced with World Savings on June 24, 2005.

22. A true and correct copy of the loan note in the 2002 transaction is attached as Exhibit 1.

23. A true and correct copy of the loan note in the 2005 transaction is attached as Exhibit 2.

24. The adjustable rate note in the 2005 transaction has the following deceptive features: 1) a statement that the interest rate on the loan would be at a "yearly rate" of 5.370% when such rate would only be in effect for less than two months; and 2) a statement that biweekly payments would be $513.98, when those payments would lead to negative amortization, thereby triggering a complicated annual payment change regime that could only lead to substantial and unmanageable upward-only payment changes.

25. Based on information in its possession, World Savings knew or should have known that the Bettinellis could not afford payments that would amortize the loan

6

and that the loan would ultimately either require further refinancing, forced sale of the property or default.

26.  The interest rate in the 2005 transaction is based on a margin and an index. The margin is 2.850% added to the "Current Index." Use of the term "Current Index" is deceptive in that the Index, as described below, was not fixed by then "current" market conditions and remained, at all times relevant to this demand, entirely within the control of the World Savings and/or its successors in interest under the loan note.

27.  The Index described in the note is:

> the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "costs of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

28.  In addition, the Index could be changed at will by World Savings and/or by its successors pursuant to the following provision of the note:

> The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of an alternative index shall be at the lender's sole discretion. The

alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

29. World Savings knew or should have known that the note language describing the Index would be impenetrable to its average customer. Moreover, it knew that borrowers would not be able to obtain information to evaluate the index in order to compare a World Savings Loan to other available loan products. Nor could customers, in light of the possibility of a change to an alternative index, rely on available information about the index.

30. Thus, the Bettinellis and other World Savings customers were deprived of an opportunity to understand the consequences of a World Savings Loan, could not comparison shop and could not evaluate the likely cost of future mortgage payments under the loan as designed.

31. The note language was designed to obscure the actual rate that would be applied to the transaction so that typical borrowers, such as the Bettinellis, would be forced to focus on the temporary interest rate of 5.370% that is stated in the note.

32. The note is deceptive and intended to deceive about the interest rate applicable to the transaction.

33. In addition, the note is unfair in that World Savings retained discretion to change the Index to its advantage at any time. Wells Fargo has exercised that discretion.

34. The note is unfair in the circumstances because it binds the Bettinellis to a loan structure they could not understand.

35. The payment change provisions of the note are complex and interrelated and provide as follows:

>Subject to Sections 3(F) and 3(G), on the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and Interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.
>
>From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.
>
>My unpaid principal balance can never exceed 125% * * of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.
>
>Beginning with the 10TH Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

36.  World Savings knew or should have known that this language concerning payments would be impenetrable to its average customer. The note language was designed to obscure the actual payments that would be due to amortize the loan in the transaction so that typical borrowers, such as the Bettinellis, would be forced to focus on the initial biweekly payment of $513.98, payments that would be in effect for just one

9

year (and which would result in negative amortization requiring an upward payment adjustment).

37. The note calls for and the Bettinellis and class members have incurred and/or paid illegal compound interest.

38. The note is deceptive and intended to deceive with respect to the amount of monthly payments.

39. The note is also unfair because it deprives typical borrowers, such as the Bettinellis, of information necessary to evaluate their long-term ability to amortize the debt.

40. The deceptiveness of the loan documentation was made worse by a series of communications at or after the closing that stated that the $513.98 biweekly payments constituted "interest only" payments although World Saving knew or should have known that those payment would not actually cover the amount of biweekly interest than due, resulting in negative amortization and required payment increases over the term of the mortgage.

41. Wells Fargo, as successor in interest to World Savings, has continued this deception in its communications with the Bettinellis by continuing to refer to non-amortizing payments as "interest only," thus implying that they would cover all of the interest then due.

42. Over time, the Bettinellis believed based on correspondence from World Savings and Wells Fargo, as its successor, that they were making payments that would cover the entire amount of interest as it came due. Nevertheless, interest has accumulated, according to Wells Fargo that would require payments of more than $1,000

10

per bi-weekly payment period to amortize the loan, payments that are beyond the Bettinellis' ability to pay.

43. Other class members have been similarly impacted by the loan structure and by deceptive correspondence concerning payments necessary to cover interest as it accrues.

44. Both World Savings and Wells Fargo, as its successor, at all time relevant to the demand, had information in its possession that the Bettinellis could not ultimately afford payments that would amortize the loan.

45. World Savings and Wells Fargo, as its successor, knew that negative amortization would increase the loan balance and make payments ultimately unaffordable leading to pressure on the Bettinellis to refinance, default or put their home on the market for a forced sale.

46. World Savings and Wells Fargo, as its successor, took advantage of the loan structure to demand increasingly expensive payments. Rather than work with the Bettinellis to provide relief that would make the loan permanently affordable, World Savings and Wells Fargo have offered only to restructure the loan in a manner that would capitalize the interest balance, therefore leading to payment of additional compounded interest and fees on amounts capitalized.

47. It is unfair under Massachusetts law for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.

48. World Savings owed the Bettinellis and other similarly situated borrowers a duty of care to underwrite the loan by considering whether the loan could eventually be paid off by amortizing payments.

49. Rather than underwrite the loan properly, World Savings considered only whether the Bettinellis and other similarly situated borrowers could make the initial monthly payment.

50. World Savings offered commissions to its loan officers and underwriters based on the volume of loans approved by those officers and underwriters, thereby incentivizing approval of loans that World Savings knew or should have known could not be repaid.

51. World Savings knew or should have known that its POA loans would almost always result in default and foreclosure unless the borrower refinanced or sold the property.

52. The unfairness and deception associated with the Bettinellis' transaction is further illustrated by the fact that the transaction was itself a refinancing of the 2002 World Savings loan to the Bettinellis on similarly unfair and deceptive terms. Because the earlier loan had many of the same features as the 2005 transaction, it left the Bettinellis with few options other than to refinance as payments increased.

53. Although the Bettinellis did not understand at the time, they were deceived by the confusing loan structure into believing that the 2005 refinance was to their benefit and would lead to affordable payments. On information and belief, the refinance of the 2002 transaction by World Savings was intended to and did capitalize interest then due as

well as fees financed in the prior loan, thus leading to payments of compound interest and further profits to World Savings and to Wells Fargo, as its successor.

54. Wells Fargo continues to attempt to reap benefits from the World Savings designed unfair loan structure based on negative amortization and increased payments of interest.

55. The Bettinellis have sought loan modification relief from Wells Fargo only to find that Wells Fargo has sought to preserve the structural advantages of the loan to them and the disadvantages to the Bettinellis.

56. Among other things, each offer of available loan modification relief has included capitalization of accumulated interest, thus leading to potentially expensive payments of compound interest.

57. The Bettinellis believe that Wells Fargo has and intends to continue to take advantage of the unfairness and deceptiveness of the original terms of the transaction to obtain further excessive payments in the transaction.

58. On June 23, 2009, Plaintiffs sent a demand for relief to Wells Fargo pursuant to G.L. c. 93A, § 9.

### V. CLASS ALLEGATIONS

59. Plaintiffs bring this action on behalf of themselves and a class of all other persons similarly situated, pursuant to Mass. R. Civ. P. 23.

60. The Class is represented by the Bettinellis and consists of all Massachusetts residents who entered into a Payment Option Arm mortgage loan with Wells Fargo on or after four years prior to the date of this Complaint.

61. There are questions of law and fact common to all members of the class, which questions predominate over any question affecting only individual class members. The principal common issues are:

   a. whether the structure of the POA transactions at issue is unfair and violative of G.L. 93A, § 2 and/or unconscionable;

   b. whether the loan notes in the POA transactions at issue are unfair and/or deceptive within the meaning of G.L. 93A, § 2 and/or unconscionable;

   c. whether the description of payment options in the POA transactions at issue are unfair and/or deceptive within the meaning of G.L. 93A, § 2 and/or unconscionable;

   d. whether the loan contracts at issue contain illegal and unenforceable terms;

   e. whether use of POAs was designed to result in profitable fees and costs and/or additional payments of interest on interest through repayment plans and refinancing arrangements resulting from duress; and

   f. whether World Savings was negligent in its underwriting practices for POAs.

62. The only individual questions concern the identification of members of each class and the computation of relief to be afforded each class member and can be determined by a ministerial examination of the relevant account records. Notice can be provided to the class by various means of communication, as identified in the Defendant's computerized databases of customers.

63. Plaintiffs' claims are typical of the claims of class members. All are based on the same legal and remedial theories.

64. Plaintiffs will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to represent. Plaintiffs have retained counsel experienced in handling class action suits involving unfair business practices and consumer law. Neither the named Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this action.

65. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

   a. the losses suffered by the class members are such that prosecution of individual actions is impractical or economically unfeasible;

   b. by contrast, the illegal profits obtained by the Defendant as a result of its unlawful practices are substantial;

   c. the form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

   d. in the absence of the class action device, the Plaintiffs and Class Members would be left without a remedy for the wrongful acts alleged, and the Defendant would be unjustly enriched;

   e. the prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards

15

    of conduct for the Defendant, making concentration of the litigation concerning this matter in this Court desirable;

   f. the claims of the representative Plaintiff is typical of the claims of the class; and

   g. no unusual difficulties are likely to be encountered in the management of this action as a class action.

  66. The class is so numerous as to make it impracticable to join all members of the class. Based upon the investigation of counsel, the number of class members in the class is estimated to be in excess of 300 persons.

**VI. CLAIMS**

**COUNT I: UNFAIRNESS AND DECEPTION (M.G.L. c. 93A, § 9)**

  67. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

  68. Wells Fargo, by its own conduct, and as successor by merger to World Savings is responsible for violations of G.L. c. 93A § 2 with respect to each Plaintiff and each class member.

  69. In their transactions with Plaintiffs and each member of the class, Wells Fargo and/or World Savings used or employed methods, acts and practices that were unfair, deceptive, and/or unconscionable as described herein.

  70. That actions at issue were in the conduct of trade or commerce in the Commonwealth within the meaning of G. L. c. 93A, § 2.

  71. The actions at issue were willful or knowing within the meaning of M.G.L. c. 93A, §9.

72. The Plaintiffs and each member of the class were injured and suffered damages by virtue of the conduct at issue.

### COUNT II: NEGLIGENT OR IMPROPER UNDERWRITING

73. World Savings owed the Plaintiffs and other similarly situated borrowers a duty of care to underwrite the loan by considering whether the loan could be paid off by amortized payments.

74. The underwriting of the loan was negligent and/or grossly negligent and resulted in damage to the Bettinellis and similarly situated homeowners.

75. The underwriting of the loan was in violation of the legal standard required by 209 C.M.R. § 53.05.

76. The underwriting was the actual and proximate cause of damage to the Bettinellis and other POA borrowers because the underwriting lead to loans that could only result in compounded fees, hidden profits and default and/or foreclosure.

77. The Bettinellis and each class member have suffered damage.

78. The damage resulting from World Savings' negligence was foreseeable in light of information obtained by World Savings for its underwriting process including, without limitation, credit reports, property appraisals, income information and information about other debts.

79. Wells Fargo is legally responsible for World Savings' negligence.

### COUNT III: UNCONSCIONABILITY AND/OR ILLEGALITY

80. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

81. The terms of the loan note described herein are unconscionable and unenforceable.

82. Said contract terms are void or voidable as a matter of public policy.

83. The Plaintiffs and each member of the class are entitled to relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of compound interest payments.

### COUNT IV: ILLEGAL CONTRACT TERMS

84. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

85. World Savings engaged in a pattern or practice of inducing the Plaintiffs to enter contracts with illegal terms which go to the heart of the contract including, without limitation:

    a. The right to change interest rates by changing the relevant indices at its sole discretion; and

    b. The right to collect interest on interest in a manner violative of longstanding Massachusetts law.

86. The Plaintiffs and each member of the class are entitled to relief from illegal contract terms, including damages, reformation of debt, cancellation and/or restitution.

### COUNT V: UNJUST ENRICHMENT

87. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

88. The Defendant has been unjustly enriched at the expense of each plaintiff and each class member.

89. The plaintiffs and each class member are entitled to equitable remedies for unjust enrichment including, without limitation, restitution and reformation of contract.

## COUNT VI: DECLARATORY JUDGMENT

90. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

91. The actions at issue have caused the Plaintiffs and class members actual prejudice. They ask this court to enter declaratory relief concerning the propriety of the challenged practices.

## REQUESTED RELIEF

**WHEREFORE**, the Plaintiffs request that the Court grant:

a. An order certifying the class as aforesaid;

b. Actual, statutory and multiple damages for themselves and the class;

c. An injunction to prevent foreclosures against the Plaintiffs and the class until the claims in this Complaint are resolved;

d. Injunctive relief and other remedies for illegal contract terms;

e. Other equitable relief as permitted by law;

f. Attorneys' fees and costs as permitted by applicable law;

g. Damages and equitable relief for unconscionable loan terms; and

h. Any other relief the court deems proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
BERNARDO AND CAROL G. BETTINELLI

By their attorneys,

/s/ Gary Klein
Gary Klein BBO # 560769
Shennan Kavanagh # 655174
Kevin Costello # 669100
Roddy Klein & Ryan
727 Atlantic Ave., 2nd floor
Boston, MA  02111
Tel. 617-357-5500 x 15
Fax. 617-357-5030
klein@roddykleinryan.com
*Attorneys for the Plaintiff*

Dated: June 24, 2009