# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BERNARDO BETTINELLI  and )
CAROL G. BETTINELLI, MARIO O. )
PIEDRA and MARIA PIEDRA, )
DELMY BARRERA )
all others similarly situated, )
                     Plaintiffs, )

v. )         **No. 09-11079-MLW**
                      )

WORLD SAVINGS BANK, FSB, )   **LEAVE TO FILE OVERSIZED**
N/K/A WACHOVIA MORTGAGE FSB )   **MEMORANDUM GRANTED**
             Defendant. )   **ON AUGUST 27, 2010**

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
## THE SECOND AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION

This action arises out of home mortgage loans that Plaintiffs Bernardo and Carol Bettinelli (the "Bettinellis"), Mario and Maria Piedra (the "Piedras"), and Delmy Barrera ("Barrera") entered into with World Savings Bank, FSB (now known as Wachovia Mortgage, FSB ("Wachovia")) between July 10, 2002 and March 26, 2007. The essence of Plaintiffs' claims is that the loans were unlawful in that they permitted Plaintiffs to make payments that could result in negative amortization, that certain loan terms were difficult to understand, and that Wachovia knew that Plaintiffs could not afford payments that would amortize their loans.

All of the claims in the Second Amended Complaint should be dismissed for two independent reasons. First, the claims should be dismissed because they are all preempted by federal law. At the time of the loans at issue, Wachovia was a federal savings bank, whose lending activities are governed by the Home Owners Loan Act ("HOLA"), and are exclusively regulated by the Office of Thrift Supervision ("OTS"). Pursuant to powers delegated to it by Congress in HOLA, OTS has enacted a regulation that preempts claims that seek to use state laws to regulate lending activities, and instead makes clear that a federal savings bank's lending activities are solely subject to a uniform national regulatory scheme. *See* 12 C.F.R. § 560.2. Claims asserted by borrowers that seek to use state law standards to challenge the lending activities—including underwriting standards, the "terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate," "disclosure and advertising," and the "servicing of mortgages"—of a federal savings bank are all preempted by the OTS regulations. *Id.* at §§ 560.2(b), 560.101. Because all of the claims asserted here relate to one or more of these activities, they are preempted by federal law.

Second, all of Plaintiffs' claims should also be dismissed because they do not state any claim under state law. Notably, Plaintiffs repeatedly reference *Commonwealth v. Fremont*

*Investment & Loan*, 452 Mass. 733 (2008) to support their claims. But *Fremont* related to a very specific kind of mortgage loan, with four specific criteria not present in any of Plaintiffs' loans; the opinion was narrow on its face and has been narrowly interpreted. There is no basis for using *Fremont* as a sweeping tool to render "unfair" every mortgage loan that a borrower does not wish to repay.

Finally, even if this Court does not dismiss this case in its entirety, it should at least dismiss the numerous claims that are barred by the statutes of limitations. As to the Bettinellis, all of their claims are barred if measured, as is appropriate, from the date that the Bettinellis first executed their mortgage. And even if measured from the Bettinellis' 2005 refinancing, their claims are still time-barred because (a) those claims that sound in tort are barred by the applicable three-year limitation period and (b) their consumer fraud act claim is barred because the Bettinellis failed to abide by the thirty-day demand letter prerequisite. As to the Piedras and Ms. Barrera, having brought suit over three years after refinancing their mortgages, all of their claims sounding in tort are time-barred.

## FACTUAL BACKGROUND

### A.    The Parties.

The Bettinellis are Massachusetts residents who reside in Stoughton. (2d Am. Compl. ¶ 9.) The Piedras are Massachusetts residents who reside in Norfolk. (*Id.* ¶ 10). Delmy Barrera is a Massachusetts resident who resides in Roslindale. (*Id.* ¶ 11). Wachovia Mortgage, FSB is a successor in interest to World Savings Bank, FSB ("World Savings"), by merger.

### B.    Plaintiffs' Loans.

The Bettinellis entered into a home mortgage loan with World Savings on July 10, 2002 (the "Bettinelli 2002 Mortgage"). (2d Am. Compl., Exh. 3.) As the Note indicates, the loan was an adjustable-rate mortgage for $221,250, with an initial interest rate of 5.773% that would be

adjusted weekly in accordance with a market-based index. (*Id.*) The Note included provisions for unpaid interest to be added to the principal loan balance, and for such principal balance to be capped at 125% of the original amount borrowed. (*Id.*)

In June of 2005, the Bettinellis refinanced their mortgage through World Savings. (2d Am. Compl., Exh. 4.) This loan (the "Bettinelli 2005 Mortgage") closed on June 24, 2005. (*Id.*) The Bettinelli 2005 Mortgage was for $280,000, an amount which both paid off the 2002 Mortgage and provided the Bettinellis with $38,139 in cash. (Declaration of Michael Goldberg, Exh. 3, filed simultaneously with this Memorandum.)[1] As the Note indicates, the loan was an adjustable-rate mortgage with an initial interest rate of 5.370% that would be adjusted weekly in accordance with a market-based index. (*Id.*) The Note included provisions for unpaid interest to be added to the principal loan balance, and for such principal balance to be capped at 125% of the original amount borrowed. (*Id.*)

The Piedras refinanced a previous mortgage on their home through World Savings on March 26, 2007 (the "Piedra Mortgage"). (2d Am. Compl. ¶ 67.) The loan was for $637,000, an amount which both paid off the Piedras' prior mortgage and provided the Piedras with $3,882 in cash. (Declaration of Michael Goldber, Exh. 4.) As indicated in the Note, the loan was an adjustable rate mortgage with an initial interest rate of 7.600% that would be adjusted weekly in accordance with a market-based index. (2d Am. Compl., Exh. 5.) The Note also included provisions for unpaid interest to be added to the principal loan balance, and for such principal balance to be capped at 125% of the original amount borrowed. (*Id.*)

---

[1] This Court can consider the HUD-1 disclosure statement from Plaintiffs' loans because it is central to Plaintiffs' claims. *See Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When … a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss.").

Delmy Barrera refinanced a previous mortgage on her home through World Savings on November 18, 2005 (the "Barrera Mortgage"). (2d Am. Compl., Exh. 6.) The loan was for $399,000, an amount which both paid off the prior mortgage and provided Ms. Barrera with $43,901 in cash. (Declaration of Michael Goldberg, Exh. 5.) As indicated in the Note, the loan was an adjustable rate mortgage for $399,000, with an initial interest rate of 6.370% that would be adjusted weekly in accordance with a market-based index. (*Id.*) The Note also included provisions for unpaid interest to be added to the principal loan balance, and for such principal balance to be capped at 125% of the original amount borrowed. (*Id.*)

Plaintiffs' mortgages were "Pick-A-Payment" loans, which allowed Plaintiffs to pick their initial loan payment amount and to decide how much they wished to pay each payment period (for some Plaintiffs, payments were biweekly, and for others payments were monthly). (2d Am. Compl., Exhs. 4-6.) The Notes disclosed the very practices of which Plaintiffs now complain. For example, in bold face just under the title, the Notes state that **"THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY [BIWEEKLY OR MONTHLY] PAYMENT AND MY UNPAID PRINCIPAL BALANCE."** (*Id.*) (emphasis in original). The Notes also disclose that the Plaintiffs had several payment options and that some of those options would not cover the accruing interest on the loan. (*Id.*) ("My initial [biweekly or monthly] payment amount was *selected by me* from a range of initial payment amounts approved by Lender and *may or may not be sufficient to pay the entire amount of interest accruing* on the unpaid Principal balance.") (emphasis added). The Notes then disclose that, in the event a payment does not cover the accruing interest, that interest will be added to the principal. (*Id.*) ("[M]y [biweekly or monthly] payments may be insufficient to pay the total amount of [biweekly or monthly] interest that is due. If this occurs, the amount

of interest that is not paid each [payment or month] ... will be added to my Principal and will accrue interest at the same rate as the Principal."). In addition, the Note explains what happens when the principal amount is increased by more than 25%:

> My unpaid balance can never exceed **125%** of the Principal I originally borrowed ... If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my [biweekly or monthly] payment is due, I will instead pay a new [biweekly or monthly] payment ... which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date."

(*Id.*) (emphasis in original).

### C.    The Complaints.

On June 23, 2009, one day before the four-year anniversary of the closing on their 2005 Mortgage, the Bettinellis both filed a complaint and sent a demand letter, presumably in an attempt to comply with the requirements for filing claims under Mass. Gen. Laws ch. 93A ("Chapter 93A"). The next day, the Bettinellis filed an amended complaint (the "First Amended Complaint") that added a Chapter 93A claim. On August 6, 2010, Plaintiffs filed their second amended complaint (the "Second Amended Complaint") adding the Piedras[2] and Ms. Barrera[3] as plaintiffs. The Second Amended Complaint alleges the following claims: unfairness and deception under Mass. Gen. L. c. 93A (Count I), Negligent or Improper Underwriting (Count II); Unconscionablity and/or Illegality (Count III); Illegal Contract Terms (Count IV); Unjust Enrichment (Count V); and Declaratory Judgment (Count VI).

---

[2] Wachovia received a Mass. Gen. L. c. 93A demand letter from the Peidras' counsel on March 4, 2010. Wachovia timely responded to that letter denying liability and arguing that the demand letter was too vague to comply with Mass. Gen. L. c. 93A.

[3] Delmy Barerra had a complaint pending in Massachusetts state court (*Barrera v. Wachovia Mortgage*, Civil Action NO. SUCV2009-04908 (Suffolk Sup. Ct. Nov. 17, 2009)) prior to consolidation.

## LEGAL STANDARD

In order to survive a motion to dismiss, "a complaint must allege 'a plausible entitlement to relief.'" *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 559 (2007)). The court "must take the allegations in the plaintiff's pleadings as true," *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005), but "need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, however, nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 n.3 (1st Cir. 2006) (citations omitted). Moreover, "courts have no duty 'to conjure up unpleaded facts that might turn a frivolous claim ... into a substantial one.'" *Twombly*, 550 U.S. at 562 (quoting *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976)).

## ARGUMENT

### I. ALL OF PLAINTIFFS' CLAIMS ARE PREEMPTED BY HOLA.

Because Wachovia and its subsidiaries were federally chartered savings associations at the time of the loans at issue (*see* Declaration of Michael Goldberg, Exhs. 1-2), their lending activities are exclusively subject to the provisions of the Home Owners Loan Act, 12 U.S.C. §§ 1461 *et seq.* ("HOLA"). Pursuant to the authority granted it by HOLA, the Office of Thrift Supervision ("OTS") has adopted regulations that preempt the state law claims asserted here. For this reason alone, the Second Amended Complaint should be dismissed in its entirety.

#### A. OTS Regulations Occupy The Field Of Federal Savings Bank Regulation.

Under HOLA, Congress explicitly delegated to OTS the authority to preempt state laws as they apply to the lending operations of federal savings associations. HOLA vests OTS with plenary authority to issue regulations "to provide for the organization, incorporation,

examination, operation, and regulation of associations to be known as Federal savings

associations." 12 U.S.C. § 1464(a)(1) (codifying § 5(a) of HOLA). The grant of preemptive

authority is clear:

> The broad language of § 5(a) expresses no limits on the [OTS]'s authority to regulate the lending practices of federal savings and loans .... Congress plainly envisioned that federal savings and loans would be governed by what the [OTS]—not any particular State—deemed to be the "best practices." ... Thus, the statutory language suggests that Congress expressly contemplated, and approved, the [OTS's] promulgation of regulations superseding state law.

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 161-62 (1982) (emphasis added).

OTS has expressly preempted the entire field of lending regulations applicable to federal

savings associations. 12 C.F.R. § 560.2(a); *see also* 12 C.F.R. § 545.2. Preemption extends to

any state law that impacts the lending activity of federal savings associations:

> Occupation of field .... To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation .... Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities .... For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

12 C.F.R. § 560.2(a). OTS's intent to broadly preempt state laws affecting the lending activities

of federal savings associations could not be clearer, and it fully implements the Congressional

directive of HOLA:

> [I]nstead of being subject to a hodgepodge of conflicting and overlapping state lending requirements, federal thrifts are free to originate loans under a single set of uniform federal laws and regulations. This furthers both the "best practices" and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden. At the same time, the interests of borrowers are protected by the elaborate network of federal borrower-protection statutes applicable to federal thrifts.

61 Fed. Reg. 50951-01, 50965 (Sept. 30, 1996).

Courts have recognized the breadth of OTS's exclusive authority to regulate the lending activities of federal savings associations. As the Supreme Court has observed, OTS acted on Congress's grant of authority to preempt *all* state laws affecting the loan operations of federal savings associations and regulated "comprehensively the operation of these [federal savings] associations, including their lending practices ...." *Fidelity Fed.*, 458 U.S. at 167; *see also Kupiec v. Republic Fed. Sav. & Loan Ass'n*, 512 F.2d 147, 150 (7th Cir. 1975) (OTS "has promulgated comprehensive rules and regulations concerning the powers and operations of every federal savings and loan association from its cradle to its corporate grave.") (citations and internal quotation marks omitted); *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 182 (2nd Cir. 2005) ("Pursuant to the authority granted to it by [HOLA], ... the OTS has occupied the entire field of lending regulation for federal saving associations.") (citations and internal quotation marks omitted).

### B. OTS Has Specified The Process For Evaluating Whether State-Law Claims Are Preempted By Regulations Promulgated Under HOLA.

As discussed more fully below, all of Plaintiffs' claims are preempted by 12 C.F.R. § 560.2. This regulation has three subsections: (a), (b), and (c). Subsection (a) declares OTS's objective to occupy "the entire field of lending regulation" and its policy of establishing a "uniform federal scheme of regulation." Subsection (b) follows with an illustrative (but not comprehensive) list of clearly preempted lending activities. Subsection (c) concludes with a list of state laws that are not preempted "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with purposes of" the broad preemption and uniform regulatory policies of subsection (a).

OTS has issued guidelines that provide a step-by-step method for determining whether a state law is preempted by its regulations:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be construed narrowly. Any doubt should be resolved in favor of preemption.

61 Fed. Reg. at 50966-67. A federal agency's interpretation of its own regulations is entitled to deference "unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 462 (1997). Here, OTS's guidelines further the stated policy of broad preemption in this field and cannot seriously be challenged as "inconsistent" with the regulation.

**C.    Every Count Of The Second Amended Complaint Seeks To Impose State Law Standards On The Lending Activities Of A Federal Savings Bank, And Is Thus Preempted.**

In this case, it is not necessary to proceed beyond the "first step" that OTS has indicated courts should take in determining whether state law claims are preempted. All of Plaintiffs' claims challenge lending activities that have been specifically identified in 12 C.F.R. § 520.2(b). As a result, "the analysis will end there; the law is preempted." 61 Fed. Reg. at 50966.

In considering whether a claim seeks to impose state standards on the lending activities of federal savings banks, courts consider what *conduct* is alleged to violate state law, not merely what generic state law is being invoked. *See Casey v. FDIC*, 583 F.3d 586, 593-94 (8th Cir. 2009). For example, state consumer fraud laws can be used to attack a wide variety of commercial activities. But if a state's consumer fraud law is being used to attack advertising in connection with a loan, then the claim would be preempted by 12 C.F.R. § 560.2(b)(9), which lists "[d]isclosure and advertising" as preempted matters. Indeed, the Ninth Circuit held that §

560.2(b)(9) squarely preempted a claim alleging that the advertisement of a mortgage-related fee as nonrefundable violated California's consumer protection law because the fee was refundable (under certain circumstances pursuant to the Truth in Lending Act). *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1006 (9th Cir. 2008). As the Court observed, "the first step is to determine if [the state law], *as applied*, is a type of state law contemplated in the list under paragraph (b) of 12 C.F.R. § 560.2. If it is, the preemption analysis ends." *Id.* (emphasis added). Other Circuits have employed this same approach of evaluating whether a law *as applied* is preempted. *See Casey*, 583 F.3d at 595 ("We conclude that a state law that either on its face or as applied imposes requirements regarding the examples listed in § 560.2(b) is preempted."); *In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 646-48 (7th Cir. 2007) (evaluating whether the bank's practices are ones covered by the regulation); *Andrade v. Wachovia Mortgage, FSB*, No. 09CV0377, 2009 WL 1111182 (S.D.Ca. Apr. 21, 2009) (holding that plaintiff's claim that Wachovia "knew or should have known ... it was not possible for Plaintiff ... to pay the loans" was preempted because, although "[p]laintiff seeks relief under state ... laws of general applicability ... she asks the court to apply the laws to regulate conduct which is expressly preempted"). Thus, the focus of the preemption analysis is on the lender's alleged *practices* that are being challenged. If any state law is being used to challenge the lending practices OTS has indicated must be subject exclusively to federal regulation, then the claim is preempted.

For the convenience of the Court, Wachovia has attached a chart identifying which OTS regulations preempt each of Plaintiffs' specific claims (Exhibit A hereto). What follows is a count-by-count explanation of why all of Plaintiffs' claims are preempted.

      1.      <u>Count I: Unfair and Deceptive Practices, Chapter 93A.</u>

Count I, brought under Mass. Gen. Laws ch. 93A, §§ 2 & 9, generally alleges methods, acts and practices that were unfair, deceptive, and/or unconscionable. (2d Am. Compl. ¶¶ 117-

124.) All of the potential bases of this claim concern lending activities that OTS has indicated are preempted from state regulation because, as applied here, Plaintiffs are seeking to use Massachusetts' consumer protection law "to impose requirements regarding … [t]he terms of credit[, d]isclosure [and] … servicing" of mortgages. *See* 12 C.F.R. §560.2 (b)(4), (9) & (10).

The alleged deceptions in the Second Amended Complaint all concern matters regulated by the OTS. A claim that a mortgage note is "complex," "unfamiliar and confusing," or "deceptive" (2d Am. Compl. ¶¶ 20, 30, 51, 74) is plainly preempted by 12 C.F.R. § 560.2(b)(9), which identifies "disclosures" as a lending activity subject exclusively to federal regulation. *Silvas*, 514 F.3d at 1006. The Second Amended Complaint indicates that the disclosures of the terms of the loan on the face of the note (namely, e.g., "a statement that the interest rate on the loan would be … 5.370%" and "a statement that biweekly payments would be $513.98" (2d Am. Compl. ¶ 45)) are the central deceptions. (*See also* 2d Am. Compl. ¶¶ 50, 73, 88 (rates), 29, 54, 77, 92 (payments).) That claim is clearly preempted by the OTS regulations regarding the terms of loans, 12 C.F.R. § 560.2(b)(4), and disclosures in loan agreements, 12 C.F.R. § 560.2(b)(9). Likewise, Plaintiffs' claims that the description of the interest rate calculation are "impenetrable to [the] average consumer" seek to impose a standard of clarity in disclosure as a matter of state, not federal, law. (2d Am. Compl. ¶¶ 26, 29, 54, 77, 92.) But, as noted above, OTS has determined that disclosure standards should be a matter exclusively of federal law. 12 C.F.R. § 560.2(b)(9). The same preemptive force applies to allegations about the use of the term "Current Index" (2d Am. Compl. ¶¶ 23, 71, 86) and allegations regarding the refinancing, which simply incorporate the same accusations (2d Am. Compl. ¶¶ 55, 56). Finally, the Plaintiffs also rely on some statements made after closing and during the course of servicing the loan, in which their payments were described (deceptively, according to the Plaintiffs) as "interest only." (2d Am.

Compl. ¶ 57.) In addition to being preempted under the provisions already mentioned above, these claims are also preempted by the federal regulation of "servicing ... of ... mortgages," 12 C.F.R. § 560.2(b)(10).

To the extent Plaintiffs' claims of unfairness add matters not discussed above, they, too, are preempted. The allegation that the loan is unfair because the Index might be changed (2d Am. Compl. ¶¶ 50, 75, 90) goes to the terms of the note, a matter squarely within the scope of 12 C.F.R. § 560.2(b)(4). The allegation that the loan is unfair if the lender "does not reasonably believe the borrower will be able to make the scheduled payments" (2d Am. Compl. ¶ 35) is simply a restatement of Count II (discussed below), and is preempted because it challenges the terms of the loan and how the loan is serviced, as well as the lender's underwriting standards. 12 C.F.R. §§ 560.2(b)(4), (10), 560.101.

### 2.   Count II: Negligent Underwriting.

Count II alleges negligent underwriting. It asserts (incorrectly, as discussed below) a state law "duty of care to underwrite the loan by considering whether the loan could be paid off by amortized payments." (2d Am. Compl. ¶ 125.) It also asserts that Plaintiffs' loan violated a state regulation that purports to require a lender to employ "sound underwriting practices which are reasonable in relation to the home loan requested." (2d Am. Compl. ¶ 127); 209 C.M.R. § 53.05. Read charitably, the Second Amended Complaint appears to be treating the alleged standard to employ "sound underwriting practices" as equivalent to a duty of care to issue loans that "could be paid off by amortized payments." (See 2d Am. Compl. ¶ 36 (alleging a "duty of care to underwrite the loan by considering whether the loan could eventually be paid"); ¶ 111(f) (alleging the claim on behalf of the putative class).) The Second Amended Complaint asserts that Wachovia considered only whether the Plaintiffs "could make the initial monthly payment," and not whether the Plaintiffs had the ability to pay off the loan by amortizing payments. (2d

Am. Compl. ¶¶ 33, 36.) The Second Amended Complaint further asserts that Wachovia knew

Plaintiffs "could not afford payments that would amortize the loan." (*See* 2d Am. Compl. ¶¶ 21,

48, 70, 85.) In short, Plaintiffs assert that state-law standards impose requirements on Wachovia

to inquire into the borrower's credit-worthiness and long-term prospects for repaying the loan

pursuant to the loan's amortization schedule, and to refuse to issue the loan if some unspecified

standard of probability for repaying the loan under that amortization schedule is not met.

Any such claim is plainly preempted by OTS regulations. The imposition of a state law

standard regarding the ability of a borrower to repay the loan under an amortization schedule

strikes at the core of "terms of credit," which OTS has specifically indicated are governed by

federal law standards alone. 12 C.F.R. § 560.2(b)(4). Indeed, OTS has specifically identified

"amortization of the loans and the deferral and capitalization of interest" as part of the "terms of

credit" that state law standards may not regulate. *Id.*

Elsewhere, OTS has indicated its intent to apply exclusively federal "lending and

investment standards." 12 C.F.R. 560.1(b). And it has promulgated a separate regulation that

lays out "[r]eal estate lending standards." 12 C.F.R. § 560.101. This regulation requires federal

savings banks "to adopt and maintain written policies that establish appropriate limits and

standards for extension of credit." *Id.* at § 560.101(a). Such policies must include "[p]rudent

underwriting standards, including loan-to-value limits, that are clear and measurable." *Id.* at

§ 560.101(b)(2)(ii). The Appendix to § 560.101 includes a section titled "Underwriting

Standards" that requires the lender's policies to consider the "capacity of the borrower ... to

adequately service the debt," "the overall creditworthiness of the borrower," and "[m]inimum

standards for net worth, cash flow, and debt service coverage of the borrower or underlying

property," among many other factors. App'x, 12 C.F.R. § 560.101. Another section of the

Appendix details OTS's authority to conduct "Supervisory Review of Real Estate Lending Practices and Policies." *Id.* In short, OTS has indicated that federal savings banks must adopt underwriting policies that comply with federal standards, not state standards, and that OTS review will ensure compliance with those federal standards.

OTS preempted the field of lending activity for federal savings banks so that they could "conduct their operations in accordance with best practices (by delivering low-cost credit to the public free from undue regulatory duplication and burden) ...." 12 C.F.R. 560.2(a). It would contravene that fundamental purpose behind OTS's regulations to allow Plaintiffs' state-law "negligent underwriting" claim to proceed. The adequacy of underwriting is already a matter of extensive, explicit federal regulation, and any putative state-mandated duty of care or underwriting standards for extending loans would produce precisely the patchwork of regulatory standards Congress and OTS intended to displace with a uniform national standard.

3.    Count III: Unconscionability and/or Illegality.

In Count III, Plaintiffs repeat the same arguments set forth in their Count I, this time asserting that the loan terms are unconscionable and/or illegal as opposed to unfair. As the allegations set forth in Count III refer to precisely the same conduct as those in Count I, they are preempted for the very same reasons. *See, e.g., Casey*, 583 F.3d at 594-95 (courts consider what *conduct* is alleged to violate state law, not merely what generic state law is being invoked).

To the extent that the claim of unconscionability is directed toward the mechanisms of disclosure (2d Am. Compl. ¶¶ 26, 29, 50, 54, 73, 77, 88, 92), and hence alleges that the loans are somehow procedurally unconscionable, *see Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1375-77 & nn.11, 13 (Mass. 1980) (discussing the difference between procedural and substantive unconscionability), because they are difficult to understand, that claim falls within 12 C.F.R. § 560.2(b)(9), which specifically preempts claims concerning "[d]isclosure" in "credit-related

14

documents." In short, Plaintiffs' challenge to the variability of the interest rate, or the difficulty of understanding the mechanism for determining its variability, can no more survive OTS's preemptive regulation when characterized as "unconscionability" than it can when characterized as unfair and deceptive under Mass. Gen. Laws ch. § 93A.

### 4. Counts IV: Illegal Contract Terms.

In Count IV, Plaintiffs allege that certain terms of their loans are "illegal." Specifically, Plaintiffs claim that Massachusetts law prohibits Wachovia from reserving the right to change the interest rate in this loan (2d Am. Compl. ¶¶ 52, 75, 90, 140(a)), and that Wachovia is violating "longstanding Massachusetts law" by charging "interest on interest" in these loans (2d Am. Compl. ¶ 140(b)). As the body of the Second Amended Complaint makes clear, the "interest on interest" claim is nothing more than Plaintiffs' characterization of the fact that the loans provide borrowers the option to pay anywhere from the full amortizing payment (interest plus principal) to full interest only (leaving the principal unaffected), to some amount less than the full interest component (leading to negative amortization as the unpaid interest component is rolled into the outstanding principal). (2d Am. Compl. ¶¶ 56-58, 60-62.) The underlying practices that the Second Amended Complaint claims are illegal clearly fall within the scope of federal preemption of lending activities for federal savings banks.

To the extent Plaintiffs' illegality claims are based on the allegations that the Notes allow the lender to change the interest rate by changing the index that is set as the benchmark for the loan (2d Am. Compl. ¶ 140(a)), the Second Amended Complaint is squarely seeking to impose state standards concerning adjustments to the interest rate. But OTS has expressly stated that if the state law purports to impose requirements regarding the "terms of credit, including … adjustments to the interest rate," 12 C.F.R. § 560.2(b)(4), it is preempted. The same is true of the claims based on the terms permitting payment of less than the interest charge, and the

consequent negative amortization. (2d Am. Compl. ¶ 140(b).) Any such claim is also barred by the preemption of laws regulating the terms of mortgages "including the amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan ...." 12 C.F.R. § 560.2(b)(4). This regulation describes *precisely* what Plaintiffs are complaining about: that the loan includes a provision permitting payment of less than the full amount of interest due and capitalizes the interest producing an effect on the balance and payments due.

4.   Counts V & VI: Unjust Enrichment and Declaratory Judgment.

Count V is for unjust enrichment. (2d Am. Compl. ¶ 143.) This claim is dependent on all of the other preceding counts, as it merely seeks recovery for Wachovia's supposedly ill-gotten gains. Likewise, Count VI is merely a declaratory judgment plea which incorporates and realleges all of the other counts. (2d Am. Compl. ¶¶ 145-46.) Both claims add no substance and are preempted for all the reasons discussed above.

## II.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL TO STATE ANY CLAIM UPON WHICH RELIEF COULD BE GRANTED.

Even if this Court were to conclude that Plaintiffs' claims are not preempted by Federal law, all of the claims should still be dismissed because they fail to state any viable claim for relief, for the reasons explained below.

### A.   Count I – Plaintiffs Have Failed To State A Claim Under Chapter 93A.

Count I should be dismissed because it fails to allege any unfair or deceptive acts or practices, as is required to state a claim under Chapter 93A. Mass. Gen. L. c. 93 A, §2. Because of concerns that litigation under Chapter 93A has become "rampant," courts have developed a rigorous test for assessing such claims. *Cablevision of Boston v. Pub. Improvement Comm'n of the City of Boston*, 38 F. Supp. 2d 46, 61 (D. Mass. 1999) (Wolf, J.). The conduct alleged must

"attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149 (1979)); *see also Mass. School of Law v. Am. Bar Ass'n*, 142 F.3d 26, 41 (1st Cir. 1998) (to state a Chapter 93A claim, "the defendant's conduct must be not only wrong, but also egregiously wrong").

### 1. Unfairness

Primarily, Plaintiffs contend that the loans were "unfair" because Wachovia allegedly knew that Plaintiffs could not "ultimately afford" to make fully-amortizing loan payments. (2d Am. Compl. ¶¶ 21, 34, 48, 70, 85.) This claim is deficient because Plaintiffs allege only conclusions, not facts, as support. But even if Plaintiffs could allege such facts, it would make no difference, because Massachusetts law does not impose any duty on a lender to determine that a borrower had the ability to repay the loan. *See, e.g., In re Fordham*, 130 B.R. 632, 646 (Bankr. D. Mass. 1991).

Plaintiffs, however, claim that there is such a duty, and they rely solely on *Fremont* to support their argument. But *Fremont* does not support an allegation of unfairness on the facts at issue here. In *Fremont*, the court merely upheld an injunction restricting but not removing Fremont's ability to foreclose on loans that contained four specified characteristics.[4] *Fremont* 452 Mass. at 739. The decision on its face is narrow, applicable only to loans containing those four characteristics. *Id.* Moreover, subsequent cases discussing *Fremont* have all interpreted the holding narrowly as well, declining to find liability where all four of the *Fremont* loan

---

[4] The four characteristics are: (1) ARM loans with an introductory period of three years or less; (2) introductory rate at least three per cent below the fully indexed rate; (3) made to borrowers with a debt-to-income ratio of greater than 50%; and (4) loan-to-value ratio of 100% or a substantial prepayment penalty. *Fremont*, 452 Mass. At 739.

characteristics are not present. *See Silva v. OneWest Bank, FSB*, No. 1001681, 2010 WL 2432046, *2 (Mass. Super. May 19, 2010) (declining to award a preliminary injunction where "a review of the terms of Silva's loan does not indicate that the loan possessed the four characteristics found by the ... Court to be presumptively unfair in *Fremont*"); *Fazio v. Bank of America, NA*, No. 1001255, 2010 WL 2432024, *3 (Mass. Super. May 13, 2010) (holding that the loans in question were not "presumptively unfair" where "the Fazios have failed to show that their loan satisfied all four of the [*Fremont*] criteria"); *Latham v. Homecomings Financial LLC*, No. 2008-02100, 2009 WL 6297593, *6 (Mass. Super. Nov. 3, 2009) (granting summary judgment where "Latham's loan does not contain the combination of features deemed unfair in the *Fremont* case"). Accordingly, because Plaintiffs do not—and cannot—allege that their loans contain the specified four characteristics, *Fremont* imposes no duty on Wachovia, and Plaintiffs cannot show any violation of Chapter 93A.

> 2.   Deception

Plaintiffs also make allegations of deception in Count I, but theses allegations fall into four categories, none of which provide a basis for Plaintiffs' Chapter 93A claim because, in each instance, Wachovia can point to the *precise* language in the Notes that clearly and articulately discloses the allegedly deceptive terms.

First, Plaintiffs claim that the terms of the Note regarding the applicable interest rate are deceptive. (2d Am. Compl. ¶¶ 47, 50, 51, 69, 73, 74, 84, 88, 89.) In particular, Plaintiffs point out that the Note mentions a "yearly rate," which they claim is deceptive because that rate would only be in effect for two months. (2d Am. Compl. ¶¶ 47, 69, 84.) But this claim is meritless because the section of the Note on which Plaintiffs rely (Section 2(a)) clearly states that "[t]he interest rate may change as described in this Section 2," and Section 2(b) explains that the

interest rate can change two months later. (2d Am. Compl., Exh. 4) ("The interest rate I will pay may change on the **15th** day of **August, 2005** and on every other Monday thereafter.") (emphasis in original); *id.*, Exh. 5 (same); *id.*, Exh. 6 (same)).

Second, Plaintiffs argue that the loan terms are deceptive because the monthly payments will lead to negative amortization, i.e., the principal balance may actually increase. (2d Am. Compl. ¶¶ 29, 47, 48, 54, 69, 70, 79, 84, 85, 92.) But this argument overlooks the facts that Plaintiffs were given a number of payment options, that *they chose* their respective payment amounts, and that the potential effects of loan payments at certain levels were explained in the Notes. Section 3(B) stated that "[m]y initial [biweekly or monthly] payment amount *was selected by me* from a range of initial payment amounts approved by Lender and *may not be sufficient to pay the entire amount of interest accruing.*" (2d Am. Compl., Exhs. 4-6) (emphasis added). Section 3(E) and 3(F) describe, in detail, what happens when a borrower does not pay the entire amount of interest accruing. (*Id.*) Thus, there is no basis for a claim of deception with respect to the potential for negative amortization.

Third, Plaintiffs make various allegations regarding the use of an index to determine the interest rate (2d Am. Compl. ¶¶ 24-26), but none of these allegations shows any deception. Section 2(E) of the Note explains that the interest rate would be determined by adding the Margin to the Current Index. (2d Am. Compl., Exhs. 4-6.) Plaintiffs claim that the use of the "Current Index" in this formula was deceptive because it was not "fixed by current market conditions" and the lender had "control" over it. (2d Am. Compl. ¶¶ 23, 71, 86.) Plaintiffs never explain what they mean by "fixed by current market conditions," but like all indices (e.g., LIBOR), the index chosen was pegged to a variable rate on specific financial products–deposit accounts–and was thus plainly proper. And Plaintiffs' claim that the lender "controlled" the

Index is groundless; the lender was at all times required to use this interest-rate index. Plaintiffs may be referring to the fact that Section 3(F) of the Note contained a *force majeure* clause allowing selection of an "Alternative Index," but the Note makes clear that use of any alternative was only permitted if the Current Index was "no longer available." (2d Am. Compl., Exhs. 4-6, § 3(F).)

Finally, Plaintiffs contend that some of the loan terms were deceptive in that they were impermissibly difficult to understand. (2d Am. Compl. ¶¶ 29-38, 54, 77, 92.) But, as explained above, the terms at issue were all disclosed clearly, accurately, and succinctly in a five-page document. A plaintiff cannot claim deception under § 93A where all of the terms of his loan were accurately described to him. *See Fernandes v. Havkin*, No. 08-11498, 2010 WL 3155805, *13 (D. Mass. Aug. 10, 2010) (declining to find a violation of § 93A where "Defendant … provided accurate disclosures of the loan terms to plaintiff on the closing documents and accompanying disclosure statements"). Moreover, even if Plaintiffs believed that the loan terms were too difficult to understand, they had numerous options available to them: they could ask questions before entering into the loan, hire a lawyer, or simply choose not to purchase this particular type of loan product. This was hardly a take-it-or-leave-it proposition; if Plaintiffs were unsatisfied with the loan product, they could have simply shopped elsewhere. Given these options, Plaintiffs cannot claim that it was unfair for Wachovia to offer this type of loan.

Accordingly, Plaintiffs cannot show that their loans were either unfair or deceptive under Chapter 93A, and therefore Count I should be dismissed.

## B.   Count II – Plaintiffs Cannot Plead A Claim For Negligent Underwriting

Count II, which asserts claims for "negligent underwriting," should be dismissed because there is no such cause of action. An essential element of any negligence claim is an allegation

that the defendant owed a duty of care to plaintiff. *See Siegal v. Am. Honda Motor Co.*, 921 F.2d 15, 17 n.4 (1st Cir. 1990). Plaintiffs allege that Wachovia "owed the Plaintiffs ... a duty of care to underwrite the loan[s] by considering whether the loan[s] could be paid off by amortized payments." (2d Am. Compl. ¶ 125.) But there is no such duty of care. To the contrary, courts applying Massachusetts law have held that a lender does not have a duty to ensure that a borrower can repay his loan. *See In re Fordham*, 130 B.R. at 648; *see also Corcoran v. Saxon Mort. Servs., Inc.*, No. 09-11468, 2010 WL 2106179, *4 (D. Mass. May 24, 2010) ("a lender owes no general duty of care to a borrower"); *Lacroix v. FDIC*, No. 92-10585-Z, 1993 WL 122340, *1 (D. Mass. April 5, 1993); *In re Laudani*, 401 B.R. 9, 38 (Bankr. D. Mass. 2009) (rejecting a claim that the covenant of good faith and fair dealing established a duty by a lender to refrain from making a loan when it "knew or should have known" that debtor would be unable to repay it). Courts in other jurisdictions have likewise declined to recognize any such duty, even in the wake of the financial crisis of 2008. *See, e.g., Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 902 (N.D. Ill. 2009) (holding that under Illinois law, a lender has no duty to refrain from making a loan if the lender knows or should know that the borrower cannot repay the loan); *Fedders N. Am., Inc. v. Goldman Sachs Credit Partners LP*, 405 B.R. 527, 551 (Bankr. D. Del. 2009) (holding that no cause of action exists either in Delaware or New Jersey for improvident lending, relying on the weight of authority from other jurisdictions).

This District recently addressed a similar issue in *Fernandes v. Havkin*, 2010 WL 3155805 (D. Mass. Aug. 10, 2010). There, plaintiff brought a claim of negligence against his mortgage lender. *Id.* at 17. The court acknowledged that a lender owes no duty of care to a borrower, and that the only duty owed in the lender-borrower context is that "the bank be honest in the dealings with [plaintiff] and that it not purposefully injure [his] right to obtain the benefit

21

of the contract." *Id.* (quoting *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir.

2009)). Accordingly, the court held that because the "defendant provided accurate descriptions

of the loan terms at the time of closing[,] … plaintiff has made no showing that defendant

undertook any negligent conduct that would violate a duty of care." (citing *FAMM Steel*, 571

F.3d at 100) (holding that negligence claims must have involved dishonesty and a showing that

defendants acted purposefully to injure plaintiff). Here, too, Wachovia provided accurate

descriptions of the loan terms to Plaintiffs at the time of closing, so there is no basis for a

negligence claim. (*See* 2d Am. Compl., Exhs. 4-6.)

Therefore, Wachovia has no duty of care to, as Plaintiffs put it, "underwrite the loan[s] by

considering whether the loan[s] could be paid off by amortized payments", (2d Am. Compl. ¶

125), and what duty does exist between a lender and a borrower, Wachovia indisputably fulfilled

by accurately disclosing Plaintiffs' loan terms.[5]

### C.    Count III – Plaintiffs Do Not Plead That Their Mortgage Loans Were Either Substantively or Procedurally Unconscionable.

---

[5] Plaintiffs also try to state a cause of action by invoking 209 C.M.R. § 53.05, but that provision of the Massachusetts Code is not even implicated for most of the Plaintiffs. Plaintiffs allege that the "underwriting of the loan was in violation of the legal standard required by 209 C.M.R. § 53.05." (2d Am. Compl. ¶ 127.) However, § 53.05 is *only* applicable where a "determination that the home loan is in the borrower's interest is required," and § 54.04 holds that such determination is *not* required where "the annual percentage rate of the new home loan at consummation does not exceed by more than [2.5] percentage points for closed-end first-lien home loans … the yield on the U.S. Treasury securities having comparable periods of maturity to the loan maturity as of the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the lender." 209 C.M.R. 53.04(1)(b). Both the Bettinellis and Ms. Barrera fall into that § 53.04 exception, and therefore 53.05 is not applicable in the first instance. The U.S. Treasury bond with the closest period of maturity to the Bettinellis' 2005 loan had a yield of **4.56%**, which is within 2.5 percentage points of their yearly rate at consummation of **5.37%**. *See* U.S. Treasury Daily Yield Rates, http://www.ustreas.gov/offices/domestic-finance/debt-management/interest-rate/yield_historical_2005.shtml. The U.S. Treasury bond with the closest period of maturity to Ms. Barrera's 2005 loan had a yield of **4.76%**, which is within 2.5 percentage points of their yearly rate at consummation of **6.37%**.

This Court should also dismiss Count III, which asserts claims for unconscionability. Plaintiffs fail to allege either procedural or and substantive unconscionability, and *both* must be alleged to state a claim. *In re Sullivan*, 346 B.R. 4, 26 (Bankr. D. Mass. 2006). The test for procedural unconscionability is "whether there was an absence of meaningful choice on the part of one of the parties," *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 293, 408 N.E.2d. 1370 (1980) or the contract was the "product of unfair surprise." *Laudani*, 401 B.R. at 34. It is not enough to merely show that a loan borrower is unsophisticated.[6] *Id.* at 35.

The Second Amended Complaint fails to meet these standards. Plaintiffs do not allege that they were without choices – Plaintiffs could have freely chosen a different initial payment, or a different type of loan altogether. Nor can they claim unfair surprise; the potential consequences of the loan terms were disclosed in the Note. And they do not allege that any loan provisions were withheld from them or that they were unduly influenced in any way. They do not claim any high-pressure sales tactics were employed. The only argument Plaintiffs make is that the loan provisions were confusing, but even if that were true—which it is not (*see supra* § II(A)(2))—such allegations would be insufficient to demonstrate unconscionability. *Cf. Waters*, 412 Mass at 68, 587 N.E.2d 231 ("The fact that this conduct constitutes an unfair or deceptive practice, however, does not mean that this conduct was unconscionable.").

Plaintiffs also fail to plead substantive unconscionability, which requires a showing that the contract terms "are unreasonably favorable to the other party." *Zapatha*, 381 Mass. at 293, 408 N.E.2d. 1370; *see also Waters*, 412 Mass at 68, 587 N.E.2d 231 ("If the sum total of the

---

[6] Rather, some element of surprise or manipulation is necessary. *See, e.g., Waters v. Min Ltd.*, 412 Mass. 64, 65, 587 N.E.2d 231 (1992) (finding unconscionability where plaintiff's ex-boyfriend "introduced the plaintiff to drugs, exhausted her credit card...unduly influenced her, suggested that the plaintiff sell her annuity contact, initiated the contract negotiations, was the agent of the defendants, and benefited from the contract").

provisions of a contract drive too hard a bargain, a court of conscience will not assist its

enforcement."). In analogous circumstances, courts have held that loan terms were not

substantively unconscionable. For example, in *Laudani*, the Court held that a loan was not

substantively unconscionable because the debtor failed to show that there was a "'gross disparity

in the valued exchanged' such that he gained no advantage from the transaction." *Laudani*, 401

B.R. at 35. The Court held that the borrower could not "credibly argue that he received no

benefit from the transaction," because he satisfied his old mortgages and several liens through

the mortgage in question. *Id.* Plaintiffs received the exact same sort of benefit here; Plaintiffs

not only paid off their prior mortgages, but they also received cash at closing. (*See* Declaration

of Michael Goldberg, Exh. 3-5.) Because Plaintiffs can survive neither part of the two-step test

for unconscionability, Count III should be dismissed.

In a last-gasp effort to allege unconscionability, Plaintiffs again point to *Fremont*, but that

case is no more applicable to Count III than it was to Count I. As discussed above concerning

Count I, *Fremont* applies only to loans with *four specified characteristics. See supra* § II(A)(2).

Because they cannot plead that their loans contain these four characteristics, Plaintiffs cannot

rely on *Fremont* to salvage their unconscionability claims.

### D.   Count IV – Plaintiffs Do Not Plead That Their Mortgage Loans Contained Illegal Terms.

Plaintiffs' "Illegal Contract Terms" claim (Count IV) is also deficient. An illegal

contract is one tainted with immoral motives or illegal means or objects. *See Nussenbaum v.*

*Chambers & Chambers, Inc.*, 322 Mass. 419, 421-24 (1948)). The illegality must be serious, and

it must be more than just an incidental part of the performance of the contract. *See Hawes v.*

*Pendrak*, 13 Mass. App. Ct. 1052, 1052, 434 N.E.2d 678 (1982). Courts have found contract

terms to be illegal only in extreme cases, when the very object of the contract was immoral or

violated settled public policy. *See, e.g., T.F. v. B.L.*, 442 Mass. 522, 813 N.E.2d 1244 (2004) (contract for bearing a child for another person to raise); *Ureneck v. Cui,* 59 Mass. App. Ct. 809, 798 N.E.2d 305 (2003) (marriage brokerage contract); *Johnston v. Senecal*, 329 Mass. 556 (1952) (contract having as its main purpose the unlawful inducement of public officials).

Neither aspect of the loans that Plaintiffs allege to be illegal—Wachovia's control over the Index or its charging "interest upon interest" (2d Am. Compl. ¶ 140)—meets the strict standard for declaring contract terms illegal. First, Wachovia did not have the "right to change interest rates by changing the relevant indices at its sole discretion." (2d Am. Compl. ¶ 140(a).) Rather, as the Note language itself makes clear, the Index is pegged to a variable rate on deposit accounts, and it cannot be changed unless it becomes unavailable. (2d Am. Compl., Exh. 4-6); *see also supra* § I(C)(4). Second, there is no authority for Plaintiffs' claim that it is per se illegal to charge "interest on interest"—a ruling that would render a vast number of loans unlawful.

## E.  Count V – An Unjust Enrichment Claim Is Unavailable to Plaintiffs.

Count V of Plaintiffs' Second Amended Complaint, unjust enrichment, should be dismissed for two reasons. First, it is well-settled that where "a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies." *In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2003) (citation omitted). Here, it is undisputed that Plaintiffs' relationships with Wachovia are governed by written contracts, namely the Notes, and as a result, they cannot pursue a claim for unjust enrichment.

Second, a claim of unjust enrichment is not available to a party with an adequate remedy at law. *Fernandes*, 2010 WL 3155805 at *10 (citing *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991)). For example, in *Fernandes*, the court held that the

plaintiff's negligence and chapter 93A claims precluded his claim for unjust enrichment. *Id.* at *10. The court also noted that the "mere availability" of the negligence and chapter 93A claims was sufficient to preclude his unjust enrichment claim, regardless of the disposition of those claims (which were dismissed). *Id.* (citing *Adrion v. Knight*, No. 07-11277, 2009 WL 3152885, *1 n.1 (D. Mass. Sept. 28, 2009)) ("the availability of an adequate remedy at law (whether successful or not) precludes an equitable claim of unjust enrichment"). Because Plaintiffs here have also alleged, *inter alia*, negligence and Chapter 93A claims, unjust enrichment is unavailable. For both of these reasons, Count V should be dismissed.

     **F.**    **Declaratory Judgment Is Not An Appropriate Claim.**

Count VI, which seeks a "Declaratory Judgment," should also be dismissed because a declaratory judgment is a form of relief, not a separate cause of action. *See Shapiro v. Haenn*, 222 F. Supp. 2d 29, 50 (D. Me. 2002) ("Declaratory judgment pursuant to 28 U.S.C. § 2201 is not an independent claim but an alternative form of relief.") (citing *Akins v. Penobscot Nation*, 130 F.3d 482, 490 n.9 (1st Cir. 1997)). While Plaintiffs seek "declaratory relief concerning the propriety of the challenged practices," such a claim is merely duplicative of other claims and should be dismissed for this reason as well. *See Miles v. Beneficial Mass., Inc.*, No. 200502371, 2007 WL 738699, *5 (Super. Ct. Mass. Feb. 12, 2007).

**III.**    **PLAINTIFFS' TIME-BARRED CLAIMS SHOULD BE DISMISSED.**

Even if this Court does not dismiss the Second Amended Complaint in its entirety for the reasons outlined above, most of Plaintiffs' claims should be dismissed in any event because they are barred by the applicable statutes of limitation.

     **A.**    **All of Plaintiffs' Tort-Based Claims, As Well as the Bettinellis' Chapter 93A Claim, Were Filed Outside of the Limitations Period and Must Be Dismissed.**

A statute of limitations ordinarily begins to run when a plaintiff is harmed by a defendant's actions. *Day v. Kerkorian*, 72 Mass. App. Ct. 1, 6, 887 N.E.2d 1098 (2008) (citing *Joseph A. Fortin Contr., Inc. v. Mass. Hous. Fin. Agency*, 392 Mass. 440, 442, 466 N.E.2d 514 (1984)). Plaintiffs allege that they were harmed by entering into the Payment Option ARM ("POA") loans. (2d Am. Compl. ¶ 4.) Plaintiffs claim that they first entered into PAO loans on, respectively, July 10, 2002 (the Bettinellis), March 26, 2007 (the Piedras), and November 18, 2005 (Ms. Barrera). (2d Am. Compl. ¶ 3.) Thus, those are the dates when the statutes of limitation began to run on Plaintiffs' claims.

The limitations period for the Chapter 93A claim in Count I is four years, Mass. Gen. L. c. 260 §5A, and all of the others claims sound in tort[7] (Counts II-VI), for which the limitations period is three years, Mass. Gen. L. c. 260 §2. Accordingly, as discussed in detail below, all of Plaintiffs' claims, with the exception of the Piedras' and Ms. Barrera's Chapter 93A claims, are untimely.

1.   The Bettinellis

The Bettinellis filed their original Complaint on July 23, 2009—more than *seven* years after the July 10, 2002 date when the statute of limitations began to run on their claims. It is proper to begin the limitations period with the Bettinellis' 2002 loan, as opposed to their 2005 loan, because, as the Plaintiffs themselves admit, the 2002 loan "had many of the same features as the 2005 transaction." (2d Am. Compl. ¶ 55.) In fact, the Bettinellis' 2002 loan included all

---

[7] While there is no specific statute of limitations for "negligent underwriting", the statute of limitations for a negligence claim is three years. *See, e.g., Koe v. Mercer*, 450 Mass. 97, 98, 876 N.E.2d 831 (2007). And in a similar case brought by mortgagors alleging unfair loan terms, analogous claims were held to be subject to the three-year limitations period. *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 24 (1st Cir. 1997) (holding that claims for breach of fiduciary duty; fraud, deceit, and misrepresentation; negligent misrepresentation; and negligent hiring and supervision were all governed by a three-year limitations period). Moreover, Plaintiffs use the language of tort in their allegations under this Count. (2d Am. Compl. ¶ 125) ("...duty of care...").

of the features that provide the basis for Plaintiffs' Second Amended Complaint: "impenetrable" loan terms, Wachovia's alleged control over the Index, and Wachovia's alleged knowledge that Plaintiffs "cannot afford" the loan. Accordingly, all of the Bettinellis' claims are time-barred. However, even if the limitations periods only began on the date of the Bettinellis' refinancing in July 2005, their tort claims in Counts II-VI would nevertheless have been filed outside of the three-year limitations period, and thus untimely.

As to Count I, although the First Amended Complaint first asserting a Chapter 93A claim was filed on the four-year anniversary of the 2005 loan closing, that claim was premature because it was filed *before* Plaintiffs had complied with Chapter 93A's pre-suit demand provisions. If Plaintiffs had complied with those provisions, they could only have filed that claim *after* the expiration of the four-year statute of limitations, and as such, the Bettinellis' Chapter 93A claim is time-barred as well, even if measured from the date of the 2005 loan.

The Massachusetts Consumer Fraud Act requires that *at least thirty days* prior to filing any Chapter 93A claim, a plaintiff must mail or deliver a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice and injury suffered. G.L. c. 93A § 9(3). Courts have repeatedly held that failure to comply with the Chapter 93A prerequisite is fatal to a claim and requires dismissal. *See Kanamaru v. Holyoke Mut. Ins. Co.*, 72 Mass. App. Ct. 396, 408-09, 892 N.E.2d 759 (2008) (citing *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass., 333 N.E.2d 202, 204 (1975)); *Roberts v. Crowley*, 538 F. Supp. 2d 413, 420 (D. Mass. 2008); *Burns ex rel Office of Pub. Guardian v. Hale and Dorr LLP*, 445 F. Supp. 2d 94, 97 (D. Mass. 2006) ("Massachusetts courts have strictly adhered to Chapter 93A's demand requirement."); *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 287, 475 N.E.2d 727 (1985). For example, in *Kanamaru,* the court affirmed summary judgment on a Chapter 93A

claim because the demand letter was not sent at least thirty days before filing suit. 72 Mass.
App. Ct. at 408, 892 N.E.2d 759. The court held that "[n]ot only must such a letter be sent, a
plaintiff must plead that he has complied with this requirement as a prerequisite to suit." *Id.* at
408-09.

Here, the Bettinellis sent a demand letter on June 23, 2009—the same day they filed their
original Complaint and only one day before the end of the expiration of the limitations period.
Thus, the earliest the Bettinellis could have brought a proper Chapter 93A claim was July 23,
2009. However, apparently recognizing that their claim would be time-barred if they waited the
requisite thirty days, the Bettinellis filed their First Amended Complaint asserting the Chapter
93A claim *the very next day*. Because the June 24, 2009 filing was a clear violation of Chapter
93A's demand letter requirement, the Chapter 93A claim should be dismissed. *See Logan v.
Arabella Mut. Ins. Co.*, No. Civ. A. 97-2387B, 1998 WL 324204 (Mass. Super. June 15, 1998).
And because a claim that complied with the pre-suit provisions could not have been filed until
July 23, 2009 – *after* the four-year limitations period – a properly asserted claim is time-barred.
*See Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 44 (1975) (holding that "the sending of a
demand letter was not the commencement of an action so as to satisfy the requirement of the
statute of limitations."). Thus, the Bettinellis' Chapter 93A cannot be salvaged by repleading,
and should be dismissed with prejudice.

   2.   The Piedras

The Piedras filed the Second Amended Complaint on August 6, 2010, over three years
after the March 26, 2007 date when the statute of limitations on their claims began to run.[8]

---

[8] Even if the Piedras' claim were deemed to have been filed on June 18, 2010 (when Plaintiffs sought
leave to file the Second Amended Complaint), the claims are still barred.

Accordingly, the Piedras' claims in Counts II-VI (the tort-based claims) are time-barred for the same reasons described above.

      3.   <u>Delmy Barrera</u>

Ms. Barrera joined this lawsuit after she had first filed a Complaint in state court. Her original complaint was filed on November 17, 2009, which was nearly four years after the November 18, 2005 date when the statute of limitations on her claims began to run. Accordingly, Ms. Barrera's claims in Counts II through VI are also time-barred.

    **B.**    **The Statutes Of Limitations Should Not Be Tolled Based on Equitable Tolling or the Discovery Rule.**

Having seen the arguments Wachovia presented in its prior Motion to Dismiss, Plaintiffs allege that the statute of limitations on their claims should be tolled. (2d Am. Compl. ¶¶ 103-107.) However, courts applying Massachusetts law have taken a narrow view of the equitable exceptions to limitations periods. *Salois*, 128 F.3d at 25; *see also Jobe v. INS*, 238 F.3d 96, 100 (1st Cir. 2001) (holding that "equitable tolling is a 'sparingly invoked' doctrine"). And Massachusetts law is clear that equitable tolling is not available here. A statute of limitations begins to run when a plaintiff has the "kernel from which the … claim" will grow. *Day v. Kerkorian*, 72 Mass. App. Ct. 1, 7, 887 N.E.2d 1098 (2008). A statute of limitations is only tolled when two conditions are met: (1) the defendant must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing, and (2) the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise of due diligence. *Gonzalez v. U.S.*, 284 F.3d 281, 292 (1st Cir. 2002) (citations omitted). Plaintiffs are unable to meet either of these two conditions.

As to the first condition, nowhere do Plaintiffs allege that Wachovia engaged in any fraud or concealment. On the contrary, all of the allegations are based on terms that were disclosed in

the loan documents (and accurately so). *See supra* § II(A)(2). As to the second condition,

Plaintiffs have made no claim that they engaged in any due diligence whatsoever; nor can they,

because by merely reading the documents that they admit Wachovia provided to them as part of

the loan process, Plaintiffs could have discovered all the terms of the loans about which they

now complain. Under Massachusetts law, "one who signs a writing that is designed to serve as a

legal document ... is presumed to know its contents." *Salois v. Dime Sav. Bank of New York,*

*FSB,* 128 F.3d 20, 26 n. 10 (1st Cir. 1997) (quoting *Hull v. Attleboro Sav. Bank,* 33 Mass. App.

Ct. 18, 24, 596 N.E.2d 358 (1992)).  Thus, Plaintiffs are presumed to know (a) that Wachovia

had the right to choose an alternative index if the Index became unavailable; (b) that their

biweekly payments might be insufficient to pay the total amount of interest, (c) and that if that

occurred the interest would be added to the principal; and that the principal could never exceed

125% of the original amount borrowed without changing the biweekly payment amount. (*See* 2d

Am. Compl., Exhs. 4-6.)  Accordingly, Plaintiffs knew from the time of the closing of the loans

of all of the terms of which they now complain; there was nothing for them to "discover".

The First Circuit addressed this very issue in *Salois v. The Dime Savings Bank of NY*, 128

F.3d at 23-26. There, plaintiff-mortgagors brought an action against a bank alleging violations

of federal and Massachusetts statutes, as well as common-law contract and fraud claims, all

arising from mortgages that resulted in negative amortization. *Id.*  Plaintiffs attempted to

circumvent the statutes of limitation by arguing that their claims were subject to equitable

tolling, *id.* at 24, because "teasing [the relevant] information out of the documents would have

required... a level of sophistication that they did not, and could have been expected to, possess."

*Id.* at 23. The Court rejected that argument, finding that the loan documents contained all of the

necessary information to determine whether plaintiffs had a cause of action:

> [T]he documents contained all of the information necessary to determine the interaction of Dime's formula with the prevailing interest rates. It was attorney consultation, rather than newly-discovered information, that prompted the plaintiffs' lawsuit. Therefore, sufficient facts—indeed *all* the facts—were available to place plaintiffs on inquiry notice of fraudulent conduct. Moreover, even if we regard plaintiffs' consultation with an attorney as "discovered" information that revealed Dime's alleged concealment, if cannot be said that plaintiffs were reasonable in waiting until 1994 to consult an attorney, when it was clear as early as 1988 that their loans had begun to accrue deferred interest. As the district court observed, "The loan documents notified the plaintiffs of the possibility of negative amortization, when it would apply, and how it would work," so that even "[i]f [Dime] had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud."

*Id.* at 26 (emphasis in original). Plaintiffs make the same argument here – that they "did not … have knowledge of Defendant's violations of law more than four years prior to the initiation of this action" (2d Am. Compl. ¶ 105) – and it should be rejected for the same reason this argument was rejected in *Salois*.

### C.     The Continuing Violation Doctrine Is Not Applicable to Plaintiffs' Claims.

In another attempt to fix their statute of limitations problems, Plaintiffs also allege for the first time that their claims are spared by the "continuing violation doctrine." (2d Am. Compl. ¶¶ 98-102, 108.) Although the doctrine is sometimes applied in the context of civil rights violations – and indeed, those are the very cases that Plaintiffs mention in their complaint[9] -- there is little precedent for applying it in circumstances, like those here, involving fully disclosed loan terms (and Plaintiffs do not cite any such cases). Moreover, application of the doctrine in these circumstances would effectively make the statute of limitations meaningless. Even if a plaintiff is aware of a potential cause of action, she would have a limitless amount of time to bring a

---

[9] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (employs "continuing violation doctrine" to claims of racial steering practices violative of the *Fair Housing Act*) (cited in 2d Am. Compl. ¶ 100); *Lewis v. City of Chicago*, No. 08-974, 2010 WL 2025206 (May 24, 2010) (employs "continuing violation doctrine" *to Title VII action*) (citied in 2d Am. Compl. ¶ 101); "Lilly Ledbetter Fair Pay Act of 2009," Pub. L. 111-2 (S 181) (Jan. 29, 2009) (amending Title VII of the Civil Rights Act of 1964, the Age Discrimination Act of 1967, the Americans with Disabilities Act of 1990, and the Rehabilitation Act of 1973) (cited in 2d Am. Compl. ¶ 108).

claim, even though the alleged wrong occurred as soon as the loan documents were executed. In the civil rights context, application of the doctrine makes sense because discrimination from may be ongoing. By comparison here, the alleged injury took place as soon as the loan documents were executed.

Moreover, even if Plaintiffs could conjure up some rationale for applying the continuing violation doctrine in this context, it still would not salvage Plaintiffs' untimely claims. Even courts that have applied the continuing violation doctrine in the civil rights context have held that, "if the plaintiff knew, or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1004 (7th Cir. 2000) (citing *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994)). In other words, if the claim could have bee discovered within the limitations period, the continuing violation doctrine is not applicable. Thus, because Plaintiffs could have easily discovered the allegedly problematic loan terms shortly after signing the loan documents (for reasons described above), Plaintiffs cannot rely on the continuing violation doctrine to toll their claims.

## CONCLUSION

For the foregoing reasons, Defendant Wachovia Home Mortgage, FSB respectfully requests that this Court dismiss Plaintiffs' First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice.

Respectfully submitted,

/s/ Michael S. D'Orsi
Peter E. Gelhaar (BBO# 188310)
Michael S. D'Orsi (BBO# 566960)
Jocelyn L. Dyer (BBO #660240)
DONNELLY CONROY & GELHAAR LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
Telephone: (617) 720-2880
Facsimile: (617) 720-3554
msd@dcglaw.com

Mark B. Blocker (pro hac vice)
Robert N. Hochman (pro hac vice)
Michael C. Andolina (pro hac vice)
Ariella L. Omholt (pro hac vice)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Defendant Wachovia Mortgage, FSB*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on August 27, 2010.

/s/ Michael S. D'Orsi
Michael S. D'Orsi