# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BERNARDO BETTINELLI and<br>CAROL G. BETTINELLI,<br>MARIO O. PIEDRA, and<br>MARIA PIEDRA, DELMY BARRERA,<br>and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) |
|  | ) |
| Plaintiffs | ) |
|  | ) |
| v. | ) |
|  | ) |
| WORLD SAVINGS BANK FSB,<br>N/K/A WACHOVIA MORTGAGE FSB, | )<br>) |
|  | ) |
| Defendant. | ) |

**C.A. NO. 09-11079-MLW**

**Leave to File Granted**
**September 23, 2010**

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISIMISS SECOND AMENDED COMPLAINT

Plaintiffs Bernardo and Carol G. Bettinelli, Mario O. and Maria Piedra and Delmy Barrerra, on behalf of themselves and all others similarly situated ("Plaintiffs") hereby oppose the Motion to Dismiss the Second Amended Complaint of World Savings Bank, FSB, n/k/a Wachovia Mortgage FSB ("Defendant" or "Wachovia").

## I.    INTRODUCTION

In this case, Plaintiffs allege that Defendant made Payment Option Arm ("POA") loans to them and to other Massachusetts homeowners on terms that Defendant knew offered no prospect of repayment from the borrowers' income. As the Defendant was well aware when it made the loan, the Plaintiffs do not have income or income prospects to make amortizing payments, but rather need meaningful relief from the loan to avoid default and foreclosure.  Foreclosure would be catastrophic to each Plaintiff and to similarly situated homeowners.

Defendant's Motion to Dismiss fails to acknowledge that this case is grounded in clearly enunciated standards of state unfair trade practice law under G.L. c. 93A. In *Commonwealth v. Fremont Investment & Loan,* 452 Mass. 733, 743 (2008) ("*Fremont*"), the Supreme Judicial Court affirmed a judge's conclusion that G.L. c. 93A liability was likely to be proven where a lender's actions "in originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure, were within established concepts of unfairness at the time the loans were made, and thus in violation of G. L. c. 93A, § 2."

*Fremont* establishes that the structure of a loan, made without prospect of repayment from income, can be unfair under G.L. c. 93A.  The borrowers here are hard-working homeowners with limited resources, who Defendant knew had income that ultimately would not be enough to make amortizing payments.  Defendant, through its systemic processes, underwrote the loan solely for minimum, non-amortizing payments knowing that under the loan structure affordable payment options were guaranteed to be temporary. Here, as in *Fremont*, Defendant

had more than sufficient information to conclude that the loan could not possibly be repaid by its terms.

The Defendant's preemption arguments fail in light of applicable law expressly preserving state unfair trade practice law to the extent it is grounded in contract or basic norms that "undergird commercial transactions."  Here, as the Supreme Judicial Court has recognized, making a loan that the lender knows cannot be repaid is unethical and unfair under basic commercial standards, because of the likelihood of default and foreclosure.  Indeed, the Office of Thrift Supervision ("OTS"), which issued the regulation on which the Defendant's preemption claims are based, has issued specific guidance on POA loans that makes clear that state unfair trade practice laws apply.

Finally, Defendant's effort to mischaracterize the case in order to achieve claim-by-claim dismissal fails as a matter of law.  Each cause of action is cognizable in Massachusetts and well-pled under applicable standards. Defendant has given the Plaintiffs complicated loans that were guaranteed to fail in light of the Plaintiffs' financial circumstances.  By virtue of its experience in the lending business and its superior bargaining power Defendant was undoubtedly in a position to understand this. The Plaintiffs, due to the complexities of the transaction, were not.

## II.    LEGAL STANDARD

In deciding a motion to dismiss, the court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  Dismissal for failure to state a claim is appropriate only if the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988). The complaint, read as a whole, must support

a "plausible" entitlement to relief. *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).   The Court's assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." *Id.* at 1949. The factual allegations need not be elaborate; rather, they must provide "fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

### III.    FACTUAL BACKGROUND

Plaintiffs are borrowers with no background or expertise in the mortgage lending industry, who refinanced their mortgages with Defendant.  *See* Second Amended Complaint [Docket No. 40] ("Complaint") ¶¶ 9, 42, 44 (Bettinnellis), ¶¶ 66, 67 (Piedras), ¶¶ 80, 83 (Barrera).  These loans, which are Payment Option Arms loans ("POA"), are the subject of Plaintiffs' Complaint.  Complaint, ¶¶ 47-48, 50 (Bettinellis), ¶ 69 (Piedras), ¶ 83 (Barrera). Plaintiffs challenge the unfair and deceptive conduct of World Savings and its successor in interest, Wachovia, relating to the POA loans the Plaintiffs and others like them received.  *E.g.*, Complaint ¶¶ 1-5, 29-31, 38-39, 60-63, 44-47, 69, 84.  Specifically, they assert that World Savings made the loan knowing that it could not be repaid by its terms, because the Plaintiffs could only afford the non-amortizing minimum monthly payment.  Complaint, ¶¶ 5, 21, 34-35, 38, 48 (Bettinellis), ¶ 70 (Piedras), ¶ 85 (Barrera).

To foster and obscure the unfair structure of the loan, Plaintiffs' POA loan contracts contain numerous deceptive features relating to the loan's interest rate, monthly payments and amortization schedule, which hid its real cost to the Plaintiffs.  Complaint, ¶¶ 1, 5, 47-56 (Bettinellis), ¶ 69 (Piedras), ¶ 84 (Barrera).  On the Bettinellis' loan, the adjustable rate note states that the interest rate on the loan would be at a "yearly rate" of 5.370% when the rate would

only be in effect for less than two months and that biweekly payments would be $513.98, when those payments would lead to negative amortization and then to an increase in payments. Complaint, ¶ 47.  The adjustable rate note in the Piedras' loan states that the interest rate would be at a "yearly rate" of 7.6% when that rate would only be in effect for two months, that monthly payments would be $2048.85, when those payments would lead to negative amortization and then to an increase in payments.  Complaint, ¶ 69.  Ms. Barrera's POA loan note also contains a statement that the interest rate on the loan would be at a "yearly rate" of 6.37% when such rate would only be effective for less than two months, and a statement that monthly payments would be $1515.01 when those payments would lead to negative amortization and then to an increase in payments.  Complaint, ¶ 84.  The interest rate of these POA loans was based on a margin and an index.  Complaint, ¶¶ 23 (Piedras), 86 (Barrera).  The margin is added to the "Current Index." Complaint, ¶¶ 71 (Piedras), 86 (Barrera).  The use of the term "Current Index" is deceptive in that the Index was not fixed by then "current" market conditions and remained entirely within the control of World Savings, and then Wachovia.  Complaint, ¶ 71.  Under the note, Defendant can change the Index at will, and has done so.  Complaint, ¶¶ 52 (Bettinellis), 75 (Piedras), 86 (Barrera).

Plaintiffs' note language was designed to hide the actual interest that would be applied and was intended to deceive about the actual interest rate applicable to the transactions. Complaint, ¶¶ 50 (Bettinellis), 74 (Piedras), 88-89 (Barrera).  Defendant knew or should have known that the note language describing these features would be impenetrable to its average customers, including the Plaintiffs.  Complaint, ¶¶ 26-29, 54 (Bettinellis), ¶ 77 (Piedras), 85, 92 (Barrera).

4

While World Savings designed and originated the Plaintiffs' unfair and deceptive POA loans, Wachovia has continued this deception by continuing to take advantage of the loan structure to demand increasingly excessive payments from Plaintiffs, Complaint, ¶¶ 94 (Barrera), 60 (Bettinellis), and communications referring to non-amortizing payments as "interest only," that imply the payments would cover all of the interest then due.  Complaint, ¶¶ 57-58 (Bettinellis).  World Savings and Wachovia knew or should have known that Plaintiffs could not afford these payments.  Complaint, ¶¶ 48 (Bettinellis), 70 (Piedras), 85 (Barrera).  Rather than work with the Plaintiffs to modify their loans to make them permanently affordable, Wachovia has denied them loan modifications or only offered loan modifications that would preserve the structural disadvantages and unfairness to the Plaintiffs.  Complaint, ¶¶ 59 (Bettinellis), 78 (Piedras), 96 (Barrera).

## IV.    ARGUMENT

### A.    Plaintiffs Adequately State a Claim for Relief Under G.L. c. 93A

Wachovia's assertion that the Plaintiffs have failed to adequately plead a cause of action under G.L. c. 93A is wrong.  The Supreme Judicial Court considers the following in determining whether a practice is unfair: "(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 778 (1986) ("*Datacomm*") (quotations omitted).  Chapter 93A creates new substantive rights and, in certain cases, "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." *Kattar v. Demoulas*, 433 Mass. 1, 12 (2000) (quotation omitted). The statute does not define unfairness, recognizing that "[t]here is no limit to human inventiveness in this field." *Id*. (quotation omitted).

### 1. *Wachovia Misstates the Standard for Identifying Unfair and Deceptive Acts or Practices*

The error of Wachovia's position begins with its misstatement of the standard under which courts are to identify unfair or deceptive acts. *See* Memorandum in Support of Motion to Dismiss [Docket No. 47] ("MTD") at 16-17 (stating that unfair or deceptive conduct must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.") The "level of rascality" standard identified by Wachovia was expressly rejected by the Supreme Judicial Court fifteen years ago. "We view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness' in deciding questions of unfairness under G.L. c. 93A." *Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc*., 420 Mass. 39, 42-43 (1995) ("*MEIC*"). Instead, the SJC has instructed courts to "focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." *Id.; See also States Resources Corp. v. The Architectural Team, Inc*., 433 F.3d 73, 84-85 (1st Cir. 2005); *Incase Inc. v. Timex Corp*., 488 F.3d 46, 57 (1st Cir. 2007) ("*Incase*").

Properly articulated, the test for unfairness considers the *Datacomm* factors laid out above and also takes into account the equities between the parties, including an examination of their respective knowledge and bargaining power. *Incase*, 488 F.3d at 57; *Swanson v. Bankers Life Co*., 389 Mass. 345, 349 (1983) ("In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. . . . What a defendant knew or should have known may be relevant in determining unfairness. . . . Similarly, a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair.")

2.      ***Analyzed Under the Correct Standard, the Complaint Adequately Alleges Unfair and Deceptive Acts or Practices***

Applied to the facts *sub judice*, the SJC's standard for identifying unfair and deceptive acts is pled.  The nature of the challenged conduct is that Defendant made loans that knew borrowers would never be able to repay, focusing on the fees earned in the course of loan origination, and dependent on the foreclosure value of the collateral rather than the likelihood that the loan would be amortized in the normal course.  [Complaint, ¶¶ 22, 34-38].  Average borrowers were deceived into accepting these loans by the blizzard of language in the notes, making it nearly impossible for them to come to a full understanding of the terms of the loan. [Complaint, ¶¶ 23-30].  The nature of this conduct is inherently unfair and deceptive, taking advantage, as it did, of the imbalance of power between the parties.

So too are the equities between the parties and the parties' respective knowledge at the time of the transaction fully supportive of G.L. c. 93A violations.  Mr. and Mrs. Bettinelli, like most average borrowers, have little or no expertise in the mortgage industry and are employed as a trucker and at-home daycare provider, respectively.  [Complaint, ¶¶ 2, 43].  Mr. Piedra, an Ecuadoran immigrant employed in the food services industry, and his wife likewise have no expertise in mortgage lending.  [Complaint, ¶ 66].  Ms. Barrera has only a seventh-grade education from El Salvador and does not speak or read English – she has no expertise in lending or the financial services industry. [Complaint, ¶¶ 80].   Yet, the loans that were sold to them were among the "riskiest and most complicated home loan products ever created." [Complaint, ¶ 20] (quoting a 2006 *Business Week* article).  In light of the complex and confusing loan terms incorporated into these loans by Defendant, even fairly sophisticated consumers would have difficulty understanding them. [Complaint, ¶ 20].

In contrast to the sophistication and understanding level of its average borrowers, World Savings Bank was among the nation's largest financial institutions at the time these loans were made, with assets of $124 billion and an annual profit of $1.5 billion as of December 31, 2005.[1] Defendant made these loans knowing that borrowers could not afford the fully indexed rate or the anticipated fully amortizing payments. [Complaint, ¶¶ 21, 29].  Given the degree of complexity of the language contained in the notes at issue, Defendant knew or should have known that an understanding of the loan terms would be impossible for its average customer.  *Id.* This sort of incongruity in the positioning of the parties is generally supportive of liability under Chapter 93A.

The Court need not rely on this general application, however, because it is not writing on a blank slate.  In *Fremont*, the Supreme Judicial Court stated at least three times that is unfair for a mortgage lender to make a loan it knows the borrower cannot repay. *Fremont*, 452 Mass. at 743 ("…originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure, are within established concepts of unfairness…in violation of G.L. c. 93A); *Fremont*, 452 Mass. at 745-46 (noting that the record showed that Fremont made no effort to determine whether borrowers could afford its loans, and that it was unreasonable, and unfair to the borrower, for Fremont to structure its loans on "unsupported optimism" that housing prices would improve and that unaffordable loans could be

---

[1] This information is contained in the Annual Report Form 10-K filed by Golden West Financial Corporation, the former parent of World Savings Bank, with the Securities and Exchange Commission for year-end 2005.  *See* SEC Form 10-K of Golden West Financial Corporation (filed March 8, 2006) *available at* http://www.sec.gov/Archives/edgar/data/42293/000119312506048352/d10k.htm#tx89653_48 The Court may take judicial notice of public records on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (on a motion to dismiss, the court "may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'").

refinanced); *Fremont*, 452 Mass. at 748-49 (originating mortgage loans that the lender should recognize at the outset the borrower is not likely to be able to repay violates Chapter 93A).[2]

As described more fully above, Plaintiffs plausibly assert that Defendant gave them a mortgage loan with terms and a structure that it knew could only result in default. [Complaint, ¶¶ 5, 21, 35, 38, 48, 70, 85].  Plaintiffs claim that Defendant acted unfairly because it did not reasonably believe that they and others like them would be able to make the scheduled payments required by the POA loans and avoid default and foreclosure. [Complaint, ¶¶ 48, 70, 85].

In addition, the Complaint cites numerous studies and articles that discuss the practical financial implications of POA loans like the one they received. [Complaint, ¶¶ 13-21].  All of these studies discuss the unfair and risky features of POA loans, such as their likelihood of default, negative amortization, forced payment restructuring including interest paid on interest and the resulting payment shock. *Id*.  These articles and studies bolster the claim that Defendant, being in the business of consumer lending, understood or should have understood the unfairness of the transaction, in ways that the Plaintiffs, as average consumers, could not.

Moreover, the OCC, OTS and other agencies issued an advisory specifically warning about the risks of POA loans and the necessity of adopting underwriting practices that consider a borrower's ability to make future amortizing payments. Interagency Guidance on Nontraditional

---

[2] Defendant's motion papers place great reliance on a handful of lower court decisions subsequent to *Fremont* for the proposition that it should only be narrowly be applied to loans that precisely align with those at issue in that case. *See* MTD at 17-18.  The above quoted language from the Supreme Judicial Court itself reveals this reading to be overly-restrictive.  The question here is whether Plaintiffs have adequately pled Defendant's commission of unfair and deceptive acts and practices – whether they fall within the penumbra of established concepts of unfairness, not whether the loans at issue meet the four criteria laid out by the trial court judge in *Fremont* for the purposes of the preliminary injunction there at issue.  As laid out more particularly below, *Fremont* relied on various state and federal pronouncements to hold that loans made without a realistic expectation of being repaid  can run afoul of established concepts of unfairness.

Mortgage Product Risks ("Agency Advisory"), 71 Fed. Reg. 58,609, 58,613 (Oct. 4, 2006)

(attached as Appendix 2):

> Payments on nontraditional loans can increase significantly when the loans begin to amortize. Commonly referred to as payment shock, this increase is of particular concern for payment option ARMs where the borrower makes minimum payment that may result in negative amortization.

> For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate…[i]n addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.

*Id.*, at 58,614.

> Institutions should avoid the use of loan terms and underwriting practices that may heighten the need for a borrower to rely on the sale or refinancing of the property once amortization begins. Loans to individuals who do not demonstrate the capacity to repay, as structured, from other sources other than the collateral pledged are generally considered unsafe and unsound.

*Id.*  These specific announcements followed years of general warnings from state and federal regulators that "'[l]oans to borrowers who do not demonstrate the capacity to repay the loan, *as structured*, from sources other than the collateral pledged are generally considered unsafe and unsound.'"  *Fremont*, 452 Mass. at 744 (emphasis in *Fremont*), *quoting* "Expanded Guidance for Subprime Lending Programs" issued jointly by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, at 11 (Jan. 31, 2001). There can be little doubt that the same established concepts of unfairness vis-à-vis the borrowers ability to repay are equally applicable here.

Defendant also purports to find fault with Plaintiffs' pleading of deceptive practices under G.L. c. 93A.  Conduct is deceptive if it reasonably can be found to have caused plaintiffs

to act differently than they otherwise would have acted. *Grossman v. Waltham Chem. Co.*, 14

Mass. App. Ct. 932, 933 (1982).  Regardless of the technical content of the notes at issue –

Plaintiffs do not here claim that Defendant's behavior violated any rules of disclosure, *per se* –

the Complaint more than adequately alleges conduct fitting this definition of deception.

[Complaint, ¶¶ 23-30, 49, 72, 87] (alleging, *inter alia*, that "customers were deprived of an

opportunity to understand the consequences of a World Savings Loan, could not comparison

shop and could not evaluate the likely cost of future mortgage payments under the loan as

designed.")  Defendant's callous assertion that Plaintiffs "could have simply shopped

elsewhere," *see* MTD at 20, not only inappropriately quarrels with the factual pleading on a

motion to dismiss, it also entirely misses the point.  The Complaint alleges that because the loan

documents were complex and deceptively drafted, Plaintiffs were unable to understand or grasp

the harm that might befall them in such a loan.  Stated differently, Plaintiffs did not know that

they did not know.  Under the standard set forth by Massachusetts courts under Chapter 93A, the

Complaint more than adequately alleges deceptive acts and practices.

## II.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED

Remarkably, Defendant fails to cite the case law that establishes that most state

unfairness claims – those that do not require enforcement of specific state lending regulations --

are not preempted by the Home Owners' Loan Act ("HOLA"). Indeed, Defendant fails to

acknowedge that its regulator, the Office of Thrift Supervision, has issued specific guidance on

Payment Option Arm products that makes clear that unfair and deceptive acts and practices

("UDAP") laws, such as 93A, apply despite HOLA.

Defendant also fails to note that United States District Court Judge Jeremy Fogel, who

was appointed to oversee the Multidistrict litigation to which Wachovia belatedly sought to have

this case transferred (Docket No. 27), opined on these issues in a case involving Wachovia in 2008.  Judge Fogel found that UDAP claims, such as those presented by the case here, are *not* preempted.  *Mandrigues, et al. v. World Savings Bank, Inc. et al.* C.N. 07-04497 JF, Docket No. 40 (N.D. Cal., April 9, 2008) ("Mandrigues") (copy attached as Appendix 1). That Wachovia was a Defendant in that case and is subject to the ruling but yet fails to mention it in its briefing, further suggests that Wachovia deliberately failed to seek transfer of this case as a tag-along to the proceeding before Judge Fogel in order to seek an inconsistent ruling on preemption here.[3] Plainly, such a ruling would enhance the complications already inherent in resolving the MDL. Wachovia's manipulations should not be countenanced.

### A.    Federal Law Does Not Preempt States From Applying Their UDAP Laws To Cases Involving Lending Abuses

As the First Circuit has recently explained:

> To simplify a complex area of law, preemption arguments are generally divided into three categories. *Fitzgerald,* 549 F.3d at 52. The first, express preemption, results from language in a statute revealing an explicit congressional intent to preempt state law. *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). The second, field preemption, is that Congress may implicitly preempt a state law by creating a pervasive scheme of regulation. *Fitzgerald,* 549 F.3d at 52; *N. Natural Gas Co. v. Iowa Utils. Bd.,* 377 F.3d 817, 823 (8th Cir.2004) (holding a state's site-specific environmental review field preempted because FERC has authority under the NGA to consider environmental issues). The third category is conflict preemption. In this category, state law is "pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 53 (quoting *Good v. Altria Group,*

---

[3] Wachovia's choice to notice this longstanding matter as a "tag-along" case more than sixteen months after the JPML was formed already strongly suggests manipulation. *See* Mem. Addressing the Implications of the Proposed Second Amended Complaint on the Pending Motion to Dismiss [Docket No. 36] at 6.  Under JPML Rule 7.5(e), Wachovia was required to "promptly notify the Clerk of the Panel of any potential 'tag-along actions' in which that party is also named or in which that counsel appears." Wachovia violated this rule by failing to notify the JPML of its belief that this matter constitutes a "tag-along" action until July 9, 2010, more one year the complaint was filed.

*Inc.,* 501 F.3d 29, 47 (1st Cir.2007)).

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council,* 589 F.3[rd] 458, 472-473 (1st Cir. 2009).  Preemption is an affirmative defense on which the Defendant bears the burden of proof.  *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.,* 510 F.3d 77 (1st Cir. 2007).

Defendant's position is apparently that the OTS's HOLA regulation, 12 C.F.R. § 560.2, despite the specific exceptions to preemption found at section 560.2(c), occupies the field such that consumers lose *any* right to consumer protection for unfairness or deception under state law. Defendant fails even to attempt to carry its burden of proof on preemption other than by making conclusory statements that mischaracterize the complaint or read allegations outside their context.  Additionally, on threshold preemption questions Defendant is simply wrong on the law.

**1.  HOLA Preemption Does Not Prevent Operation Of Basic Fairness Protections Under State Law.**

In an opinion by Judge Posner, the Seventh Circuit has held that common law and commercial law claims, including contract-based claims and state statutory unfairness claims grounded in common law or other federal regulation, are not preempted by Office of Thrift Supervision Regulations, 12 C.F.R. § 560.2.  The opinion states as follows:

> [W]e read subsection (c) [of Section 560.2] to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies. Suppose an S & L signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the mortgagee (or a servicer like Ocwen) fraudulently represents to the mortgagor that it will forgive a default, and then forecloses, it would be surprising for a federal regulation to bar a suit for fraud. Some federal laws do create such bars, notably ERISA, see 29 U.S.C. §§ 1132(a), (e), but this is recognized as exceptional.  *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 232, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995);  *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142-43, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Enforcement of state law in either of the mortgage-

servicing examples above would complement rather than substitute for the federal regulatory scheme.

This is well explained in "Preemption of State Laws Applicable to Credit Card Transactions" ¶ IIC (Opinion of OTS Chief Counsel, Dec. 24, 1996, 1996 WL 767462):

> State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b).... The [Indiana] DAP [deceptive acts and practices] statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit. Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, ... a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.
>
> The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions.... The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute-the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law.
>
> *See also Courtney v. Halleran,* 485 F.3d 942, 951 (7th Cir.2007); *Binetti v. Washington Mutual Bank,* 446 F.Supp.2d 217, 220 (S.D.N.Y.2006) ( "the New York Consumer Fraud Statute is precisely the type of general commercial law designed to 'establish the basic norms that undergird commercial transactions' that OTS has indicated it does not intend to preempt"); *cf. Cliff v. Payco General American Credits, Inc.,* 363 F.3d 1113, 1124-25 (11th Cir.2004); *Bank of America v. City & County of San Francisco, supra*, 309 F.3d at 559.

*In re Ocwen Federal Bank Loan Servicing Litig.,* 491 F.3d 638, 643-644 (7th Cir. 2007). It is important to note that Judge Posner is relying on the OTS's own statements in reaching this conclusion. The OTS does not intend by regulation to limit state unfair and deceptive practices laws – laws like Chapter 93A – designed to protect consumers by regulating "ethical practices of all businesses engaged in commerce." As described more fully above, regulating "ethical

14

practices" of businesses is exactly what the Supreme Judicial Court has done, in *Fremont*, by

regulating lending practices that will inevitably result in defaults and foreclosures.  The SJC

grounds its holding in *Fremont* in specific federal regulatory guidance similar to that which is

present here and described below.

The First Circuit has recently cited the Seventh Circuit decision in *Ocwen* with approval:

> As to Yeomalakis' count II claim under chapter 93A, HOLA does not preempt ordinary
> contractual claims based on state law; Yeomalakis could have argued that Washington
> Mutual's account agreement did not permit the "retroactive" increase. Similarly, while the
> OTS regulation purports to preempt state regulation of disclosure and advertising, it is
> debatable how far HOLA supersedes ordinary fraud claims under state law. *See In re
> Ocwen Loan Servicing,* 491 F.3d 638 (7th Cir.2007) (Posner, J.).

*Yeomalakis v. F.D.I.C.*, 562 F.3d 56, 61 (1st Cir. 2009). *See also e.g., Michalowski v. Flagstar*

*Bank*, 2002 WL 113905 at 5 (N.D. Ill. 2002); *Alkan v. Citimortagage, Inc*., 336 F. Supp. 2d

1061, 1064 (N.D. Cal. 2004); *Gibson v. World Savings & Loan Assn*., 103 Cal. App. 4th 1291

(Cal. App. 2002).  *See generally Morse v. Mutual Federal Savings and Loan Association*, 536 F.

Supp. 1271, 1280-81 (D. Mass. 1982) (pre-section 560.2 holding that federal savings and loans

are subject to a general Massachusetts statute proscribing unfair and deceptive business

practices).

Importantly, these are also the views of Judge Fogel, who has been assigned by the JPML

to oversee MDL No. 2015:  *Wachovia Corp. "Pick a Payment" Mortgage Marketing and Sales*

*Practices Litigation*.  In 2008, Judge Fogel opined:

> The OTS recognizes that HOLA preserves the rights of states to regulate for the
> protection of consumers and others, the regular contract and commercial practices of
> lenders. Se OTS Opinion Ltr., December 24, 1996.

*See Mandrigues*, attached as Appendix 1, at 4.  Judge Fogel also notes that *Silvas v. E-Trade*

*Mortgage Corp.*, 514 F.3rd 1001 (9th Cir. 2008), on which Wachovia heavily relies,  "recognizes

that HOLA does not preempt UCL claims in which the 'predicated acts were violations of the

general legal duties with which every business must comply.'" *Mandrigues* at 5, *quoting Silvas* at 1320.

As Judge Posner notes in *Ocwen*, the OTS itself has disavowed any intention of occupying the field by making clear that it does not intend to undermine general state commercial laws that "undergird commercial transactions."[4]   Basic state fairness doctrines, including laws governing good faith and fair dealing are just such state laws.  *Id.*  As discussed above, Plaintiffs here do not seek remedies for how the loan was disclosed.  Nor do they seek a ruling that all loans involving negative amortization and upward payment adjustments are illegal.  Rather, they seek a remedy under *Fremont*, for the unfairness inherent in making a loan in a structure that Defendants knew, based on its underwriting, could not be repaid by its terms.

### 2. The OTS Itself Has Warned Regulated Thrifts, Like The Defendant, Of The Dangers Of Payment Option Arm Loans And That State Unfairness Law May Apply.

In the Agency Advisory that governs this issue (attached as Appendix 2), the Office of Thrift Supervision pointed out the very problems with Payment Option Arm loans that the Plaintiffs challenge here:

> Residential mortgage lending has traditionally been a conservatively managed business with low delinquencies and losses and reasonably stable underwriting standards. In the past few years consumer demand has been growing, particularly in high priced real estate markets, for closed-end residential mortgage loan products that allow borrowers to defer

---

[4] These views are consistent with the Obama Administration's expressed intention to limit application of federal preemption.  In a Presidential Memo Regarding Preemption, issued on May 9, 2009, President Obama stated: "the general policy of my Administration [is] that preemption of State law by executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption." *Available at* http://www.whitehouse.gov/the_press_office/Presidential-Memorandum-Regarding-Preemption/  Courts have used this statement as an additional ground for ruling against preemption in close cases. *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 668 F. Supp. 2d 831, 838 (W.D. La. 2009); *Cook v. Ford Motor Co.*, 913 N.E.2d 311, FN7 (Ind. App. 2009).

repayment of principal and, sometimes, interest. These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.

\* \* \*

Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:

• Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;
• Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio; and
• Ensure that consumers have sufficient information to clearly understand loan terms and associated risks prior to making a product choice.

Agency Advisory at 58,613.

The OTS goes on to warn regulated Thrifts of exactly the potential for the type of

problem raised by the Plaintiffs:

While nontraditional mortgage loans provide flexibility for consumers, the Agencies are concerned that consumers may enter into these transactions without fully understanding the product terms. Nontraditional mortgage products have been advertised and promoted based on their affordability in the near term; that is, their lower initial monthly payments compared with traditional types of mortgages.

Agency Advisory at 58,616.

Most importantly, the OTS then makes clear that state laws, including those governing

unfair trade practices, may apply:

**Legal Risks** – Institutions that offer nontraditional mortgage products must ensure that they do so in a manner that complies with all applicable laws and regulations. With respect to the disclosures and other information provided to consumers, applicable laws and regulations include the following:

> • Truth in Lending Act (TILA) and its implementing regulation, Regulation Z.
> • Section 5 of the Federal Trade Commission Act (FTC Act).
>
> * * *
>
> *State laws, including laws regarding unfair or deceptive acts or practices, also may apply.*

Agency Advisory at 58,617 (emphasis added).

Plainly, the OTS was aware that regulated thrifts are not protected from unfairness claims by HOLA regulation. There would be no reason for the OTS to warn of the need to comply with state UDAP laws if its position was that such laws never apply. As noted by Judge Posner and Judge Fogel, this is consistent with the Agency's position since at least 1996. *Ocwen* at p. 643-644.

The Agency Advisory is similar to the Guidance relied on by the SJC in *Fremont*. Here, as in *Fremont*, the evidence is clear that the lender was on notice of exactly the type of problems that the Plaintiffs face. It would be anomalous if the result here were different from *Fremont* solely because the entity ignoring federal guidance *is actually regulated* by the entity issuing the warnings. Defendant, should have, but did not, heed its own regulator.

**B.     Preemption Does Not Affect Specific Claims.**

At pages 9-15 of its brief, by attempting to ignore what this case is about, Defendant asserts that certain claims are preempted because they come within section 560.2(b).

**1.   G.L. c. 93A**

The UDAP issues under *Fremont* are largely addressed above. This is not, as Defendant attempts to assert in its claim-by-claim analysis, a case like *Silvas v. E-Trade Mortgage Corp.*, 514 F.3rd 1001 (9th Cir. 2008) in which Plaintiffs sought state remedies for E-Trade's efforts to undermine the federal disclosure regime. Nor is it a case in which Plaintiffs challenge the way in

which the loan was advertised.  The Plaintiffs argue here primarily that the loan structure, as applied to them, was unfair, as in *Fremont*, because the lender knew or should have known, that the loan could not be repaid by its terms.  Entering into a complex consumer contract that the lender knows will inevitably lead to default is, put mildly, an unethical business practice subject to general business regulation by states.  That is especially true where homes are at issue and local government is likely to be left with the social consequences attendant to resulting foreclosures including homelessness, property deterioration and loss of property tax revenues.

To the extent the issues here go beyond unfairness and touch on deception, Wachovia's argument appears to be that its regulator specifically permits it to make deceptive statements about its loan products.  For example, Plaintiffs allege that communications made in billing statements containing the language that a payment is "interest only" are deceptive because they imply that the payment covers all of the interest then due, when instead the loan is set up to negatively amortize.  [Complaint, ¶ 57].  Notably, Wachovia does not point to a specific regulation that allows it to call a non-amortizing payment "interest only", but rather simply makes an assertion that the regulation treats all "disclosure and advertising" as preempted matters covered by § 560.2.  Defendant's Memo at 9.  The idea that any deceptive statement that Wachovia makes about its loan is necessarily a "disclosure" or "advertising" even when it appears in a billing statement is plainly overbroad and undermines basic state regulation of deception and fraud.  *See Ocwen, supra.*

As Judge Fogel noted, *Silvas* itself makes clear that "HOLA does not preempt UCL claims in which the 'predicated acts were violations of the general legal duties with which every business must comply.'" *Mandrigues* at p. 5; *Silvas*, 421 F. Supp. 2d at p. 1320. This perforce must include deceptive statements that are at variance with the actual loan terms and conditions.

19

Otherwise a regulated lender could tell a borrower, for example, "your interest rate is 5%" even though it is 10% and the borrowers would have no recourse because the representation can be termed a "disclosure," (albeit false). This is plainly absurd.  The only case Wachovia cites that provides it any support, *Andrade v. Wachovia Mortgage, FSB*, No. 2009 WL 111182 (S.D. Cal. April 21, 2009), is one in which Plaintiff "neither filed an opposition nor sought additional time to do so." Id. at *1.[5]  In that case, the result is explained better by the absence of opposition, than by the force of Wachovia's arguments.

To the extent Plaintiffs assert other claims about "disclosed information," it is opaque language of the loan contract itself.  The Plaintiffs claim, as unsophisticated average consumers, that deceptive and confusing contractual language made it impossible for them to understand the unfairness of the loan structure.  This is thus not a case about federally mandated ancillary disclosures as in *Silvas*.  Moreover, contrary to Defendants' argument, the claim that reservation of the right to change the contractual interest rate at any time, including by use of an "index" under the Defendants' sole control, is a pure question of state contract law, that is expressly preserved under section 560.2(c)(1).

## 2. Negligent Underwriting

For the reasons discussed below, the Plaintiffs' claim for negligent underwriting is based on a standard of care imposed by the Massachusetts legislature and is squarely within the principles underlying *Fremont*.  The problem with Defendants' position on preemption of this claim is neatly illustrated by its attempt to characterize this claim as one that challenges the amortization of the loans and the deferral and capitalization of interest.  The Defendant needs to

---

[5] Because the JPML formed the Wachovia MDL on February 9, 2009, the April 2009 decision date of *Andrade* is curious. *Andrade* appears to be another case that Wachovia conveniently forgot to disclose as related to the MDL. It appears that Wachovia preferred an opportunity to get a favorable ruling in a case in which the Plaintiff chose not to participate.

perform this sleight of hand to overcome the applicability of *Fremont* and that case's general

conclusion that a loan needs to be underwritten to standards that suggest that it can be repaid.

The fact that the Plaintiffs' loan involved negative amortization, deferral of interest and

interest capitalization is not, in and of itself, being challenged.  The abuse being challenged is

carelessly underwriting such a loan in a way that allows a lender to make a loan that can only

result in default and foreclosure.  Quite simply, World Savings knew or should have known that

the Plaintiffs could only make non-amortizing payments. [Complaint, ¶¶ 5, 34-35, 48, 70, 85]  If

there were any doubt, World Savings saw the result of its 2002 loan to the Bettinellis in a

negatively amortizing structure when it refinanced in 2005 and already then capitalized

substantial unpaid interest.

### 3.  Illegality of Contract

Plaintiffs assert that as a matter of state contract law, Defendant cannot reserve the right

to change the interest rate unilaterally or to charge interest on interest.  These are precisely the

types of state law claims that are saved under HOLA by 12 C.F.R. § 560.2(c)(1) governing state

contract laws.  It is only by characterizing this case as something it is not, a general legal

challenge to loans requiring negative amortization, that Defendant can assert preemption.


### III.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY APPLICABLE STATUTES OF LIMITATION

#### A.  The Piedras Have Filed a Timely Class Claim under Chapter 93A and Fully Complied with the Statute's Demand Letter Requirement

There are no grounds to dismiss the G.L. c. 93A claims of the Piedras and the putative

class on the basis of timeliness.  As incorporated and alleged in the Complaint, the Piedras sent

Defendant a demand letter on March 4, 2010.  Complaint, ¶ 40 & Ex. 1.  Wachovia responded to

that demand on March 29, 2010 by denying liability and refusing to make an offer of settlement.

Complaint, ¶ 41.  Defendant does not challenge the validity of the Piedras' demand, made on behalf of a putative class, nor could it.  The Supreme Judicial Court has ruled that a demand letter sent on behalf of a class of similarly situated homeowners is sufficient to fulfill the pre-suit demand requirement for the entire class. *Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 43 (1975) ("*Baldassari*") ("If a proper demand is made by one plaintiff, identifying him as the claimant and reasonably describing the act or practice relied on and the injury suffered by him, we think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice.")  *Accord Schorr v. Countrywide Home Loans, Inc.*, No. S10Q019, 2010 WL 2718993 at *2-*3 (Ga. July 12, 2010) (citing *Baldassari* and reciting the "general rule allowing the named plaintiffs in a class action to satisfy preconditions for suit on behalf of the entire class").  Therefore, regardless of how the Court rules on the remaining statute of limitations issues, the Piedras have brought a valid, timely class claim under Chapter 93A that fully complies with the statute's prerequisites to suit.

### B.  With Regard to the Claims of the Bettinellis, Chapter 93A's Thirty Day Notice Requirement Does Not Abridge Its Four Year Statute Of Limitations Period

In connection with the individual Chapter 93A claims of the Bettinellis, Defendant urges the Court to find that 93A's four year statute of limitations is actually a three year, eleven month limitations period – because a consumer would be required to send a demand letter at least thirty days prior to the end of the limitations period. [MTD, at 28-29].  Even if the Bettinellis' demand letter is found to have failed some technical requirements of the statute, this is inconsequential, because the Piedras sent a timely demand letter.  [Complaint, ¶¶ 40-41].  That neither of these letters yielded an offer of settlement from Wachovia reveals its position on this motion to be exceedingly hollow -- even if the Bettinellis had sent their demand letter earlier, no offer of settlement was forthcoming.  *Id.*

Wachovia does not complain that it was not given adequate notice of the claims against it; rather, it asserts only a bare technical violation of the statute's demand letter requirement.  As the Supreme Judicial Court has admonished regarding chapter 93A, "technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice." *Leardi v. Brown*, 394 Mass. 151, 159 (1985), *quoting Baldassari*, 369 Mass. at 41.  "This includes the reading of the demand letter requirement." *Richards v. Arteva Specialties S.A.R.I.*, 66 Mass. App. Ct. 726, 730 (2006) ("*Richards*"), *citing Baldassari*, 369 Mass. at 41-42. Wachovia's complaint regarding the Demand Letter is archetypal of a "technicality" put forth to defeat Plaintiffs' legitimate claims.  The burden should thus be placed on Wachovia to show how the Plaintiffs' course of action undermines the interests promoted by the statute's demand letter requirement.

Moreover, Defendant offers no authority to support its position.[6]  In *Baldassari*, the only case Defendant cites even raising this question, the Supreme Judicial Court declined to address it. *Baldassari*, 369 Mass. at 44 ("[s]ince the point has not been argued, we do not now consider whether the thirty days between the mailing or delivery of the demand letter and the maturing of the right to sue should be included in the period of limitations.").  In *Logan v. Arabella Mut. Ins. Co.*, No. Civ. A. 97-2387B, 1998 WL 324204 (Mass. Super. June 15, 1998), upon which Defendant also relies, the Court did not dismiss plaintiff's Chapter 93A case because she failed to send a demand letter before filing suit. Rather, the Court dismissed plaintiff's complaint without leave to amend because she had *settled her case* and her demand letters (the substance of which the defendant challenged) were moot. *Logan*, at *3 ("…plaintiff's counsel's barrage of

---

[6] Wachovia cites numerous cases that generally find that sending a demand letter is a necessary prerequisite for filing a UDAP claim. [MTD, at 28].  However, none of the cases discuss what

letters and his institution of this suit…which *did* succeed in effectuating a settlement of the underlying action short of trial, are inadequate to sustain this c. 93A action."). Here, despite receiving the Bettinellis' Demand Letter over a year ago, Defendant has not made any settlement offer.

The Court should not adopt Defendant's reasoning because it is inconsistent with the purposes of 93A and because the result would prejudice the Bettinellis (who would lose their 93A claim forever) far more than Defendant (which would have merely been deprived of an additional 30 days notice of the Bettinellis' complaint and the right to make a settlement offer that it never made).  The Bettinellis complied with 93A's technical requirements as best they could under the circumstances. As Defendant points out, the Bettinellis filed their lawsuit on the day before the statue of limitations period would have run on their 93A claim and sent the G.L. c. 93A demand letter on the same date. [MTD at 28].  By sending the letter, the Plaintiffs afforded the Defendant the statutory opportunity to make a settlement proposal – a proposal that never came.

**C.  Plaintiffs' Common Law Claims Do Not Run Afoul of Applicable Statutes of Limitations**

Defendant further argues that the state law claims of the Bettinellis, the Piedras and Ms. Barrera are untimely under the applicable three-year statute of limitations for such claims.  MTD at 27-30.  The Bettinellis originally filed this matter on June 23, 2009 as a putative class action. In so doing, the statutes of limitation for all claims of the putative class described in that pleading were tolled.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("The filing of a class action tolls the statute of limitations as to all asserted members of the class . . . .")  For this reason, even under Defendant's understanding of the application of the three-year statute of

_____

happens when the statute of limitations on a plaintiff's UDAP claim would run within the thirty-

limitations as strictly limited to the date of closing, the Piedras' common law claims on their own behalf and on behalf of the putative class are timely.[7]

With regard to the common law claims of the Bettinellis and Ms. Barrera, the Complaint adequately alleges a "continuing violation" theory.  [Complaint, ¶¶ 98-108].  "Statutes of limitations such as that contained in [the FHA] are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness concern disappears." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982).  Where a plaintiff alleges not just one incident, but rather an unlawful practice, the claim will not be time-barred when the defendant's actions continue into the statute of limitations period.  *Id.,* 455 U.S. at 380-81.

In *Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990), the First Circuit ruled that "so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint," even if he fails to show an identifiable discrete violation transpiring within the period.  In this case, the Complaint alleges a practice employed by the Defendant both before and within the statute of limitations period.  Indeed, given the structure of the loans at issue, it is apparent that Defendant designed the product to ensure that borrowers would need to refinance before the maturity date-- a strategy borne out in the 2005 refinance loan to the Bettinellis.[8]

Further, where the complaint alleges violations stemming from an ongoing practice, it:

---

day demand letter period.  Here, it is undisputed that the Plaintiffs did send a demand letter.
[7] The Piedras closing occurred on March 26, 2007.  [Complaint, ¶ 67].
[8] Defendant's claim that the statute of limitations began to run in 2002 when the Bettinellis received their first POA loan from World Savings is simply wrong.  The Bettinellis' Complaint is not about their 2002 loan; it is about their June 24. 2005 loan. [Complaint, ¶23-39]. However, the Bettinellis' POA loan history here is illustrative of the Hobson's choice World Savings gave them with its initial POA loan - to either refinance capitalized interest they could not afford to repay or lose their home to foreclosure. [Complaint, ¶52].

> [I]s likely to affect the rights of an evolving class of claimants, in addition to the plaintiff before the court. Therefore, ... permitting challenges to these policies by anyone injured by them within the limitations period-regardless of how long ago a particular policy was instituted, when the plaintiff learned of it, or when the policy was first applied to the plaintiff-eliminates the prospect of repetitive lawsuits directed at the same unlawful conduct.

*Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008) *quoting* Kyle Graham,

*The Continuing Violations Doctrine*, 43 Gonz. L.Rev. 271, 325-326 (2008).

The loans that are at the heart of this case are alleged to be part of a pattern or practice of unfair and deceptive conduct "because, as an integral part of the Defendants' business plan, it was the standard operating procedure of Defendants that injured borrowers."  [Complaint, ¶ 98]. *See also*, Form 10-K, *supra* n.1 ("Almost all of our loans are adjustable rate mortgages (ARMs) on residential properties. . . . Our principal loan product is the 'option ARM' . . . .")  Application of these lending practices was not a sporadic, isolated incident, but rather occurred every day that loans were extended, renewed or continued during the Class Period.  The loans of the Bettinellis, the Piedras and Ms. Barrerra were a part of this "Standard Operating Procedure" that began before the limitations period and continued into it.  For this reason, application of the continuing violation doctrine is appropriate here.[9]

Moreover, a recent decision of the Supreme Court suggests that the ongoing benefit that Defendant receives into and during the limitations period supports a finding of timeliness here. In *Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010), the Supreme Court held that where the

---

[9] Defendant suggests, without citation, that the continuing violation theory is limited to cases involving civil rights.  There is no support for this statement, and the weight of the jurisprudence is to the contrary. *See Church v. General Elec. Co.*, 138 F. Supp. 2d 169, 175-76 (D. Mass. 2001) (ruling on continuing tort theory of nuisance and trespass); *Kusek v. Family Circle, Inc.*, 894 F. Supp. 522, 530 (D. Mass. 1995) (trademark infringement).  *See also Cunningham v. Huffman,* 154 Ill. 2d 398 (1993) (applying continuing violations rule to medical malpractice claim alleging that injury resulted from continuous unbroken course of negligent treatment).

gravamen of a complaint challenges the adoption of a policy or practice that violates law, the

claim is timely so long as plaintiffs show that the policy or practice was applied during the

limitations period.  Similarly, here, where the Defendant's acts are alleged to constitute a pattern

or practice of conduct, the claims are timely so long as the unfair and deceptive acts or practices

were committed pursuant to a standard operating procedure that continued into and required

payment during the limitations period.[10]  Defendant's use of the lending practices at issue

occurred both before the limitations period and during the limitations period, and so the common

law claims of the Bettinellis and Ms. Barrera should be considered timely.

Last, the doctrines of equitable tolling and the discovery rule render the disputed claims

timely.  Taking the latter theory first, Massachusetts courts have recognized that the discovery

rule applies to claims that of unfair and deceptive conduct under Chapter 93A, arising from the

terms of a mortgage loan.  *See Damas v. Mortgage Electronics Registration Systems*, 25 Mass. L.

Rptr. 499 (Mass. Super. Ct. 2009), *citing Koe v. Mercer*, 450 Mass. 97, 101 (2007).  In this case,

Plaintiffs have alleged that they did not, and reasonably could not, have discovered the true terms

of their loan until "payment shock" set in. [Complaint, ¶¶ 105-107].  Judged from these dates,

Plaintiffs' claims are timely.[11]   This Court ought to consider application of equitable tolling in

---

[10] This understanding of continuing violation doctrine is supported by recent federal legislation.
On January 29, 2009, President Obama signed the "Lilly Ledbetter Fair Pay Act of 2009."  This
Act defines an unlawful employment practice as occurring, inter alia, "each time wages, benefits,
or other compensation is paid, resulting in whole or in part from such a [discriminatory] decision
or other practice." Similarly, Plaintiffs' payment of their mortgage loans, on terms that violate
the law, within the limitations period prevents their claims from being time-barred. *Cf. Bazemore
v. Friday,* 478 U.S. 385, 395-97 (1986) ("Each week's paycheck that delivers less to a black than
to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this
pattern was begun prior to the effective date of Title VII.")

[11] In the case of the Bettinellis' June 24, 2005 loan, the initial payment of $513.98 was in effect
for one year.  [Complaint, ¶ 54].  Payment shock thus set in for the Bettinellis in July 2006.  In
the case of Delmy Barrera, her August 2005 loan likewise had a payment structure that expired

the circumstances present here.  Equitable tolling should be applied where the plaintiff is excusably ignorant about the filing period, or where the defendant affirmatively deceived the plaintiff.  *See Andrews v. Arkwright Mut. Ins. Co*., 423 Mass. 1021 (1996).  As argued in the section above regarding Chapter 93A, the Complaint adequately alleges both deceit and points to language in the loans so dense that their ignorance of their claims was excusable.

## IV.   PLAINTIFFS ASSERT VIABLE COMMON LAW CLAIMS

### 1.   The Plaintiffs' Negligent Underwriting Claim Is Valid In Light Of *Fremont*

Defendant asserts that the Plaintiffs' Negligent Underwriting claim should be dismissed because it is not recognized under Massachusetts law. [MTD, pp. 20-22]. First, as discussed in Section I, *supra*, negligent underwriting is a cognizable claim under 93A, because *Fremont* imposes a duty on mortgage lenders to insure that borrowers have the financial means to repay its loans.

Even if *Fremont* did not expressly address the underwriting duties alleged in this case, the SJC's methodology makes clear that evolving standards governing lenders (such as the underwriting standards contained in 209 CMR § 53.05) can be found even in regulatory and statutory provisions that are inapplicable to the transaction being litigated.  Among other things, the SJC points to a variety of federal and state regulatory guidelines and pronouncements on predatory lending even though those guidelines were not issued under G.L. c. 93A. *Fremont*, 452 Mass. at 744-747.

More importantly, the *Fremont* Court finds standards governing lenders in G.L. c. 183, applicable to high cost loans, *even though* chapter 183 does not apply to the transactions at issue in *Fremont*. *Fremont*, 452 Mass. at 744-747.  The Court concluded:

---

after one year.  [Complaint, ¶ 92].  Payment shock thus set in for Ms. Barrera in September 2006,

Fremont's mortgage loans were not "high cost home mortgage loans" governed by G.L. c. 183C, as the [trial court] judge recognized. Fremont contends, however, that the judge improperly interpreted c. 183C to reach Fremont's loans, and thereby violated basic rules of statutory construction that prohibit inferring a legislative intent to reach conduct that the statute's unambiguous language clearly does not cover. Fremont's argument lacks merit. Even though the loans have different terms from Fremont's, the conduct the act prohibits, and deems a violation of G.L. c. 93A, is similar to the central element of unfairness the judge found in Fremont's lending practices: the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay. See G.L. c. 183C, § 4. That the Legislature chose in the act to focus specifically on home loan mortgages with different terms and features from Fremont's is not dispositive; the question is whether the act may be read to establish a concept of unfairness that may apply in similar contexts. As stated by the single justice of the Appeals Court, the judge appropriately could and did "look to Chapter 183C as an established, statutory expression of public policy that it is unfair for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.

*Id.*

The identical issue is present here. Plaintiffs assert that a duty of care by lenders to borrowers in the underwriting process is manifest in Chapter 183. Chapter 183, § 28C plainly expresses a legislative belief that lenders owe a duty of care to consumer borrowers to avoid making unsuitable loans. The regulation, 209 C.M.R. § 53.05, is the Division of Banks' expression of that standard. It provides "a lender shall use sound underwriting practices which are reasonable in relation to the home loan requested." Although the Plaintiffs do not make a claim under section 28C, it and its implementing regulation are the source of a duty of care that lenders making loans in Massachusetts have to borrowers to avoid underwriting loans that cannot be repaid. [12]

---

less than three years prior to the filing of this action.

[12] The cases cited by Wachovia at page 21 of its brief either were decided prior to Fremont and/or the enactment of 209 C.M.R. § 53.05 or because they deal with claims other than negligent underwriting. *Fernandes v. Havkin*, 2010 WL 3155805 (D. Mass. August 10, 2010 is a summary judgment decision that does not deal with negligent underwriting or section 53.05 providing grounds for a duty of care applicable to underwriting under Massachusetts law.

**B.      The Plaintiffs Have Adequately Alleged Unconscionability and Illegality**

Defendant's argument with regard to the Plaintiffs' unconscionability count lacks merit.

The Supreme Judicial Court has repeatedly emphasized that unconscionability is a fact specific

claim, which "must be determined on a case-by-case basis . . . ." *Zapatha v. Dairy Mart, Inc*.,

381 Mass. 284, 292-93 (1980) ("*Zapatha*").  Such claims are particularly inappropriate for

resolution at the motion to dismiss stage.  *Cf. Nisselson v. Lernout,* 568 F. Supp. 2d 137, 145 (D.

Mass. 2008) (a fact question is inappropriate for determination at the motion to dismiss stage).

Indeed, Massachusetts' codification of the UCC specifically contemplates that "the parties shall

be afforded a reasonable opportunity to present evidence" where unconscionability may be

present. Mass. G.L. c. 106, § 2-302(2).

"Historically, a [contract] was considered unconscionable if it was 'such as no man in his

senses and not under delusion would make on the one hand, and as no honest and fair man would

accept on the other.'" *Waters v. Min Ltd.,* 412 Mass. 64, 66 (1992) ("*Waters*"), *quoting Hume v.

United States,* 132 U.S. 406, 411 (1889).  The Supreme Judicial Court has admonished that

"there is no clear, all-purpose definition of "unconscionable," nor could there be . . . ." *Zapatha*,

381 Mass. at 292-93.  Instead of offering such a definition, the SJC has noted fact-specific

instances where unconscionability has been appropriately identified.  "For example, gross

disparity in the consideration alone 'may be sufficient to sustain [a finding that the contract is

unconscionable],' since the disparity 'itself leads inevitably to the felt conclusion that knowing

advantage was taken of [one party].'" *Waters,* 412 Mass. at 68 (alterations in original).  In

reviewing such instances, the SJC stated, "'[i]f the sum total of the provisions of a contract drive

---

Moreover, even with respect to a general claim of negligent lending, Magistrate Judge Bowler
allows for the possibility that evidence could support such a claim. Id. at *17.

too hard a bargain, a court of conscience will not assist its enforcement.'" *Id., quoting Campbell Soup Co. v. Wentz,* 172 F.2d 80, 84 (3d Cir. 1948).

In comparison, the Complaint clearly states a claim for unconscionability.  The First Circuit has noted that Massachusetts law considers both procedural and substantive unconscionability.  *See Skirchak v. Dynamics Research Corp., Inc.*, 432 F. Supp. 2d 175, 179 (D. Mass. 2006), (unconscionability includes "'both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so one-sided as to be oppressive."), *quoting Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith*, 170 F.3d 1, 17 (1st Cir. 1999).  With regard to procedural unconscionability, the Second Amended Complaint identifies language from the mortgage documents that is "intended to deceive about the interest rate applicable to the transaction." [Complaint, ¶¶ 24-25, 27-28].  In paragraphs 25 and 28, the Complaint quotes language from the mortgage contract that is alleged to be "impenetrable." [Complaint, ¶¶ 26, 29].   With regard substantive unconscionability, the gravamen of the Complaint is that it is oppressive for a lender to make a "home mortgage loan secured by the borrower's principal residence in circumstances where [it] does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure." [Complaint, ¶ 35].

In addition, the Plaintiffs have adequately stated a claim on the basis of illegality. Massachusetts has long recognized that freedom of contract is outweighed in certain circumstances by public policy.  *See A.Z. v. B.Z.,* 431 Mass. 150, 160-61 & n.24 (Mass. 2000) (gathering examples).  The Complaint offers two specific examples of how the contract at issue violates public policy.  First, referring to the language quoted in paragraph 28 of the Complaint, the contract allowed the Defendant sole discretion in changing the index used to calculate the

interest rate.  [Complaint, ¶¶ 25-26, 140a].  Second, the Complaint alleges that the contract runs

counter to Massachusetts' longstanding prohibition on charging interest upon interest.

[Complaint, ¶¶ 32, 56, 140b].  *See, Ratner v. Hill*, 270 Mass. 249, 254 (1930); *Ellis v. Sullivan*,

241 Mass. 60, 64 (1922).  Such pleading is sufficient to survive a motion to dismiss.

### D.      Defendant Misstates the Law Of Unjust Enrichment

With respect to the unjust enrichment claim, Defendant is simply incorrect to say that

under Massachusetts law, no claim for unjust enrichment will lie whenever a contract is at issue.

The question rather is whether there is an adequate remedy at law. The cases Defendant cites do

not hold otherwise.

Under Massachusetts law a Plaintiff alleging unjust enrichment need only show: "First, a

benefit or enrichment was conferred upon the defendant ...; second, the retention of that benefit

or enrichment resulted in a detriment to [the plaintiff]; and, third, there are circumstances which

make the retention of that benefit ... unjust."  *Brandt v. Wand Partners,* 242 F.3rd 6, 14 (1st Cir.

2001).  Each element is pled here.

### E.      Defendant's Effort to Dismiss the Declaratory Judgment Count is Not Justified at This Stage of the Case

Under the Declaratory Judgment Act, federal courts have the power to declare the rights

and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a);

*Porter v. Warner Holding Co.,* 328 U.S. 395, 398, (1946).  Declaratory relief is available under

the Declaratory Judgment Act whenever there is a case of actual controversy, and regardless of

whether the plaintiff seeks any other relief. 28 U.S.C. §§2201, 2202.

Notably, G.L. c. 93A § 9(1) provides the authority to grant "such equitable relief

including an injunction as the Court deems to necessary and proper.  This alleviates any potential

that the Court will overstep its equitable authority on claims that sound in equity.  Particularly at

this early stage of the case, there is thus no reason to exercise discretion to dismiss claims for equitable and declaratory relief.  Doing so may later unnecessarily deprive the Court of an opportunity to shape relief on such as issues as foreclosures, loan reformation, rescission and enforceability of the underlying loan contracts.  Courts have declined generally to dismiss claims for declaratory relief at the motion to dismiss stage, where the related claims are valid.  *See, Smith v. Jenkins*, 626 F. Supp. 2d 155, 173 (D. Mass. 2009) (denying motion to dismiss to deal with declaratory relief count at time of judgment); *American Glue & Resin, Inc. v. Air Products & Chemicals, Inc.,* 835 F. Supp. 36, 49 (D. Mass. 1993) (declaratory relief counts that are derivative of other counts should not be dismissed).

## VI.    CONCLUSION

For the reasons set forth above, the Court should deny Defendant's Motion to Dismiss the Second Amended Complaint in its entirety.

> Respectfully Submitted,
> BERNARDO AND
> CAROL G. BETTINELLI, MARIO O.
> AND MARIA PIEDRA AND DELMY
> BARRERA,
>
> By their attorneys,
> */s/ Gary Klein*
> Gary Klein BBO # 560769
> Shennan Kavanagh # 655174
> Kevin Costello # 669100
> Roddy Klein & Ryan
> 727 Atlantic Ave., 2nd floor
> Boston, MA  02111
> Tel. 617-357-5500 x 15
> Fax. 617-357-5030
> klein@roddykleinryan.com
> *Attorneys for the Plaintiffs*

Dated: September 23, 2010

## CERTIFICATE OF SERVICE

I, Gary Klein, hereby certify that on September 23, 2010, a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all registered users through the Court's ECF system.

*/s/ Gary Klein*
Gary Klein