*APPENDIX 2*

**DEPARTMENT OF THE TREASURY**

**Office of the Comptroller of the Currency**

[Docket No. 06–11]

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**

[Docket No. OP–1246]

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**DEPARTMENT OF THE TREASURY**

**Office of Thrift Supervision**

[No. 2006–35]

**NATIONAL CREDIT UNION ADMINISTRATION**

**Interagency Guidance on Nontraditional Mortgage Product Risks**

**AGENCIES:** Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); Office of Thrift Supervision, Treasury (OTS); and National Credit Union Administration (NCUA).

**ACTION:** Final guidance.

**SUMMARY:** The OCC, Board, FDIC, OTS, and NCUA (the Agencies), are issuing final Interagency Guidance on Nontraditional Mortgage Product Risks (guidance). This guidance has been developed to clarify how institutions can offer nontraditional mortgage products in a safe and sound manner, and in a way that clearly discloses the risks that borrowers may assume.

**FOR FURTHER INFORMATION CONTACT:**
*OCC:* Gregory Nagel, Credit Risk Specialist, Credit and Market Risk, (202) 874–5170; or Michael S. Bylsma, Director, or Stephen Van Meter, Assistant Director, Community and Consumer Law Division, (202) 874–5750.

*Board:* Brian Valenti, Supervisory Financial Analyst, (202) 452–3575; or Virginia Gibbs, Senior Supervisory Financial Analyst, (202) 452–2521; or Sabeth I. Siddique, Assistant Director, (202) 452–3861, Division of Banking Supervision and Regulation; Kathleen C. Ryan, Counsel, Division of Consumer and Community Affairs, (202) 452–3667; or Andrew Miller, Counsel, Legal Division, (202) 452–3428. For users of Telecommunications Device for the Deaf (''TDD'') only, contact (202) 263–4869.

*FDIC:* Suzy S. Gardner, Examination Specialist, (202) 898–3640, or April Breslaw, Chief, Compliance Section, (202) 898–6609, Division of Supervision and Consumer Protection; or Ruth R. Amberg, Senior Counsel, (202) 898–3736, or Richard Foley, Counsel, (202) 898–3784, Legal Division.

*OTS:* William Magrini, Senior Project Manager, Examinations and Supervision Policy, (202) 906–5744; or Fred Phillips-Patrick, Director, Credit Policy, (202) 906–7295; or Glenn Gimble, Senior Project Manager, Compliance and Consumer Protection, (202) 906–7158.

*NCUA:* Cory Phariss, Program Officer, Examination and Insurance, (703) 518–6618.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Agencies developed this guidance to address risks associated with the growing use of mortgage products that allow borrowers to defer payment of principal and, sometimes, interest. These products, referred to variously as ''nontraditional'', ''alternative'', or ''exotic'' mortgage loans (hereinafter referred to as nontraditional mortgage loans), include ''interest-only'' mortgages and ''payment option'' adjustable-rate mortgages. These products allow borrowers to exchange lower payments during an initial period for higher payments during a later amortization period.

While similar products have been available for many years, the number of institutions offering them has expanded rapidly. At the same time, these products are offered to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgages. The Agencies are concerned that some borrowers may not fully understand the risks of these products. While many of these risks exist in other adjustable-rate mortgage products, the Agencies concern is elevated with nontraditional products because of the lack of principal amortization and potential for negative amortization. In addition, institutions are increasingly combining these loans with other features that may compound risk. These features include simultaneous second-lien mortgages and the use of reduced documentation in evaluating an applicant's creditworthiness.

In response to these concerns, the Agencies published for comment proposed Interagency Guidance on Nontraditional Mortgage Products, 70 FR 77249 (Dec. 29, 2005). The Agencies proposed guidance in three primary areas: ''Loan Terms and Underwriting Standards'', ''Portfolio and Risk Management Practices'', and ''Consumer Protection Issues''. In the first section, the Agencies sought to ensure that loan terms and underwriting standards for

nontraditional mortgage loans are consistent with prudent lending practices, including credible consideration of a borrower's repayment capacity. The portfolio and risk management practices section outlined the need for strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses (ALLL) that reflects the collectibility of the portfolio. Finally, the consumer protection issues section recommended practices to ensure consumers have clear and balanced information prior to making a product choice. Additionally, this section described control systems to ensure that actual practices are consistent with policies and procedures.

The Agencies together received approximately 100 letters in response to the proposal.[1] Comments were received from financial institutions, trade associations, consumer and community organizations, state financial regulatory organizations, and other members of the public.

## II. Overview of Public Comments

The Agencies received a full range of comments. Some commenters applauded the Agencies' initiative in proposing the guidance, while others questioned whether guidance is needed.

A majority of the depository institutions and industry groups that commented stated that the guidance is too prescriptive. They suggested institutions should have more flexibility in determining appropriate risk management practices. A number observed that nontraditional mortgage products have been offered successfully for many years. Others opined that the guidance would stifle innovation and result in qualified borrowers not being approved for these loans. Further, many questioned whether the guidance is an appropriate mechanism for addressing the Agencies' consumer protection concerns.

A smaller subset of commenters argued that the guidance does not go far enough in regulating or restricting nontraditional mortgage products. These commenters included consumer organizations, individuals, and several community bankers. Several stated these products contribute to speculation and unsustainable appreciation in the housing market. They expressed concern that severe problems will occur if and when there is a downturn in the economy. Some also argued that these products are harmful to borrowers and that borrowers may not understand the associated risks.

Many commenters voiced concern that the guidance will not apply to all lenders, and thus federally regulated financial institutions will be at a competitive disadvantage. The Agencies note that both State financial regulatory organizations that commented on the proposed guidance—the Conference of State Bank Supervisors (CSBS) and the State Financial Regulators Roundtable (SFRR)—committed to working with State regulatory agencies to distribute guidance that is similar in nature and scope to the financial service providers under their jurisdictions.[2] These commenters noted their interest in addressing the potential for inconsistent regulatory treatment of lenders based on whether or not they are supervised solely by state agencies. Subsequently, the CSBS, along with a national organization representing state residential mortgage regulators, issued a press release confirming their intent to offer guidance to State regulators to apply to their licensed residential mortgage brokers and lenders.[3]

## III. Final Joint Guidance

The Agencies made a number of changes to the proposal to respond to commenters' concerns and to provide additional clarity. Significant comments on the specific provisions of the proposed guidance, the Agencies'' responses, and changes to the proposed guidance are discussed as follows.

### Scope of the Guidance

Many financial institution and trade group commenters raised concerns that the proposed guidance did not adequately define ''nontraditional mortgage products''. They requested clarification of which products would be subject to enhanced scrutiny. Some suggested that the guidance focus on products that allow negative amortization, rather than interest-only loans. Others suggested excluding certain products with nontraditional features, such as reverse mortgages and home equity lines of credit (HELOCs). Those commenting on interest-only loans noted that they do not present the same risks as products that allow for negative amortization. Those that argued that HELOCs should be excluded noted that they are already covered by interagency guidance issued in 2005. They also noted that the principal amount of these loans is generally lower than that for first mortgages. As for reverse mortgages, the commenters pointed out that they were developed for a specific market segment and do not present the same concerns as products mentioned in the guidance.

To address these concerns, the Agencies are clarifying the types of products covered by the guidance. In general, the guidance applies to all residential mortgage loan products that allow borrowers to defer repayment of principal or interest. This includes all interest-only products and negative amortization mortgages, with the exception of HELOCs. The Agencies decided not to include HELOCs in this guidance, other than as discussed in the Simultaneous Second-Lien Loans section, since they are already covered by the May 2005 Interagency *Credit Risk Management Guidance for Home Equity Lending.* The Agencies are amending the May 2005 guidance, however, to address the consumer disclosure recommendations included in the nontraditional mortgage guidance.

The Agencies decided against focusing solely on negative amortization products. Many of the interest-only products pose risks similar to products that allow negative amortization, especially when combined with high leverage and reduced documentation. Accordingly, they present similar concerns from a risk management and consumer protection standpoint. The Agencies did, however, agree that reverse mortgages do not present the types of concerns that are addressed in the guidance and should be excluded.

### Loan Terms and Underwriting Standards

#### Qualifying Borrowers

The Agencies proposed that for all nontraditional mortgage products, the analysis of borrowers' repayment

---

[1] Nine of these letters requested a thirty-day extension of the comment period, which the Agencies granted.

[2] Letter to J. Johnson, Board Secretary, *et al.* from N. Milner, President & CEO, Conference of State Bank Supervisors (Feb. 14, 2006); Letter to J. Johnson, Board Secretary, *et al.*, from B. Kent, Chair, State Financial Regulators Roundtable.

[3] Media Release, CSBS & American Association of Residential Mortgage Regulators, ''CSBS and AARMR Consider Guidance on Nontraditional Mortgage Products for State-Licensed Entities'' (June 7, 2006), available at *http://www.csbs.org/Content/NavigationMenu/PublicRelations/PressReleases/News_Releases.htm*. The press release stated:

The guidance being developed by CSBS and AARMR is based upon proposed guidance issued in December 2005 by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration.

The Federal guidance, when finalized, will only apply to insured financial institutions and their affiliates. CSBS and AARMR intend to develop a modified version of the guidance which will primarily focus on residential mortgage underwriting and consumer protection. The guidance will be offered to State regulators to apply to their licensed residential mortgage brokers and lenders.

capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. In addition, the proposed guidance stated that for products that permit negative amortization, the repayment analysis should include the initial loan amount plus any balance increase that may accrue from negative amortization. The amount of the balance increase is tied to the initial terms of the loan and estimated assuming the borrower makes only the minimum payment.

Generally, banks and industry groups believed that the proposed underwriting standards were too prescriptive and asked for more flexibility. Consumer groups generally supported the proposed underwriting standards, warning that deteriorating underwriting standards are bad for individual borrowers and poor public policy.

A number of commenters suggested that industry practice is to underwrite payment option adjustable-rate mortgages at the fully indexed rate, assuming a fully amortizing payment. Yet several commenters argued that this standard should not be required when risks are adequately mitigated. Moreover, many commenters opposed assuming a fully amortizing payment for interest-only loans with extended interest-only periods. They argued that the average life span of most mortgage loans makes it unlikely that many borrowers will experience the higher payments associated with amortization. Additionally, many commenters opposed the assumption of minimum payments during the deferral period for products that permit negative amortization on the ground that this assumption suggests that lenders assume a worst-case scenario.

The Agencies believe that institutions should maintain qualification standards that include a credible analysis of a borrower's capacity to repay the full amount of credit that may be extended. That analysis should consider both principal and interest at the fully indexed rate. Using discounted payments in the qualification process limits the ability of borrowers to demonstrate sufficient capacity to repay under the terms of the loan. Therefore, the proposed general guideline of qualifying borrowers at the fully indexed rate, assuming a fully amortizing payment, including potential negative amortization amounts, remains in the final guidance.

Regarding interest-only loans with extended interest-only periods, the Agencies note that since the average life of a mortgage is a function of the housing market and interest rates, the average may fluctuate over time. Additionally, the Agencies were concerned that excluding these loans from the underwriting standards could cause some creditors to change their market offerings to avoid application of the guidance. Accordingly, the final guidance does not exclude interest-only loans with extended interest-only periods.

Finally, regarding the assumption for the amount that the balance may increase due to negative amortization, the Agencies have revised the language to respond to commenters' requests for clarity. The basic standard, however, remains unchanged. The Agencies expect a borrower to demonstrate the capacity to repay the full loan amount that may be advanced.[4] This includes the initial loan amount plus any balance increase that may accrue from the negative amortization provision. The final document contains guidance on determining the amount of any balance increase that may accrue from the negative amortization provision, which does not necessarily equate to the full negative amortization cap for a particular loan.

The Agencies requested comment on whether the guidance should address consideration of future income or other future events in the qualification standards. The commenters generally agreed that there is no reliable method for considering future income or other future events in the underwriting process. Accordingly, the Agencies have not modified the guidance to address these issues.

Collateral-Dependent Loans

Commenters that specifically addressed this aspect of the guidance concurred that it is unsafe and unsound to rely solely on an individual borrower's ability to sell or refinance once amortization commences. However, many expressed concern about the possibility that the term "collateral-dependent", as it is used in the guidance, would be interpreted to apply to stated income and other reduced documentation loans.

To address this concern, the Agencies provided clarifying language in a footnote to this section. The final guidance provides that a loan will not be determined to be collateral-dependent solely because it was underwritten using reduced documentation.

Risk Layering

Financial institution and industry group commenters were generally critical of the risk layering provisions of the proposed guidance on the grounds that they were too prescriptive. These commenters argued that institutions should have flexibility in determining factors that mitigate additional risks presented by features such as reduced documentation and simultaneous second-lien loans. A number of commenters, however, including community and consumer organizations, financial institutions, and industry associations, suggested that reduced documentation loans should not be offered to subprime borrowers. Others questioned whether stated income loans are appropriate under any circumstances, when used with nontraditional mortgage products, or when used for wage earners who can readily provide standard documentation of their wages. Several commenters argued that simultaneous second-lien loans should be paired with nontraditional mortgage loans only when borrowers will continue to have substantial equity in the property.

The Agencies believe that the guidance provides adequate flexibility in the methods and approaches to mitigating risk, with respect to risk layering. While the Agencies have not prohibited any of the practices discussed, the guidance uniformly suggests strong quality control and risk mitigation factors with respect to these practices.

The Agencies declined to provide guidance recommending reduced documentation loans be limited to any particular set of circumstances. The final guidance recognizes that mitigating factors may determine whether such loans are appropriate but reminds institutions that a credible analysis of both a borrower's willingness and ability to repay is consistent with sound and prudent lending practices. The final guidance also cautions that institutions generally should be able to readily document income for wage earners through means such as W–2 statements, pay stubs, or tax returns.

*Portfolio and Risk Management Practices*

Many financial institution and industry group commenters opposed provisions of the proposed guidance for the setting of concentration limits. Some commenters advocated active monitoring of concentrations of diversification strategies as more

---

[4] This is similar to the standard in the Agencies' May 2005 *Credit Risk Management Guidance for Home Equity Lending* recommending that, for interest-only and variable rate HELOCs, borrowers should demonstrate the ability to amortize the fully drawn line over the loan term.

appropriate approaches. The intent of the guidance was not to set hard concentration limits for nontraditional mortgage products. Instead, institutions with concentrations in these products should have well-developed monitoring systems and risk management practices. The guidance was clarified to reiterate this point.

Additionally, a number of financial institution and industry association commenters opposed the provisions regarding third-party originations. They argued that the proposal would force lenders to have an awareness and control over third-party practices that is neither realistic nor practical. In particular, many of these commenters argued that lenders should not be responsible for overseeing the marketing and borrower disclosure practices of third parties.

Regarding controls over third-party practices, the Agencies clarified their expectations that institutions should have strong systems and controls for establishing and maintaining relationships with third parties. Reliance on third-party relationships can significantly increase an institution's risk profile. The guidance, therefore, emphasizes the need for institutions to exercise appropriate due diligence prior to entering into a third-party relationship and to provide ongoing, effective oversight and controls. In practice, an institution's risk management system should reflect the complexity of its third-party activities and the overall level of risk involved.

A number of commenters urged the Agencies to remove language in the proposed guidance relating to implicit recourse for loans sold in the secondary market. They expressed concern that the proposal added new capital requirements. The Agencies clarified the language in the guidance addressing this issue. The Agencies do not intend to establish new capital requirements. Instead, the Agencies' intent is to reiterate existing guidelines regarding implicit recourse under the Agencies' risk-based capital rules.

*Consumer Protection Issues*

Communications With Consumers

Many financial institution and trade group commenters suggested that the Agencies' consumer protection goals would be better accomplished through generally applicable regulations, such as Regulation Z (Truth in Lending)[5] or Regulation X (Real Estate Settlement Procedures).[6] Some commenters stated that the proposed guidance would add burdensome new disclosure requirements and cause a confusing overlap with current Regulation Z requirements. They also expressed concern that the guidance would contribute to an overload of information currently provided to consumers. Additionally, some argued that implementing the disclosure provisions might trigger Regulation Z requirements concerning advertising.[7] Some commenters also urged the Agencies to adopt model disclosure forms or other descriptive materials to assist in compliance with the guidance.

Some commenters voiced concern that the Agencies are attempting to establish a suitability standard similar to that used in the securities context. These commenters argued that lenders are not in a position to determine which products are most suitable for borrowers, and that this decision should be left to borrowers themselves.

Finally, several community and consumer organization commenters questioned whether additional disclosures are sufficient to protect borrowers and suggested various additional measures, such as consumer education and counseling.

The Agencies carefully considered the commenters' argument that consumer protection issues—particularly, disclosures—would be better addressed through generally applicable regulations. The Agencies determined, however, that given the growth in this market, guidelines are needed now to ensure that consumers will receive the information they need about the material features of nontraditional mortgages as soon as possible.

The Agencies also gave careful consideration to the commenters' concerns that the guidelines will overlap with Regulation Z, add to the disclosure burden on lenders, and contribute to information overload. While the Agencies are sensitive to these concerns, we do not believe they warrant significant changes to the guidance. The guidance focuses on providing information to consumers during the pre-application shopping phase and post-closing with any monthly statements lenders choose to provide to consumers. Moreover, the Agencies do not anticipate that the information outlined in the guidance will result in additional lengthy disclosures. Rather, the Agencies contemplate that the information can be provided in brief narrative format and through the use of examples based on hypothetical loan transactions.[8] We have, however, revised the guidance to make clear that transaction-specific disclosures are not required. Institutions will still need to ensure that their marketing materials promoting their products comply with Regulation Z, as applicable.

As previously discussed, some commenters, including industry trade associations, asked the Agencies to include model or sample disclosures or other descriptive materials as part of the guidance to assist lenders, including smaller institutions, in following the recommended practices for communications with consumers. The Agencies have determined not to include required model or sample disclosures in the guidance. Instead, the guidance provides a set of recommended practices to assist institutions in addressing particular risks raised by nontraditional mortgage products.

The Agencies have determined that it is desirable to first seek public comment on potential model disclosures, and in a **Federal Register** notice accompanying this guidance are seeking comment on proposed illustrations of consumer information for nontraditional mortgage products that are consistent with the recommendations contained in the guidance. The Agencies appreciate that some institutions, including community banks, following the recommendations set forth in the guidance may prefer not to incur the costs and other burdens of developing their own consumer information documents. The Agencies are, therefore, requesting comment on illustrations of the type of information contemplated by the guidance.

The Agencies disagree with the commenters who expressed concern that the guidance appears to establish a suitability standard, under which lenders would be required to assist borrowers in choosing products that are suitable to their needs and circumstances. It was not the Agencies' intent to impose such a standard, nor is there any language in the guidance that does so. In any event, the Agencies have revised certain statements in the proposed guidance that could have been interpreted to suggest a requirement to ensure that borrowers select products appropriate to their circumstances.

Control Systems

Several commenters requested more flexibility in designing appropriate control systems. The Agencies have

---

[5] 12 CFR part 226 (2006).
[6] 24 CFR part 3500 (2005).
[7] *See* 12 CFR part 226.24(c) (2006).
[8] *See* elsewhere in today's issue of the **Federal Register**. (Proposed Illustrations of Consumer Information for Nontraditional Mortgage Products).

revised the "Control Systems" portion of the guidance to clarify that we are not requiring any particular means of monitoring adherence to an institution's policies, such as call monitoring or mystery shopping. Additional changes have also been made to clarify that the Agencies do not expect institutions to assume an unwarranted level of responsibility for the actions of third parties. Rather, the control systems that are expected for loans purchased from or originated through third parties are consistent with the Agencies' current supervisory policies. As previously discussed, the Agencies have also made changes to the portfolio and risk management practices portion of the final guidance to clarify their expectations concerning oversight and monitoring of third-party originations.

## IV. Text of Final Joint Guidance

The text of the final Interagency Guidance on Nontraditional Mortgage Product Risks follows:

## Interagency Guidance on Nontraditional Mortgage Product Risks

Residential mortgage lending has traditionally been a conservatively managed business with low delinquencies and losses and reasonably stable underwriting standards. In the past few years consumer demand has been growing, particularly in high priced real estate markets, for closed-end residential mortgage loan products that allow borrowers to defer repayment of principal and, sometimes, interest. These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.[1]

While some institutions have offered nontraditional mortgages for many years with appropriate risk management and sound portfolio performance, the market for these products and the number of institutions offering them has expanded rapidly. Nontraditional mortgage loan products are now offered by more lenders to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgage loans and may not fully understand the associated risks.

Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ("reduced documentation") and are increasingly combined with simultaneous second-lien loans.[2] Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans.

Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:

• Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;

• Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio; and

• Ensure that consumers have sufficient information to clearly understand loan terms and associated risks prior to making a product choice.

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS) and the National Credit Union Administration (NCUA) (collectively, the Agencies) expect institutions to effectively assess and manage the risks associated with nontraditional mortgage loan products.[3]

Institutions should use this guidance to ensure that risk management practices adequately address these risks. The Agencies will carefully scrutinize risk management processes, policies, and procedures in this area. Institutions that do not adequately manage these risks will be asked to take remedial action.

The focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type itself. Institutions with sound underwriting, adequate risk management, and acceptable portfolio performance will not be subject to criticism merely for offering such products.

### Loan Terms and Underwriting Standards

When an institution offers nontraditional mortgage loan products, underwriting standards should address the effect of a substantial payment increase on the borrower's capacity to repay when loan amortization begins. Underwriting standards should also comply with the agencies' real estate lending standards and appraisal regulations and associated guidelines.[4]

Central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures. Institutions are strongly cautioned against ceding underwriting standards to third parties that have different business objectives, risk tolerances, and core competencies. Loan terms should be based on a disciplined analysis of potential exposures and compensating factors to ensure risk levels remain manageable.

*Qualifying Borrowers*—Payments on nontraditional loans can increase significantly when the loans begin to amortize. Commonly referred to as payment shock, this increase is of particular concern for payment option ARMs where the borrower makes minimum payments that may result in negative amortization. Some institutions manage the potential for excessive negative amortization and payment shock by structuring the initial terms to limit the spread between the introductory interest rate and the fully indexed rate. Nevertheless, an institution's qualifying standards should recognize the potential impact of payment shock, especially for borrowers

---

[1] Interest-only and payment option ARMs are variations of conventional ARMs, hybrid ARMs, and fixed rate products. Refer to the Appendix for additional information on interest-only and payment option ARM loans. This guidance does not apply to reverse mortgages; home equity lines of credit ("HELOCs"), other than as discussed in the Simultaneous Second-Lien Loans section; or fully amortizing residential mortgage loan products.

[2] Refer to the Appendix for additional information on reduced documentation and simultaneous second-lien loans.

[3] Refer to Interagency Guidelines Establishing Standards for Safety and Soundness. For each Agency, those respective guidelines are addressed in: 12 CFR part 30 Appendix A (OCC); 12 CFR part 208 Appendix D–1 (Board); 12 CFR part 364 Appendix A (FDIC); 12 CFR part 570 Appendix A (OTS); and 12 U.S.C. 1786 (NCUA).

[4] Refer to 12 CFR part 34—Real Estate Lending and Appraisals, OCC Bulletin 2005–3—Standards for National Banks' Residential Mortgage Lending, AL 2003–7—Guidelines for Real Estate Lending Policies and AL 2003–9—Independent Appraisal and Evaluation Functions (OCC); 12 CFR 208.51 subpart E and Appendix C and 12 CFR part 225 subpart G (Board); 12 CFR part 365 and Appendix A, and 12 CFR part 323 (FDIC); 12 CFR 560.101 and Appendix and 12 CFR part 564 (OTS). Also, refer to the 1999 Interagency Guidance on the "Treatment of High LTV Residential Real Estate Loans" and the 1994 "Interagency Appraisal and Evaluation Guidelines". Federally Insured Credit Unions should refer to 12 CFR part 722—Appraisals and NCUA 03–CU–17—Appraisal and Evaluation Functions for Real Estate Related Transactions (NCUA).

with high loan-to-value (LTV) ratios, high debt-to-income (DTI) ratios, and low credit scores. Recognizing that an institution's underwriting criteria are based on multiple factors, an institution should consider these factors jointly in the qualification process and may develop a range of reasonable tolerances for each factor. However, the criteria should be based upon prudent and appropriate underwriting standards, considering both the borrower's characteristics and the product's attributes.

For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate,[5] assuming a fully amortizing repayment schedule.[6] In addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.[7]

Furthermore, the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute for income verification in the underwriting process. The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and outstanding liabilities.

*Collateral-Dependent Loans*—Institutions should avoid the use of loan terms and underwriting practices that may heighten the need for a borrower to rely on the sale or refinancing of the property once amortization begins. Loans to individuals who do not demonstrate the capacity to repay, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound.[8] Institutions that originate collateral-dependent mortgage loans may be subject to criticism, corrective action, and higher capital requirements.

*Risk Layering*—Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with reduced documentation or a simultaneous second-lien loan, face increased risk. When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity. Mitigating factors could include higher credit scores, lower LTV and DTI ratios, significant liquid assets, mortgage insurance or other credit enhancements. While higher pricing is often used to address elevated risk levels, it does not replace the need for sound underwriting.

*Reduced Documentation*—Institutions increasingly rely on reduced documentation, particularly unverified income, to qualify borrowers for nontraditional mortgage loans. Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be used with caution. As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity. Clear policies should govern the use of reduced documentation. For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent W–2 statements, pay stubs, or tax returns.

*Simultaneous Second-Lien Loans*—Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with minimal or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity generally should not have a payment structure that allows for delayed or negative amortization without other significant risk mitigating factors.

*Introductory Interest Rates*—Many institutions offer introductory interest rates set well below the fully indexed rate as a marketing tool for payment option ARM products. When developing nontraditional mortgage product terms, an institution should consider the spread between the introductory rate and the fully indexed rate. Since initial and subsequent monthly payments are based on these low introductory rates, a wide initial spread means that borrowers are more likely to experience negative amortization, severe payment shock, and an earlier-than-scheduled recasting of monthly payments. Institutions should minimize the likelihood of disruptive early recastings and extraordinary payment shock when setting introductory rates.

*Lending to Subprime Borrowers*—Mortgage programs that target subprime borrowers through tailored marketing, underwriting standards, and risk selection should follow the applicable interagency guidance on subprime lending.[9] Among other things, the subprime guidance discusses circumstances under which subprime lending can become predatory or abusive. Institutions designing nontraditional mortgage loans for subprime borrowers should pay particular attention to this guidance. They should also recognize that risk-layering features in loans to subprime borrowers may significantly increase risks for both the institution and the borrower.

*Non-Owner-Occupied Investor Loans*—Borrowers financing non-owner-occupied investment properties should qualify for loans based on their ability to service the debt over the life of the

---

[5] The fully indexed rate equals the index rate prevailing at origination plus the margin that will apply after the expiration of an introductory interest rate. The index rate is a published interest rate to which the interest rate on an ARM is tied. Some commonly used indices include the 1-Year Constant Maturity Treasury Rate (CMT), the 6-Month London Interbank Offered Rate (LIBOR), the 11th District Cost of Funds (COFI), and the Moving Treasury Average (MTA), a 12-month moving average of the monthly average yields of U.S. Treasury securities adjusted to a constant maturity of one year. The margin is the number of percentage points a lender adds to the index value to calculate the ARM interest rate at each adjustment period. In different interest rate scenarios, the fully indexed rate for an ARM loan based on a lagging index (e.g., MTA rate) may be significantly different from the rate on a comparable 30-year fixed-rate product. In these cases, a credible market rate should be used to qualify the borrower and determine repayment capacity.

[6] The fully amortizing payment schedule should be based on the term of the loan. For example, the amortizing payment for a loan with a 5-year interest only period and a 30-year term would be calculated based on a 30-year amortization schedule. For balloon mortgages that contain a borrower option for an extended amortization period, the fully amortizing payment schedule can be based on the full term the borrower may choose.

[7] The balance that may accrue from the negative amortization provision does not necessarily equate to the full negative amortization cap for a particular loan. The spread between the introductory or ''teaser'' rate and the accrual rate will determine whether or not a loan balance has the potential to reach the negative amortization cap before the end of the initial payment option period (usually five years). For example, a loan with a 115 percent negative amortization cap but a small spread between the introductory rate and the accrual rate may only reach a 109 percent maximum loan balance before the end of the initial payment option period, even if only minimum payments are made. The borrower could be qualified based on this lower maximum loan balance.

[8] A loan will not be determined to be ''collateral-dependent'' solely through the use of reduced documentation.

[9] Interagency Guidance on Subprime Lending, March 1, 1999, and Expanded Guidance for Subprime Lending Programs, January 31, 2001. Federally insured credit unions should refer to 04–CU–12—Specialized Lending Activities (NCUA).

loan. Loan terms should reflect an appropriate combined LTV ratio that considers the potential for negative amortization and maintains sufficient borrower equity over the life of the loan. Further, underwriting standards should require evidence that the borrower has sufficient cash reserves to service the loan, considering the possibility of extended periods of property vacancy and the variability of debt service requirements associated with nontraditional mortgage loan products.[10]

*Portfolio and Risk Management Practices*

Institutions should ensure that risk management practices keep pace with the growth and changing risk profile of their nontraditional mortgage loan portfolios and changes in the market. Active portfolio management is especially important for institutions that project or have already experienced significant growth or concentration levels. Institutions that originate or invest in nontraditional mortgage loans should adopt more robust risk management practices and manage these exposures in a thoughtful, systematic manner. To meet these expectations, institutions should:

• Develop written policies that specify acceptable product attributes, production and portfolio limits, sales and securitization practices, and risk management expectations;

• Design enhanced performance measures and management reporting that provide early warning for increasing risk;

• Establish appropriate ALLL levels that consider the credit quality of the portfolio and conditions that affect collectibility; and

• Maintain capital at levels that reflect portfolio characteristics and the effect of stressed economic conditions on collectibility. Institutions should hold capital commensurate with the risk characteristics of their nontraditional mortgage loan portfolios.

*Policies*—An institution's policies for nontraditional mortgage lending activity should set acceptable levels of risk through its operating practices, accounting procedures, and policy exception tolerances. Policies should reflect appropriate limits on risk layering and should include risk management tools for risk mitigation purposes. Further, an institution should set growth and volume limits by loan type, with special attention for products and product combinations in need of heightened attention due to easing terms or rapid growth.

*Concentrations*—Institutions with concentrations in nontraditional mortgage products should have well-developed monitoring systems and risk management practices. Monitoring should keep track of concentrations in key portfolio segments such as loan types, third-party originations, geographic area, and property occupancy status. Concentrations also should be monitored by key portfolio characteristics such as loans with high combined LTV ratios, loans with high DTI ratios, loans with the potential for negative amortization, loans to borrowers with credit scores below established thresholds, loans with risk-layered features, and non-owner-occupied investor loans. Further, institutions should consider the effect of employee incentive programs that could produce higher concentrations of nontraditional mortgage loans. Concentrations that are not effectively managed will be subject to elevated supervisory attention and potential examiner criticism to ensure timely remedial action.

*Controls*—An institution's quality control, compliance, and audit procedures should focus on mortgage lending activities posing high risk. Controls to monitor compliance with underwriting standards and exceptions to those standards are especially important for nontraditional loan products. The quality control function should regularly review a sample of nontraditional mortgage loans from all origination channels and a representative sample of underwriters to confirm that policies are being followed. When control systems or operating practices are found deficient, business-line managers should be held accountable for correcting deficiencies in a timely manner. Since many nontraditional mortgage loans permit a borrower to defer principal and, in some cases, interest payments for extended periods, institutions should have strong controls over accruals, customer service and collections. Policy exceptions made by servicing and collections personnel should be carefully monitored to confirm that practices such as re-aging, payment deferrals, and loan modifications are not inadvertently increasing risk. Customer service and collections personnel should receive product-specific training on the features and potential customer issues with these products.

*Third-Party Originations*—Institutions often use third parties, such as mortgage brokers or correspondents, to originate nontraditional mortgage loans. Institutions should have strong systems and controls in place for establishing and maintaining relationships with third parties, including procedures for performing due diligence. Oversight of third parties should involve monitoring the quality of originations so that they reflect the institution's lending standards and compliance with applicable laws and regulations.

Monitoring procedures should track the quality of loans by both origination source and key borrower characteristics. This will help institutions identify problems such as early payment defaults, incomplete documentation, and fraud. If appraisal, loan documentation, credit problems or consumer complaints are discovered, the institution should take immediate action. Remedial action could include more thorough application reviews, more frequent re-underwriting, or even termination of the third-party relationship.[11]

*Secondary Market Activity*—The sophistication of an institution's secondary market risk management practices should be commensurate with the nature and volume of activity. Institutions with significant secondary market activities should have comprehensive, formal strategies for managing risks.[12] Contingency planning should include how the institution will respond to reduced demand in the secondary market.

While third-party loan sales can transfer a portion of the credit risk, an institution remains exposed to reputation risk when credit losses on sold mortgage loans or securitization transactions exceed expectations. As a result, an institution may determine that it is necessary to repurchase defaulted mortgages to protect its reputation and maintain access to the markets. In the agencies' view, the repurchase of mortgage loans beyond the selling institution's contractual obligation is

---

[10] Federally insured credit unions must comply with 12 CFR part 723 for loans meeting the definition of member business loans.

[11] Refer to OCC Bulletin 2001–47—Third-Party Relationships and AL 2000–9—Third-Party Risk (OCC). Federally insured credit unions should refer to 01–CU–20 (NCUA), Due Diligence over Third Party Service Providers. Savings associations should refer to OTS Thrift Bulletin 82a—Third Party Arrangements.

[12] Refer to ''Interagency Questions and Answers on Capital Treatment of Recourse, Direct Credit Substitutes, and Residual Interests in Asset Securitizations'', May 23, 2002; OCC Bulletin 2002–22 (OCC); SR letter 02–16 (Board); Financial Institution Letter (FIL–54–2002) (FDIC); and CEO Letter 163 (OTS). *See* OCC's Comptroller Handbook for Asset Securitization, November 1997. *See* OTS Examination Handbook Section 221, Asset-Backed Securitization. The Board also addressed risk management and capital adequacy of exposures arising from secondary market credit activities in SR letter 97–21. Federally insured credit unions should refer to 12 CFR Part 702 (NCUA).

implicit recourse. Under the agencies' risk-based capital rules, a repurchasing institution would be required to maintain risk-based capital against the entire pool or securitization.[13] Institutions should familiarize themselves with these guidelines before deciding to support mortgage loan pools or buying back loans in default.

*Management Information and Reporting*—Reporting systems should allow management to detect changes in the risk profile of its nontraditional mortgage loan portfolio. The structure and content should allow the isolation of key loan products, risk-layering loan features, and borrower characteristics. Reporting should also allow management to recognize deteriorating performance in any of these areas before it has progressed too far. At a minimum, information should be available by loan type (*e.g.*, interest-only mortgage loans and payment option ARMs); by risk-layering features (*e.g.*, payment option ARM with stated income and interest-only mortgage loans with simultaneous second-lien mortgages); by underwriting characteristics (*e.g.*, LTV, DTI, and credit score); and by borrower performance (*e.g.*, payment patterns, delinquencies, interest accruals, and negative amortization).

Portfolio volume and performance should be tracked against expectations, internal lending standards and policy limits. Volume and performance expectations should be established at the subportfolio and aggregate portfolio levels. Variance analyses should be performed regularly to identify exceptions to policies and prescribed thresholds. Qualitative analysis should occur when actual performance deviates from established policies and thresholds. Variance analysis is critical to the monitoring of a portfolio's risk characteristics and should be an integral part of establishing and adjusting risk tolerance levels.

*Stress Testing*—Based on the size and complexity of their lending operations, institutions should perform sensitivity analysis on key portfolio segments to identify and quantify events that may increase risks in a segment or the entire portfolio. The scope of the analysis should generally include stress tests on key performance drivers such as interest rates, employment levels, economic growth, housing value fluctuations, and other factors beyond the institution's immediate control. Stress tests typically assume rapid deterioration in one or more factors and attempt to estimate the potential influence on default rates and loss severity. Stress testing should aid an institution in identifying, monitoring and managing risk, as well as developing appropriate and cost-effective loss mitigation strategies. The stress testing results should provide direct feedback in determining underwriting standards, product terms, portfolio concentration limits, and capital levels.

*Capital and Allowance for Loan and Lease Losses*—Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios. They should also consider the higher risk of loss posed by layered risks when establishing their ALLL.

Moreover, institutions should recognize that their limited performance history with these products, particularly in a stressed environment, increases performance uncertainty. Capital levels should be commensurate with the risk characteristics of the nontraditional mortgage loan portfolios. Lax underwriting standards or poor portfolio performance may warrant higher capital levels.

When establishing an appropriate ALLL and considering the adequacy of capital, institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics. The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Segments could also differentiate loans by payment and portfolio characteristics, such as loans on which borrowers usually make only minimum payments, mortgages with existing balances above original balances, and mortgages subject to sizable payment shock. The objective is to identify credit quality indicators that affect collectibility for ALLL measurement purposes. In addition, understanding characteristics that influence expected performance also provides meaningful information about future loss exposure that would aid in determining adequate capital levels.

Institutions with material mortgage banking activities and mortgage servicing assets should apply sound practices in valuing the mortgage servicing rights for nontraditional mortgages. In accordance with interagency guidance, the valuation process should follow generally accepted accounting principles and use reasonable and supportable assumptions.[14]

*Consumer Protection Issues*

While nontraditional mortgage loans provide flexibility for consumers, the Agencies are concerned that consumers may enter into these transactions without fully understanding the product terms. Nontraditional mortgage products have been advertised and promoted based on their affordability in the near term; that is, their lower initial monthly payments compared with traditional types of mortgages. In addition to apprising consumers of the benefits of nontraditional mortgage products, institutions should take appropriate steps to alert consumers to the risks of these products, including the likelihood of increased future payment obligations. This information should be provided in a timely manner—before disclosures may be required under the Truth in Lending Act or other laws—to assist the consumer in the product selection process.

*Concerns and Objectives*—More than traditional ARMs, mortgage products such as payment option ARMs and interest-only mortgages can carry a significant risk of payment shock and negative amortization that may not be fully understood by consumers. For example, consumer payment obligations may increase substantially at the end of an interest-only period or upon the "recast" of a payment option ARM. The magnitude of these payment increases may be affected by factors such as the expiration of promotional interest rates, increases in the interest rate index, and negative amortization. Negative amortization also results in lower levels of home equity as compared to a traditional amortizing mortgage product. When borrowers go to sell or refinance the property, they may find that negative amortization has substantially reduced or eliminated their equity in it even when the property has appreciated. The concern that consumers may not fully understand these products would be exacerbated by marketing and promotional practices that emphasize potential benefits without also providing clear and balanced information about material risks.

In light of these considerations, communications with consumers,

---

[13] Refer to 12 CFR part 3 Appendix A, Section 4 (OCC); 12 CFR parts 208 and 225, Appendix A, III.B.3 (FRB); 12 CFR part 325, Appendix A, II.B (FDIC); 12 CFR 567 (OTS); and 12 CFR part 702 (NCUA) for each Agency's capital treatment of recourse.

[14] Refer to the "Interagency Advisory on Mortgage Banking", February 25, 2003, issued by the bank and thrift regulatory agencies. Federally Insured Credit Unions with assets of $10 million or more are reminded they must report and value nontraditional mortgages and related mortgage servicing rights, if any, consistent with generally accepted accounting principles in the Call Reports they file with the NCUA Board.

including advertisements, oral statements, promotional materials, and monthly statements, should provide clear and balanced information about the relative benefits and risks of these products, including the risk of payment shock and the risk of negative amortization. Clear, balanced, and timely communication to consumers of the risks of these products will provide consumers with useful information at crucial decision-making points, such as when they are shopping for loans or deciding which monthly payment amount to make. Such communication should help minimize potential consumer confusion and complaints, foster good customer relations, and reduce legal and other risks to the institution.

*Legal Risks*—Institutions that offer nontraditional mortgage products must ensure that they do so in a manner that complies with all applicable laws and regulations. With respect to the disclosures and other information provided to consumers, applicable laws and regulations include the following:

• Truth in Lending Act (TILA) and its implementing regulation, Regulation Z.

• Section 5 of the Federal Trade Commission Act (FTC Act). TILA and Regulation Z contain rules governing disclosures that institutions must provide for closed-end mortgages in advertisements, with an application,[15] before loan consummation, and when interest rates change. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices.[16]

Other Federal laws, including the fair lending laws and the Real Estate Settlement Procedures Act (RESPA), also apply to these transactions. Moreover, the Agencies note that the sale or securitization of a loan may not affect an institution's potential liability for violations of TILA, RESPA, the FTC Act, or other laws in connection with its origination of the loan. State laws, including laws regarding unfair or deceptive acts or practices, also may apply.

**Recommended Practices**

Recommended practices for addressing the risks raised by nontraditional mortgage products include the following:[17]

*Communications with Consumers*—When promoting or describing nontraditional mortgage products, institutions should provide consumers with information that is designed to help them make informed decisions when selecting and using these products. Meeting this objective requires appropriate attention to the timing, content, and clarity of information presented to consumers. Thus, institutions should provide consumers with information at a time that will help consumers select products and choose among payment options. For example, institutions should offer clear and balanced product descriptions when a consumer is shopping for a mortgage—such as when the consumer makes an inquiry to the institution about a mortgage product and receives information about nontraditional mortgage products, or when marketing relating to nontraditional mortgage products is provided by the institution to the consumer—not just upon the submission of an application or at consummation.[18] The provision of such information would serve as an important supplement to the disclosures currently required under TILA and Regulation Z or other laws.[19]

*Promotional Materials and Product Descriptions.* Promotional materials and other product descriptions should provide information about the costs, terms, features, and risks of nontraditional mortgages that can assist consumers in their product selection decisions, including information about the matters discussed below.

• *Payment Shock.* Institutions should apprise consumers of potential increases in payment obligations for these products, including circumstances in which interest rates or negative amortization reach a contractual limit. For example, product descriptions could state the maximum monthly payment a consumer would be required to pay under a hypothetical loan example once amortizing payments are required and the interest rate and negative amortization caps have been reached.[20] Such information also could describe when structural payment changes will occur (*e.g.*, when introductory rates expire, or when amortizing payments are required), and what the new payment amount would be or how it would be calculated. As applicable, these descriptions could indicate that a higher payment may be required at other points in time due to factors such as negative amortization or increases in the interest rate index.

• *Negative Amortization.* When negative amortization is possible under the terms of a nontraditional mortgage product, consumers should be apprised of the potential for increasing principal balances and decreasing home equity, as well as other potential adverse consequences of negative amortization. For example, product descriptions should disclose the effect of negative amortization on loan balances and home equity, and could describe the potential consequences to the consumer of making minimum payments that cause the loan to negatively amortize. (One possible consequence is that it could be more difficult to refinance the loan or to obtain cash upon a sale of the home).

• *Prepayment Penalties.* If the institution may impose a penalty in the event that the consumer prepays the mortgage, consumers should be alerted to this fact and to the need to ask the lender about the amount of any such penalty.[21]

• *Cost of Reduced Documentation Loans.* If an institution offers both reduced and full documentation loan programs and there is a pricing premium attached to the reduced documentation program, consumers should be alerted to this fact.

---

[15] These program disclosures apply to ARM products and must be provided at the time an application is provided or before the consumer pays a nonrefundable fee, whichever is earlier.

[16] The OCC, the Board, and the FDIC enforce this provision under the FTC Act and section 8 of the FDI Act. Each of these agencies has also issued supervisory guidance to the institutions under their respective jurisdictions concerning unfair or deceptive acts or practices. *See* OCC Advisory Letter 2002–3—Guidance on Unfair or Deceptive Acts or Practices, March 22, 2002; Joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks, March 11, 2004. Federally insured credit unions are prohibited from using any advertising or promotional material that is inaccurate, misleading, or deceptive in any way concerning its products, services, or financial condition. 12 CFR 740.2. The OTS also has a regulation that prohibits savings associations from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered. 12 CFR 563.27. This regulation supplements its authority under the FTC Act.

[17] Institutions also should review the recommendations relating to mortgage lending practices set forth in other supervisory guidance from their respective primary regulators, as applicable, including guidance on abusive lending practices.

[18] Institutions also should strive to: (1) Focus on information important to consumer decision making; (2) highlight key information so that it will be noticed; (3) employ a user-friendly and readily navigable format for presenting the information; and (4) use plain language, with concrete and realistic examples. Comparative tables and information describing key features of available loan products, including reduced documentation programs, also may be useful for consumers considering the nontraditional mortgage products and other loan features described in this guidance.

[19] Institutions may not be able to incorporate all of the practices recommended in this guidance when advertising nontraditional mortgages through certain forms of media, such as radio, television, or billboards. Nevertheless, institutions should provide clear and balanced information about the risks of these products in all forms of advertising.

[20] Consumers also should be apprised of other material changes in payment obligations, such as balloon payments.

[21] Federal credit unions are prohibited from imposing prepayment penalties. 12 CFR 701.21(c)(6).

*Monthly Statements on Payment Option ARMs.* Monthly statements that are provided to consumers on payment option ARMs should provide information that enables consumers to make informed payment choices, including an explanation of each payment option available and the impact of that choice on loan balances. For example, the monthly payment statement should contain an explanation, as applicable, next to the minimum payment amount that making this payment would result in an increase to the consumer's outstanding loan balance. Payment statements also could provide the consumer's current loan balance, what portion of the consumer's previous payment was allocated to principal and to interest, and, if applicable, the amount by which the principal balance increased. Institutions should avoid leading payment option ARM borrowers to select a non-amortizing or negatively-amortizing payment (for example, through the format or content of monthly statements).

*Practices to Avoid.* Institutions also should avoid practices that obscure significant risks to the consumer. For example, if an institution advertises or promotes a nontraditional mortgage by emphasizing the comparatively lower initial payments permitted for these loans, the institution also should provide clear and comparably prominent information alerting the consumer to the risks. Such information should explain, as relevant, that these payment amounts will increase, that a balloon payment may be due, and that the loan balance will not decrease and may even increase due to the deferral of interest and/or principal payments. Similarly, institutions should avoid promoting payment patterns that are structurally unlikely to occur.[22] Such practices could raise legal and other risks for institutions, as described more fully above.

Institutions also should avoid such practices as: Giving consumers unwarranted assurances or predictions about the future direction of interest rates (and, consequently, the borrower's future obligations); making one-sided representations about the cash savings or expanded buying power to be realized from nontraditional mortgage products in comparison with amortizing mortgages; suggesting that initial minimum payments in a payment option ARM will cover accrued interest (or principal and interest) charges; and making misleading claims that interest rates or payment obligations for these products are "fixed".

*Control Systems*—Institutions should develop and use strong control systems to monitor whether actual practices are consistent with their policies and procedures relating to nontraditional mortgage products. Institutions should design control systems to address compliance and consumer information concerns as well as the safety and soundness considerations discussed in this guidance. Lending personnel should be trained so that they are able to convey information to consumers about product terms and risks in a timely, accurate, and balanced manner. As products evolve and new products are introduced, lending personnel should receive additional training, as necessary, to continue to be able to convey information to consumers in this manner. Lending personnel should be monitored to determine whether they are following these policies and procedures. Institutions should review consumer complaints to identify potential compliance, reputation, and other risks. Attention should be paid to appropriate legal review and to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products.

With respect to nontraditional mortgage loans that an institution makes, purchases, or services using a third party, such as a mortgage broker, correspondent, or other intermediary, the institution should take appropriate steps to mitigate risks relating to compliance and consumer information concerns discussed in this guidance. These steps would ordinarily include, among other things, (1) Conducting due diligence and establishing other criteria for entering into and maintaining relationships with such third parties, (2) establishing criteria for third-party compensation designed to avoid providing incentives for originations inconsistent with this guidance, (3) setting requirements for agreements with such third parties, (4) establishing procedures and systems to monitor compliance with applicable agreements, bank policies, and laws, and (5) implementing appropriate corrective actions in the event that the third party fails to comply with applicable agreements, bank policies, or laws.

## Appendix: Terms Used in This Document

*Interest-only Mortgage Loan*—A nontraditional mortgage on which, for a specified number of years (*e.g.*, three or five years), the borrower is required to pay only the interest due on the loan during which time the rate may fluctuate or may be fixed. After the interest-only period, the rate may be fixed or fluctuate based on the prescribed index and payments include both principal and interest.

*Payment Option ARM*—A nontraditional mortgage that allows the borrower to choose from a number of different payment options. For example, each month, the borrower may choose a minimum payment option based on a "start" or introductory interest rate, an interest-only payment option based on the fully indexed interest rate, or a fully amortizing principal and interest payment option based on a 15-year or 30-year loan term, plus any required escrow payments. The minimum payment option can be less than the interest accruing on the loan, resulting in negative amortization. The interest-only option avoids negative amortization but does not provide for principal amortization. After a specified number of years, or if the loan reaches a certain negative amortization cap, the required monthly payment amount is recast to require payments that will fully amortize the outstanding balance over the remaining loan term.

*Reduced Documentation*—A loan feature that is commonly referred to as "low doc/no doc", "no income/no asset", "stated income" or "stated assets". For mortgage loans with this feature, an institution sets reduced or minimal documentation standards to substantiate the borrower's income and assets.

*Simultaneous Second-Lien Loan*—A lending arrangement where either a closed-end second-lien or a home equity line of credit (HELOC) is originated simultaneously with the first lien mortgage loan, typically in lieu of a higher down payment.

Dated: September 25, 2006.

**John C. Dugan,**

*Comptroller of the Currency.*

By order of the Board of Governors of the Federal Reserve System, September 27, 2006.

**Jennifer J. Johnson,**

*Secretary of the Board.*

Dated at Washington, DC, this 27th day of September, 2006.

Federal Deposit Insurance Corporation.

**Robert E. Feldman,**

*Executive Secretary.*

Dated: September 28, 2006.

By the Office of Thrift Supervision.

**John M. Reich,**

*Director.*

By the National Credit Union Administration on September 28, 2006.

**JoAnn M. Johnson,**

*Chairman.*

[FR Doc. 06–8480 Filed 10–3–06; 8:45 am]

**BILLING CODE 4810–33–P, 6210–01–P, 6714–01–P, 6720–01–P, 7535–01–P**

---

[22] For example, marketing materials for payment option ARMs may promote low predictable payments until the recast date. Such marketing should be avoided in circumstances in which the minimum payments are so low that negative amortization caps would be reached and higher payment obligations would be triggered before the scheduled recast, even if interest rates remain constant.