**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| BERNARDO BETTINELLI, | ) | |
| CAROL G. BETTINELLI, and | ) | |
| all others similarly situated, | ) | |
| Plaintiffs, | ) | |
| v. | ) | NO. 09-11079-MLW |
|  | ) | |
| WORLD SAVINGS BANK FSB, | ) | |
| N/K/A WACHOVIA MORTGAGE, FSB, | ) | |
| Defendant. | ) | |

_____

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

## INTRODUCTION[1]

Plaintiffs' Opposition to Wachovia's Motion to Dismiss ("Response") is as telling for what it does not say as for what it does say.  In response to Wachovia's preemption arguments, Plaintiffs ignore the Office of Thrift Supervision's ("OTS") own guidance on how to apply the preemption regulation.  That guidance says that courts should first look to see if the state law as applied is listed in the regulation, and, if it is, the state law is preempted and the section that lists exceptions need not be considered.  But Plaintiffs construct their arguments by inverting the analysis – they look first at the exceptions.  There is no support for this backwards approach, and the fact that Plaintiffs are forced to employ it in their Response confirms what Wachovia has argued – the claims asserted here are all preempted.

As to the arguments concerning their failure to state a claim, Plaintiffs make a variety of arguments, but again, most of them ask the Court to either ignore settled law or to disregard the plain language of the loan documents.  The fact that Plaintiffs cannot squarely confront Wachovia's arguments again speaks volumes about the viability of their claims.  Finally, as to the statutes of limitations, Plaintiffs provide no valid reason for this Court to overlook the fact that a majority of their claims are plainly untimely.  Thus, as explained below, Wachovia's motion to dismiss should be granted.

## ARGUMENT

### I.    ALL OF PLAINTIFFS' CLAIMS ARE PREEMPTED BY HOLA.

Plaintiffs seek to avoid preemption by pretending that OTS has not expressly instructed courts regarding how to apply its preemption regulation.  *See* 61 Fed. Reg. 50966-67.  That method, properly followed (as discussed in Wachovia's opening brief at 8-16), leaves no room for doubt:  all of Plaintiffs' claims are preempted.  Plaintiffs further seek to hide behind vague

---

[1] Wachovia was permitted to file this reply brief by order dated August 10, 2010.  (Doc. 42, p. 2 ¶ 2(d)).

generalities, including the undisputed (but inapplicable) proposition that OTS has not preempted claims asserting state consumer fraud or other basic contract and commercial regulations *that do not have the effect of regulating lending*.  But the law is clear that the mere invocation of a generally applicable commercial law does not avoid preemption.  As all of the Circuit Courts to have considered the question have concluded, preemption is determined based on what activities of the bank a plaintiff is challenging.  *Casey v. FDIC*, 583 F.3d 586, 592-95 (8th Cir. 2009); *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1006 (9th Cir. 2008); *In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 646-48 (7th Cir. 2007).  No matter how hard Plaintiffs try to spin their claims, Plaintiffs are asking this Court to do exactly what HOLA preemption was designed to avoid: use state law to regulate activities that the OTS has said are lending activities.[2]  To the extent Judge Fogel's opinion in *Mandrigues*, relied upon by Plaintiffs, is inconsistent with these settled authorities, it is wrong, and should not prevent this Court from dismissing Plaintiffs' complaint in its entirety as preempted.

> **A.**     **Plaintiffs' Arguments Fundamentally Misconstrue The Methods For Determining Whether A State Law Claim Is Preempted By § 560.2.**

OTS has enacted a regulation, 12 C.F.R. § 560.2, which makes clear its intention to ensure that the *lending activities* of federal savings banks are regulated exclusively by OTS under federal law.  In the first paragraph of § 560.2, OTS declared that it "hereby occupies the entire field of *lending regulation* for federal savings associations.  OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a

---

[2] Plaintiffs initially contend that preemption is an "affirmative defense on which the Defendant bears the burden of proof."  (Resp. 13.)  To the extent Plaintiffs are suggesting that this issue cannot be resolved on a motion to dismiss, the argument is meritless.  Preemption is a threshold legal question that courts routinely resolve on a motion to dismiss.  *See Sprietsman v. Mercury Marine*, 537 U.S. 51, 56 (2002).  Plaintiffs' sole support for this contention is a dissenting opinion that evaluated the existence of federal question jurisdiction, and that is not at issue here.  *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik GmbH & Co.*, 510 F.3d 77, 99 n.22 (1st Cir. 2007) (Cyr, J., dissenting).

*uniform federal scheme of regulation*." 12 C.F.R. § 560.2(a) (emphasis added). As Wachovia

pointed out in its opening brief, the guidance issued by OTS for implementing this regulation is

straightforward; it provides that "the first step will be to determine whether the type of law in

question is listed in paragraph (b) [of § 560.2]. If so, the analysis will end there; the law is

preempted." 61 Fed. Reg. 50951, 50966 (Sept. 30, 1996). Only if the type of law is not listed in

section (b), should a court consider whether paragraph (c) of the regulation applies.

Plaintiffs not only fail to address this interpretive guidance, they effectively ask this

Court to adopt exactly the opposite approach, misreading both OTS and court authorities in their

effort to turn the preemption analysis on its head. Quoting selectively from Judge Posner's

opinion in *Ocwen*, Plaintiffs suggest that the Seventh Circuit has concluded that subsection (c)

preserves any claim asserted under a state consumer fraud statute. (Resp. 13-14.) In fact, Judge

Posner engaged in a lengthy examination of the specifics of the various claims in the case, and

concluded that numerous claims asserted under state unfair trade practice statutes like the

Massachusetts statute at issue here were preempted because the plaintiff was trying to use those

statutes to regulate the lending activities of a federal savings bank. *Ocwen*, 491 F.3d at 646-48;

*accord Casey*, 583 F.3d at 595 (holding that a state law that "as applied imposes requirements

regarding the examples listed in § 560.2(b) is preempted"); *Silvas*, 514 F.3d at 1006 (holding that

if the state law, "as applied, is a type of state law contemplated in the list under paragraph (b)," it

is preempted).[3]

---

[3] Judge Fogel's ruling in *Mandrigues* never addresses whether the activities challenged in that case fall
within the illustrative list of activities expressly singled out in 12 C.F.R. § 560.2(b) for preemption by
OTS. (Resp., App. 1 at 4-5.) Indeed, Judge Fogel never acknowledges that under OTS's own
regulations, the preemption analysis ends if the challenged activity is listed in § 560.2(b). (*Id.*) His ruling
is, therefore, contrary to both OTS's regulations and the uniform authority in the Courts of Appeals
stating that preemption is determined not by reference to the general state statute invoked, but by
considering whether a general state law is being invoked to challenge the lending activities of a federal
savings bank.

The OTS Opinion Letter cited in *Ocwen*, upon which Plaintiffs rely (Resp. 14), reinforces the point.  In that letter, OTS determined that Indiana's deceptive trade practices act was not preempted *on its face* by § 560.2.  OTS Opinion P-96-12, at 9-10 (Dec. 24, 1996).  That is, the OTS Letter is simply a recognition by OTS that there may be circumstances where application of a consumer fraud act claim against a federal savings association does not involve lending activities, and therefore is not preempted.  But as a later OTS Letter makes clear, when the preemption question arises in the context of a particular claim, rather than a facial challenge to a state law, the "preemption analysis requires consideration of the relationship between federal and state laws *as they are interpreted and applied, not merely as they are written*."  OTS Opinion P-99-3, at 12 (Mar. 10, 1999) (emphasis added).  Indeed, OTS itself has recognized that a state unfairness law can be preempted by § 560.2, concluding that a specific claim under California's unfair competition law was preempted.  *Id.*, at 1, 4-9, 10-17.

Plaintiffs cite the First Circuit's decision in *Yeomalakis v. FDIC*, 562 F.3d 56 (1st Cir. 2009), but never even try to explain how it could save their claims from preemption.  It does not.  To the contrary, the First Circuit in *Yeomalakis*, like the Seventh, Eighth and Ninth Circuits, makes clear that the mere invocation of a state unfair trade practices statute will not suffice to avoid preemption.  Rather, when the defendant demonstrates that the allegations of the complaint show that the plaintiff seeks to use the state law to regulate the lending activities of a federal savings bank, the claim will be preempted unless the plaintiff can articulate "a version of a claim under [the state law] that might avoid preemption."  *Id*. at 61.

What Plaintiffs refuse to acknowledge is that the regulation does not require and does not allow a court to decide that a generally worded state statute is either preempted entirely or not at all.  Contrary to Plaintiffs' suggestion (Resp. 20), holding that *their* claims are preempted would

not be the equivalent of concluding that a claim based on a lender's false statement regarding the interest rate on a loan would also be preempted. As *Ocwen* itself demonstrates, OTS has determined not to preempt a claim that charges a lender with breaching its loan agreement by charging a higher rate than the loan permits, 491 F.3d at 643, but it has determined to preempt claims that challenge "the terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due …." 12 C.F.R. §560.2(b)(4). Plaintiffs have not alleged that Wachovia wronged them by charging an amount of interest different from that which the loan documents permit. They have alleged that Wachovia wronged them with regard to the terms of credit, including, among other things, amortization of their loans and minimum payments due. Their actual claim is preempted, even though a different claim might not be. Indeed, while purporting to deny that their claims seek to regulate lending, Plaintiffs actually admit it. Plaintiffs openly admit that they are asking this court for a "remedy under [state law] for the unfairness inherent in making a loan *in a structure* that Defendants [allegedly] knew, *based on underwriting*, could not be repaid by its terms." (Resp. 16 (emphasis added); *see also* Resp. 19 ("Plaintiffs argue that the *loan structure*, as applied to them, was unfair…" (emphasis added).) Whether a loan should be structured to defer and capitalize interest payments are matters specifically preempted by OTS. 12 C.F.R. § 560.2(b)(4). Underwriting standards, too, have been expressly identified by OTS as being subject to uniform *federal* regulation, not left to a multiplicity of potentially conflicting state standards. (Def.'s Memo. 13) (citing 12 C.F.R. § 560.101 & Appendix.)

### B.  The Fact That OTS Has Specifically Regulated POAs Reinforces, Rather Than Undermines, The Applicability of Preemption.

Contrary to Plaintiffs' argument (Resp. 16-18), the fact that OTS has specifically addressed underwriting risks involved with payment option ARM loans supports rather than

undermines the conclusion that their claims are preempted.  *See* 71 Fed. Reg. 58609.  The

regulation *confirms* that OTS has occupied the field of lending regulation, and has concluded that

setting underwriting standards for federal savings associations is comfortably within its domain.

OTS intends to allow for its regulatory oversight, not *ad hoc* state law standards and judicial

decisions, to ensure that federal savings associations abide by those regulatory standards.

Through the regulation, OTS "sought to ensure that loan terms and underwriting standards for

nontraditional mortgage loans are consistent with prudent lending practices," and "described

control systems to ensure that actual practices are consistent with policies and procedures."  71

Fed. Reg. 58609-10.  OTS left no doubt that they would "carefully scrutinize risk management

processes, policies, and procedures in this area.  Institutions that do not adequately manage these

risks will be asked to take remedial action."  *Id.*  In short, OTS recognized a concern, addressed

it by adopting standards, and has asserted the right to oversee and enforce compliance with its

standards.  This is entirely consistent with the overall policy of ensuring a uniform system of

federal regulation for the lending activities of federal savings banks promulgated in § 560.2(a).

The fact that the regulation also notes that state unfair practices laws "may" apply, 71 Fed. Reg.

at 58617, merely acknowledges the existing structure of federal preemption, *i.e.*, that state law

can apply to matters unrelated to lending activities.  It should not be understood to allow states to

apply their own standards with respect to underwriting nontraditional mortgage loans and

therefore displace the regulators' express desire for uniformity.[4]

---

[4] In addition, Plaintiffs' reliance on OTS's underwriting regulation is particularly misplaced because it
was adopted *after* several of the loans at issue in this case were made.  *Compare* 71 Fed. Reg. 58609 (Oct.
4, 2006) *with* (2d Am. Compl. ¶¶ 42, 80) (stating that the relevant loans were written in 2002 and 2005).
The regulation's federally mandated standards can play no role in determining whether Wachovia failed
to comply with its legal obligations in making these loans.

In the end, as the Seventh Circuit recognized, "[i]t would not do to let the broad standards characteristic of [the fields of law identified in subparagraph (c)] morph into a scheme of state regulation of federal S&Ls." *Ocwen*, 491 F.3d at 643. The activities listed in § 560.2(b) have been determined by OTS not to merely incidentally affect lending. That is why the analysis starts with an examination of those activities, and *ends there* if the state law at issue is being used to regulate those activities.[5]

## II.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL TO STATE ANY CLAIM UPON WHICH RELIEF COULD BE GRANTED.

Wachovia demonstrated in its opening brief that each count in the Second Amended Complaint should also be dismissed because it fails to state a claim. In their Response, Plaintiffs fail to overcome any of Wachovia's arguments.

### A.   Count I:  Plaintiffs Have Failed To State A Claim Under Chapter 93A.

In its opening brief, Wachovia demonstrated that Plaintiffs' allegations of deception and unfairness under Chapter 93A are deficient. As to Plaintiffs' claims of unfairness, Wachovia showed that Plaintiffs rely solely on a misreading of *Commonwealth v. Fremont Investment and Loan*, 452 Mass. 733 (2008). (Def.'s Memo. 17-18.) And as to Plaintiffs' allegations of deception, Wachovia pointed to the precise language in Plaintiffs' Notes that clearly and accurately disclosed each allegedly deceptive term. (*Id.* 18-20.)

In response, Plaintiffs begin by accusing Wachovia of misstating the standards applicable to Chapter 93A claims. (Resp. 6.) Plaintiffs essentially claim that the "'level of rascality' standard" has been rejected in favor or a more lenient standard for assessing Chapter 93A claims.

---

[5] Plaintiffs argue that Wachovia has "fail[ed] to cite" relevant case law that, according to Plaintiffs, shows that "most state unfairness claims" are not preempted, apparently referring to *Ocwen*. (Resp. 11.) Wachovia not only cited *Ocwen*, but showed that *Ocwen* is entirely consistent with *Casey* and *Silvas* in examining whether a state law *as applied* is preempted. (Def.'s Memo. 9.) Indeed, *Casey* (which Plaintiffs never cite or discuss) relies on *Ocwen* for its holding and specifically rejects Plaintiffs' interpretation of the Seventh Circuit's ruling. *Casey*, 583 F.3d at 586 n. 3.

(*Id.*)  But this argument is groundless.  Wachovia cited cases from both the First Circuit and this Court – none of which have been overruled – that all make clear that Mass. Gen. L. c 93A is to be narrowly construed in order to curb the trend of "rampant" litigation under the statute.  *See, e.g.*, *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989);[6] *Cablevision*, 38 F. Supp. 2d at 61; *Mass. School of Law v. Am. Bar Ass'n.*, 142 F.3d 26, 41 (1st Cir. 1998) (to state a Chapter 93A claim, "the defendant's conduct must be not only wrong, but also egregiously wrong).  And Plaintiffs have cited no cases that suggest otherwise.

Instead, Plaintiffs rely exclusively on *Fremont*, claiming that it stands for the proposition that it "is unfair for a mortgage lender to make a loan it knows the borrower cannot repay." (Resp. 8.)  *Fremont*, however, is not nearly as broad as Plaintiffs claim; there, the court simply upheld an injunction restricting but not removing Fremont's ability to foreclose on loans that contained *four specified characteristics*.[7]  *Id.* at 739.  As Wachovia made clear in its opening brief, Plaintiffs do not – and cannot – allege that their loans contain those four characteristics. Accordingly, even if Plaintiffs were correct that *Fremont* is the standard against which a loan's fairness should be measured, then the Plaintiffs' loans indisputably pass the test.[8]

---

[6] Plaintiffs argue that the "level of rascality" language used in *Garrity* has been "expressly rejected" by the Supreme Judicial Court's decision in *Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.* 420 Mass. 39, 42043 (1995).  (Resp. 6).  In fact, courts have continued to use that language even after *Propac. See, e.g., Suzuki of Western Mass., Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 50 (D. Mass. 2001); *Cablevision of Boston v. Pub. Improvement Comm'n of the City of Boston*, 38 F. Supp. 2d 46, 61 (D. Mass. 1999) (Wolf, J.); *Egan v. Athol Memorial Hosp.*, 971 F. Supp. 37, 47 (D. Mass. 1997). In any event, Plaintiffs' focus on the specific words used in *Garrity* misses the larger point that courts have continued to require a showing of substantial misconduct in order to state a claim.

[7] The four characteristics are:  (1) ARM loans with an introductory period of three years or less; (2) introductory rate at least three per cent below the fully indexed rate; (3) made to borrowers with a debt-to-income ratio of greater than 50%; and (4) loan-to-value ratio of 100% or a substantial prepayment penalty.  *Fremont*, 452 Mass. At 739.

[8] Plaintiffs also claim that the "equities between the parties" and the "blizzard of language in the notes" indicates that the loans were unfair. (Resp. 7-8).  As to the equities, Plaintiffs apparently mean that Wachovia is a big bank and they are individuals, but if that were sufficient, then every home mortgage

Plaintiffs' arguments concerning alleged deception fail as well.  In its opening brief, Wachovia detailed the precise language in Plaintiffs' Notes that clearly disclosed each allegedly deceptive term, (Def.'s Memo. 18-20), and argued that a plaintiff cannot claim deception under Chapter 93A where the terms of his loan were accurately described to him, *see Fernandes v. Havkin*, No. 08-11498, 2010 WL 3155805, *13 (D. Mass. Aug. 10, 2010).  In response, Plaintiffs rely on *Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982), which held that a defendant's failure to disclose certain information (a termite infestation) "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."  But that case is inapplicable here because Wachovia *did* disclose all relevant information to Plaintiffs (*see* 2d Am. Compl., Exhs. 4-6).

**B.      Count II:  Plaintiffs Have Failed To State A Claim For "Negligent or Improper Underwriting".**

Plaintiffs' claim for "negligent or improper underwriting" also fails, as Wachovia has fulfilled all of its underwriting duties.  Plaintiffs allege that Wachovia owed them a duty of care to underwrite their loans by considering whether the loans could be paid off by amortized payments.  (2d Am. Compl. ¶ 125.)  In its opening brief, Wachovia cited several cases that hold exactly the opposite – that a lender *does not* owe a borrower any duty to consider whether the borrower has the ability to repay a loan.  (Def.'s Memo. 20-22.)

Plaintiffs do not address this plethora of contrary authority.  Instead, Plaintiffs rely solely on *Fremont*, quoting a long passage that they claim reverses all relevant precedent and creates a duty that thus far has been expressly and uniformly rejected by numerous courts.  As discussed above, *Fremont* related to loans containing four specific characteristics – characteristics that

---

loan would be deemed unfair.  As to the disclosures, Plaintiffs overlook the fact that mortgage disclosures are mandated by Federal law.

Plaintiffs' loans do not share.  In any event, *Fremont* discusses a Chapter 93A claim, *not* a

negligent or improper underwriting claim.  Thus, *Fremont* should not be read to create a duty

that is inconsistent with settled law.

## C.    Count III:  Plaintiffs Have Failed To State A Claim For Unconscionability.

As Wachovia demonstrated in its opening brief, Plaintiffs cannot adequately plead that

their mortgage loans were either procedurally or substantively unconscionable, and nothing in

Plaintiffs' Response salvages those claims.  Plaintiffs cannot show procedural unconscionability

because they have not pled that they entered into the mortgage agreement with "an absence of

meaningful choice," *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 293, 408 N.E.2d 1370 (1980),

or that the contracts were the "product of unfair surprise," *Laudani*, 401 B.R. at 34.  In response,

Plaintiffs allege that certain mortgage language was "impenetrable," and claim that that complex

language amounts to procedural unconscionability.  (Resp. 31.)[9]  However, the allegedly

"impenetrable" terms are explained in the loan documents themselves.  (*See* Def.'s Memo. 20-

22; *see also* 2d Am. Compl., Exhs. 4-6.)

As for substantive unconscionability, Plaintiffs have made no showing that their loans

drove "too hard a bargain" to be enforced.  *See Waters v. Min Ltd.*, 412 Mass. 64, 68, 587 N.E.2d

231 (1992).  Plaintiffs argue that Wachovia did not reasonably believe that the Plaintiffs would

be able to make the scheduled payments and avoid foreclosure.  (Resp. 31.)  But that argument is

insufficient to plead substantive unconscionability for at least two reasons.  First, Wachovia had

no way of knowing, at the mortgage consummation, that Plaintiffs would repeatedly choose to

---

[9] Moreover, Plaintiffs' contention that the loans' disclosure language was "impenetrable" is directly at odds with their claims in the preemption section of their brief that they "do not here claim that Defendant's behavior violated any rules of disclosure," (Resp. 11) and that "Plaintiffs here do not seek remedies for how the loan was disclosed" (*id*. 16).  Their arguments in this section simply prove what Wachovia has said – these claims concern disclosure and are preempted.

make the minimum payments on their loan – which is the sole reason that Plaintiffs contend that

the loans have become unmanageable.  That was not part of the parties' bargains but rather a

result of Plaintiffs' own post-bargain behavior.  Second, as Wachovia demonstrated in its

opening brief, Plaintiffs cannot "credibly argue that [they] received no benefit from the

transaction."  (Def.'s Memo. 23-24) (citing *Laudani*, 401 B.R. at 35).

> ### D.     Count IV:  Plaintiffs Have Failed To State A Claim For Illegality.

In their Response, Plaintiffs claim two aspects of their loans violate public policy:[10]

Wachovia's alleged control over the Index, and the charging of "interest upon interest".  (Resp.

31-32.)  The first point is easily refuted, because Wachovia did not have "sole discretion in

changing the index used to calculate the interest rate," as Plaintiffs allege.  (*Id.*).  Rather, as

Wachovia explained in its opening brief, the Index is tied to a variable rate on deposit accounts,

and the use of that index cannot be changed unless it becomes unavailable.  (Def.'s Memo. 25.)

Plaintiffs' second allegation, that Wachovia cannot charge  "interest on interest," also

fails.  Adopting a rule that it is illegal to charge "interest on interest" in the manner that

Plaintiffs' mortgages do would render illegal every mortgage loan that permits negative

amortization.[11]  Not surprisingly, there is no authority to support such a proposition.  In fact, the

two cases Plaintiffs cite (from 1930 and 1922) both hold that charging interest on interest *is*

permissible when it is an explicit part of a contract, which it clearly was here.  *Ratner v. Hill*, 270

Mass. 249, 254 (1930) (holding that "[s]uch a payment … must arise from special agreement of

---

[10] Plaintiffs offer no argument for why these alleged violations of public policy should amount to *illegality*.  This alone should be fatal to their claim, especially in light of the authority that Wachovia cited in its opening brief holding that illegality must be serious.  (Def.'s Memo. 25.)

[11] And Plaintiffs do not explain how to reconcile this allegation of illegality with their earlier claims that they do not "seek a ruling that all loans involving negative amortization and upward payment adjustments are illegal," (Resp. 16), that "[t]he problem with Defendant's position … is … its attempt to characterize this claim as one that challenges the amortization of the loans and the deferral of capitalization of interest, (*id.* at 20), or that "[t]he fact that the Plaintiffs' loan involved negative amortization, deferral of interest, and interest capitalization is not, in and of itself, being challenged" (*id.* at 21).

the parties); *Ellis v. Sullivan*, 241 Mass. 60, 64, 134 N.E. 695 (1922) (holding that charging interest on interest is allowed with contractual authority to do so).

> **E.      Count V:  Plaintiffs Cannot Bring A Claim Of Unjust Enrichment.**

In its opening brief, Wachovia explained that unjust enrichment is unavailable where, as here, (1) the parties' relationship is covered by a contract, or (2) where a party has an adequate remedy at law.  (Def.'s Memo. 25.)  As to the first point, Plaintiffs do not refute that there is a contract covers the parties' relationship, and for this reason alone, Count V should be dismissed.  As to the second point, Plaintiffs admit that "[t]he question … is whether there is an adequate remedy at law."  (Resp. 32.)   Therefore, like in *Fernandes*, 2010 WL 3155805 at *13 – which Plaintiffs' Response does not even address – where the court held that a plaintiff's negligence and chapter 93A claims precluded his claim for unjust enrichment (even though such claims were ultimately unsuccessful), Plaintiffs' assertion of those same claims here means that their unjust enrichment claim should be dismissed.

> **F.      Count VI:  Dismissal of Plaintiffs' Declaratory Judgment Claim Is Not Premature.**

Plaintiffs argue that dismissal of their declaratory judgment count would be premature.  (Resp. 32-33.)  However, Plaintiffs claim only that "[c]ourts have declined generally to dismiss claims for declaratory relief at the motion to dismiss stage, *where the related claims are valid*." (*id.* 33) (emphasis added).   As demonstrated herein, none of Plaintiffs' other claims can survive, and therefore there is no reason to defer ruling on their derivative declaratory judgment claim.

## III.    PLAINTIFFS' UNTIMELY CLAIMS SHOULD BE DISMISSED.

In its opening brief, Wachovia demonstrated that the following claims are untimely: (a) the Bettinellis' Chapter 93A claim and (b) all Plaintiffs' tort-based claims.  In their response, Plaintiffs (a) concede that the Bettinellis' Chapter 93A claim could not have been filed within the

limitations period, but contend it is nonetheless timely, and (b) do not dispute that their tort-based claims were filed after the limitations period, but offer a number of reasons as to why the limitations period was tolled or should be extended, none of which has merit.  Each of these arguments is addressed below.

> **A.** **The Bettinellis' Chapter 93A Claim Is Untimely.**

If the Court holds that the limitations period for the Bettinellis' Chapter 93A claim began to run with the execution of their 2002 loan – as is appropriate[12]– then even Plaintiffs do not dispute that their June 2009 Complaint is barred by the applicable four-year limitations period. But even if the limitations period only began to run when the Bettinellis executed their 2005 loan, the claim is still time-barred because, as Wachovia argued in its opening brief, the Massachusetts Consumer Fraud Act requires a plaintiff to deliver a written demand for relief to the defendant *at least thirty days* prior to filing a Chapter 93A claim.  Mass. Gen. Laws ch. 93A § 9(3).  Plaintiffs do not deny that the Bettinellis failed to comply with this requirement in time to file a timely Chapter 93A claim 30 days later.  They argue instead that the Court should excuse their late filing because the rule amounts to a mere "technicality."  (Resp. 23.)  However, this requirement is no more "technical" than any other timing requirement.

Although *Baldassari* left open the question of the results of such a failure, *Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 44 (1975), when *Baldassari* is read in context with other decisions, it is clear that dismissal is required here.  Numerous cases hold that the Chapter 93A demand requirement is "strictly adhered to" and that compliance is a "prerequisite to suit."  *See, e.g., Kanamaru v. Holyoke Mut. Ins. Co.*, 72 Mass. App. Ct. 396, 408-09, 892 N.E.2d 759

---

[12] While the Second Amended Complaint relies on both the 2002 and 2005 loans, it acknowledges that the 2002 loan "had many of the same features as the 2005 transaction."  (2d Am. Compl. ¶ 53.)  Moreover, the fact that the Bettinellis were on notice of their claims as a result of the 2002 loan is confirmed by Plaintiffs' own argument that their 2005 refinancing proved that the POA loan structure inherently resulted in a refinancing (Resp. 25 n.8.), which is the *very* violation they allege  (2d Am. Compl. ¶ 59.)

(2008); *Burns ex rel Office of Pub. Guardian v. Hale and Dorr LLP*, 445 F. Supp. 2d 94, 97 (D. Mass. 2006).  And *Baldassari* holds that, "the sending of a demand letter was not the commencement of an action so as to satisfy the requirement of the statute of limitations." *Baldassari*, 369 Mass. at 44.  Plaintiffs provide no case law suggesting that another interpretation of *Baldassari* would be appropriate.

In fact, Plaintiffs present no argument except to complain that they would "lose their 93A claim forever" if they were not permitted to proceed.  (Resp. 24.)  But that is true of all failures to file claims within the limitations period and therefore cannot excuse noncompliance.  Because the Bettinellis could not have complied with the demand requirement and filed a timely claim, their Chapter 93A claim should be dismissed with prejudice.

**B.     Plaintiffs' Common Law Claims Are Time-Barred.**

Plaintiffs do not dispute that all of their state common law claims were brought more than three years after the closing of each of their loans, but claim that the three-year limitations period was tolled or should be extended for various reasons.  As explained below, none of these arguments has any merit.

1.     <u>The Continuing Violation Theory Does Not Toll Plaintiffs' Claims.</u>

Plaintiffs argue that the common law claims of the Bettinellis and Ms. Barrera (but not the Piedras) remain timely because of the "continuing violation doctrine."  (Resp. 25-27.)  But as Wachovia explained in its opening brief, the "continuing violation doctrine" is not relevant to claims like those raised in this litigation, and for good reason:  application of the doctrine in circumstances like those present here would render the statute of limitations a nullity.  (*See* Def.'s Memo. 32-33.)  Plaintiffs would have been aware of their putative claims simply from looking at the loan documents, and nothing that happened after the documents were executed

would have changed that claim.  Almost any allegedly unlawful conduct can be characterized as "stemming from an ongoing practice" (Resp. 25) by simply characterizing the conduct as uncorrected, as Plaintiffs do, but if that were enough to constitute a continuing violation for purposes of statutes of limitations, then limitations periods would be rendered meaningless.

In support of their argument for application of the continuing violation doctrine here, Plaintiffs once again mainly rely on civil rights cases.  Although Plaintiffs also cite three non-civil rights cases that they claim represent "the weight of the jurisprudence" regarding the continuing violation doctrine, none of them support Plaintiffs' argument.  (Resp. 26) (citing *Church v. Gen. Electric Co.*, 138 F. Supp. 2d 169 (D. Mass. 2001); *Kusek v. Family Circle, Inc.*, 894 F. Supp. 522 (D. Mass. 1995); *Cunningham v. Huffman*, 154 Ill. 2d 398 (1993)).  *Church* is the only one in which the court actually applied the continuing violation doctrine, but it did so in the context of a contamination of Plaintiffs' property that occurred every day and therefore could constitute a "continuing trespass."  138 F. Supp. 2d at 176.  In the other two case, courts did not apply the doctrine.  *Kusek* was a trademark infringement case in which the court determined that the statute of limitations ran from last actual "use" of the trademark in question.  894 F. Supp. at 530-31.  In *Cunningham*, the court *rejected* an argument to use a "continuous course of treatment doctrine" to measure the start of the statute of limitations.  154 Ill. 2d at 404-06, 609 N.E.2d at 324-25.

In fact, far from proving Plaintiffs' point, these cases bolster Wachovia's argument that the "continuing violation doctrine" is inapplicable here.  In each of these cases, the behavior on which Plaintiffs' claims were predicated – respectively, trespass, trademark infringement, and medical malpractice – was held to accrue on the date of the *actual* violation.  *See* Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 285 (2008) ("Courts first ascertain

the essential thrust of a claim, and then they determine which (if any) of the acts or events encompassed within the plaintiff's allegations comprises the offense."). Here, the "essential thrust" of Plaintiffs' claims is that Wachovia made loans that they "knew or should have known" could not be repaid. That event occurred *once* – on the date that the loan was made.

2.      The Doctrines of Equitable Tolling and the Discovery Rule Do Not Toll Plaintiffs' Claims.

Plaintiffs also claim that the statute of limitations applicable to their claims should be extended either by equitable tolling or the discovery rule. But as Wachovia pointed out in its opening brief, the First Circuit has rejected the applicability of such doctrines in a nearly identical case in which plaintiffs alleged that their loan was unlawful because it provided for negative amortization, *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20 (1st Cir. 1997),and not surprisingly, Plaintiffs' Response does not even attempt to address this case. (Def.'s Memo. at 30-32). *Salois* held that equitable exceptions to limitations periods are narrowly construed and did not apply when the loan documents themselves disclosed the existence of negative amortization, and thus contained all of the information necessary to determine that they had a claim. 128 F.3d at 23-26.

Although Plaintiffs cite two other cases in support of their argument, neither suggests that an equitable exception should apply here. In *Damas v. Mortgage Electronics Registration Sys.*, No. 082207, 2009 WL 2232778, *2 (Mass. Super. June 3, 2009), a Massachusetts trial court held that, in applying the discovery rule, "[t]he issue is when did Mr. Damas know or reasonably should have known of his injuries." But that rule does not help Plaintiffs because it is predicated on the notion that Plaintiffs did not know the terms of their loan documents, and *Salois* held that "one who signs a writing that is designed to serve as a legal document … is presumed to know its contents." 128 F.3d at 25, 25 n.10. The contents of Plaintiffs' Notes include disclosure of *all*

16

the allegedly actionable aspects of Plaintiffs' loans: (a) Wachovia's right to choose an alternative

index if the Index becomes unavailable; (b) that their stated payments might be insufficient to

pay the total amount of interest; (c) and that if that occurred, the interest would be added to the

principal and the principal could never exceed 125% of the original amount borrowed without

changing the biweekly payment amount.  (*See* 2d Am. Compl., Exhs. 4-6.)  The other case on

which Plaintiffs rely, *Andrews v. Arkwright Mut. Ins. Co.*, 423 Mass. 1021 (1996), is not even a

mortgage case – it is an employment discrimination case in which the Court held that there was

no basis to extend the applicable statute of limitations.

> 3.   The Bettinelli's Untimely Complaint Did Not Toll The Statute of
> Limitations for Other Plaintiffs.

Finally, in a two-sentence argument, Plaintiffs claim that the Piedras' common law

claims (but not those of Ms. Barrera[13]) were tolled by the June 2009 filing of the Bettinelli's

original class action complaint in this action.  (Resp. 24-25.)  In other words, Plaintiffs are

arguing that, even though all of the claims of the named Plaintiffs (the Bettinellis) were time-

barred, the mere filing of class action lawsuit should stop the limitations period as to claims of

other potential loan holders.  But even the case on which Plaintiffs rely, *Crown, Cork & Seal Co.

v. Parker*, 462 U.S. 345 (1983), while it permits tolling in certain circumstances, does not

approve of tolling when the claims of the named plaintiffs in a class action are time-barred.

Indeed, even after the Court first articulated the class action tolling rules in *American Pipe &

Construction Co. v. Utah*, 414 U.S. 538 (1974), it subsequently indicated that tolling would only

apply when the claims of the named plaintiffs are timely.  *See United Airlines v. McDonald*, 432

U.S. 385, 392 (1977) ("The lawsuit had been commenced by the *timely filing* of a complaint for

classwide relief…") (emphasis added).

---

[13] Ms. Barrera's mortgage loan closed in August 2005, so her common law claims are untimely even if
the Court tolled claims from the June 2009 original filing in this action.

Moreover, approval of tolling in these circumstances would promote the sort of abuse that the three concurring Justices in *Crown, Cork* said should be avoided in applying the class action tolling rules.  462 U.S. at 354; *see also Hunter v. American Gen. Life and Acc. Ins. Co.*, 384 F. Supp. 2d 888, 892 (D.S.C. 2005) (class action tolling rules "should not be interpreted so generously as to invite abuse").  Accepting Plaintiffs' argument would allow a class action to be commenced by filing a putative class action on behalf of a plaintiff whose claim was no longer viable – through statute of limitations or otherwise – and then conducting a search for a replacement named plaintiff whose claims were viable.  The effect of such a rule would make for bad public policy, because it means that the statute of limitations could be tolled for months or years beyond the putative limitations period even though no viable claim could be asserted against the class action defendant.  *Cf. Hunsaker v. Hurwitz*, No. 99-15883, 14 Fed. Appx. 826, 830 (9th Cir. 2001) (a "plaintiff cannot rely on the doctrine of *American Pipe* to piggyback one class action onto another in order to correct a procedural deficiency in an earlier would-be class.") (citations omitted).  Here, Plaintiffs waited a full year after filing before seeking to add new plaintiffs, and one of their admitted purposes for doing so was to fix the statute of limitations deficiency of the Bettinellis' claims.  (Doc. No. 25, ¶ 8(b)).  Thus, under Plaintiffs' argument, the statute of limitations was effectively extended by one year even though no viable claim had been asserted.  Such a rule would hardly serve the purposes for which class action tolling is permitted, and therefore Plaintiffs' argument for tolling should not be accepted here.

## **CONCLUSION**

For the foregoing reasons, and those stated in its Memorandum In Support Of Its Motion To Dismiss The Second Amended Class Action Complaint, Defendant Wachovia Home Mortgage, FSB respectfully requests that this Court dismiss Plaintiffs' Second Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice.

Respectfully submitted,


/s/  Michael S. D'Orsi
Peter E. Gelhaar (BBO# 188310)
Michael S. D'Orsi (BBO# 566960)
Jocelyn L. Dyer (BBO #660240)
DONNELLY CONROY & GELHAAR LLP
One Beacon Street, 33rd Floor
Boston, MA  02108
Telephone: (617) 720-2880
Facsimile: (617) 720-3554
msd@dcglaw.com

Mark B. Blocker (pro hac vice)
Robert N. Hochman (pro hac vice)
Michael C. Andolina (pro hac vice)
Ariella L. Omholt (pro hac vice)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Defendant Wachovia Mortgage, FSB*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this **REPLY IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on October 6, 2010.

/s/ Michael S. D'Orsi
Michael S. D'Orsi